IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| WAGGONER CATTLE, LLC, | § | Case No. 18-20126-11 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| LONE STAR STATE BANK OF WEST TEXAS, | § § § | |
| Plaintiff, | § § | |
| v. | § § | |
| MICHAEL QUINT WAGGONER, Individually and d/b/a WAGGONER CATTLE, LLC; WAGGONER CATTLE, LLC; CLIFF HANGER CATTLE, LLC; BUGTUSSLE CATTLE, LLC; and CIRCLE W OF DIMMITT, INC., | § § § § § § | Adversary Proceeding No._____ |
| Involuntary Plaintiffs, | § § | |
| v. | § § | |
| RITA F. MOSELEY, KEVIN DALE MOSELEY, and RICKY RYAN RIDDLE, Individually and all d/b/a MOSELEY & RIDDLE; RITA F. MOSELEY, P.C.; KEVIN DALE MOSELEY, P.C.; and RICKY RYAN RIDDLE, P.C., | § § § § § § § § | |
| Defendants. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE COURT:

COMES NOW Plaintiff, LONE STAR STATE BANK OF WEST TEXAS ("Lone Star"), joining MICHAEL QUINT WAGGONER, Individually and d/b/a WAGGONER CATTLE, LLC, WAGGONER CATTLE, LLC, CLIFF HANGER CATTLE, LLC, BUGTUSSLE CATTLE, LLC, and CIRCLE W OF DIMMITT, INC. (collectively "Involuntary Plaintiffs" or also referred to as "Waggoner entities"), and further complaining of Defendants, RITA F. MOSELEY, KEVIN DALE MOSELEY and RICKY RYAN

RIDDLE, Individually and all d/b/a MOSELEY & RIDDLE, RITA F. MOSELEY, P.C., KEVIN DALE MOSELEY, P.C., and RICKY RYAN RIDDLE, P.C. (hereinafter collectively referred to as "MR Defendants"). Lone Star shows the following:

**RULE 7001**

1. This is a proceeding to recover money, pursuant to Bankruptcy Rule 7001(1).

**I. PARTIES**

2. Plaintiff, LONE STAR STATE BANK OF WEST TEXAS ("Lone Star") is a Texas state banking corporation with its principal office located at 6220 Milwaukee Avenue, Lubbock, Lubbock County, Texas 79424.

3. Debtor/Defendant, MICHAEL QUINT WAGGONER, is an individual residing in Castro County, Texas, and who may be served at 1400 Co. Rd. 630, Dimmitt, Castro County, Texas 79027.

4. Debtor/Defendant, WAGGONER CATTLE, LLC is a Texas limited liability company, whose President is Michael Quint Waggoner, and which may be served through its agent for service of process, Johnny Kent Merritt, 3913 Bell Street, Suite C, Amarillo, Randall County, Texas 79109.

5. Debtor/Defendant, CLIFF HANGER CATTLE, LLC is a Texas limited liability company, whose President is Michael Quint Waggoner, and which may be served through its agent for service of process, Johnny K. Merritt, 3913 Bell Street, Suite C, Amarillo, Randall County, Texas 79109.

6. Debtor/Defendant, BUGTUSSLE CATTLE, LLC is a Texas limited liability company, whose Governing Persons are Michael Quint Waggoner and Waggoner Trust, under Trust dated August 13, 2010, and which may be served through its agent for service of process, "Merritt K. Johnny" (i.e., Johnny K. Merritt), 3913 Bell Street, Suite C, Amarillo, Randall County, Texas 79109.

7. Debtor/Defendant, CIRCLE W OF DIMMITT, INC., is a Texas domestic for-profit corporation, whose President is Michael Q. Waggoner, and which may be served through its agent for service of process, Johnny K. Merritt, 3913 Bell Street, Suite C, Amarillo, Randall County, Texas.

8. Defendant, RITA F. MOSELEY, Individually and d/b/a MOSELEY & RIDDLE, is an individual residing in Hale County, Texas, and an accountant licensed to practice public accounting

in the State of Texas, who may be served with process at her business address of 621 West 7th Street, Plainview, Hale County, Texas, or at her residence address of 4209 W. 3rd Street, Plainview, Hale County, Texas.

9. Defendant, KEVIN DALE MOSELEY, Individually and d/b/a MOSELEY & RIDDLE, is an individual residing in Lubbock County, Texas, and an accountant licensed to practice public accounting in the State of Texas, who may be served with process at 2406 20th Street, Lubbock, Lubbock County, Texas.

10. Defendant, RICKY RYAN RIDDLE, Individually and d/b/a MOSELEY & RIDDLE, is an individual residing in Hale County, Texas, and an accountant licensed to practice public accounting in the State of Texas, who may be served with process at his business address of 621 West 7th Street, Plainview, Hale County, Texas, or at his home address of 608 S. Holliday Street, Plainview, Hale County, Texas.

11. Defendant, MOSELEY & RIDDLE, is a Texas general partnership providing professional accounting services to the public, through accountants licensed to practice accounting in the State of Texas. On information and belief, this Defendant may be served with citation by service upon one of its partners, Rita F. Moseley, Kevin Dale Moseley, or Ricky Ryan Riddle, at its principle place of business, 621 West 7th Street, Plainview, Hale County, Texas.

12. Defendant, RITA F. MOSELEY, P.C. is a Texas professional corporation providing professional accounting services to the public, through accountants licensed to practice accounting in the State of Texas. This Defendant may be served with citation by service upon its President, Rita F. Moseley, at its principal office, 621 West 7th Street, Plainview, Hale County, Texas.

13. Defendant, KEVIN DALE MOSELEY, P.C. is a Texas professional corporation providing professional accounting services to the public, through accountants licensed to practice accounting in the State of Texas. This Defendant may be served with citation by service upon its President, Kevin Moseley, at 2405 20th Street, Lubbock, Lubbock County, Texas.

14. Defendant, RICKY RYAN RIDDLE, P.C., is a Texas professional corporation providing professional accounting services to the public, through accountants licensed to practice accounting in the State of Texas. This Defendant may be served with citation by service upon its President, Ricky Riddle, at its principal office, 621 West 7th Street, Plainview, Hale County, Texas.

## II. VENUE

15. Venue is proper in the Amarillo Division of the Northern District of Texas because all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Lubbock, Hale and Castro Counties. Further, venue is also proper in the Northern District of Texas because all Involuntary Plaintiffs and Defendants reside, office and have their principal places of business in the the Northern District of Texas. Further, all Involuntary Plaintiffs have filed bankruptcy petitions in the Bankruptcy Court for the Amarillo Division of the Northern District of Texas.

## III. FACTUAL BACKGROUND

16. Lone Star has a banking relationship with the Involuntary Plaintiffs: Waggoner Cattle, LLC, Cliff Hanger Cattle, LLC, Bugtussle Cattle, LLC, and Circle W of Dimmitt, Inc. These related entities conduct cattle operations primarily in Castro County, Texas. Waggoner Cattle operates a "calf ranch", where baby calves are fed to approximately 250-350 pounds, then the calves are sold or "transferred" to Cliff Hanger Cattle. Cliff Hanger Cattle's operations have included the feeding and caring of these calves in certain feedyards. The calves are fed at the feedyards for up to one year, then sold at market. Bugtussle's operations include ownership of equipment, and real estate constituting the physical facilities for the operation of Circle W of Dimmitt. Bugtussle's real estate and equipment are located largely in Castro County, Texas. Circle W of Dimmitt provides labor and employee services to the Waggoner Cattle calf ranch, including feeding and care of the calves.

17. Beginning in approximately July 2011, Lone Star began lending money to Waggoner Cattle to finance its cattle operations. Lone Star and Waggoner Cattle entered into loan documents, promissory notes, security agreements, and financial agreements. Under these agreements, Lone Star obtained a perfected first lien security interest in the cattle, receivables, and accounts of

Waggoner Cattle. In approximately 2012, as a condition for continuing the loans, Lone Star required Quint Waggoner to hire auditors to audit the financial statements and businesses of Waggoner Cattle Co., Cliff Hanger, Circle W, and Bugtussle. Quint Waggoner hired the MR Defendants to conduct the audits required by Lone Star.

18. The majority of the Lone Star loaned funds was through an operating line of credit. The line of credit initially began at $5,000,000 in July 2011 and increased to $11,500,000 by June 2015.

19. Beginning in approximately 2014, Waggoner Cattle began to "sell" or transfer calves from the calf ranch to Cliff Hanger Cattle. Cliff Hanger Cattle then placed those cattle into the Dean Cluck, Bar-G, Great Plains and Barrett & Crofoot feedyards.

20. Subsequently, the banking relationship between Lone Star and Waggoner Cattle was extended to Cliff Hanger Cattle, Bugtussle Cattle, and Circle W of Dimmitt. An Amended and Restated Credit Agreement was executed between Lone Star and all the Waggoner entities. Lone Star continued to have a perfected security interest in cattle and collateral.

21. Cliff Hanger's operations continued to grow rapidly due to the shipments it received from Waggoner Cattle. Cliff Hanger required additional loans that could not be accommodated by Lone Star. Beginning in October 2014, additional monies were lent to Cliff Hanger by Rabo Agrifinance, Inc. ("Rabo"). A credit agreement was executed between Cliff Hanger and Rabo.

22. Lone Star continued to have a prior lien and security interest in cattle and collateral of Waggoner Cattle and Cliff Hanger. Rabo obtained a security interest in the calves transferred to Cliff Hanger from the Waggoner Cattle calf ranch, but Rabo's security interest was subordinate to Lone Star's interest until Waggoner Cattle and Lone Star were paid in full for such cattle. An Intercreditor Agreement was executed on November 26, 2014 between Lone Star and Rabo, where Rabo did not obtain a lien or security interest in cattle transferred from the Waggoner Cattle to Cliff Hanger Cattle unless Waggoner Cattle and Lone Star were paid in full for the Waggoner Cattle calves.

23. The funds which Rabo loaned to Cliff Hanger were through an operating line of credit that began at $35,000,000. This amount eventually increased to $42,000,000 by June 2016.

24. Beginning in 2012, the MR Defendants audited the combined financial statements of Waggoner Cattle, Bugtussle Cattle, and Circle W of Dimmitt. The first auditors' report was issued on September 5, 2012, for the period ending June 30, 2012.

25. Beginning in 2014, the combined financial statements included Waggoner Cattle, Bugtussle Cattle, Circle W of Dimmitt, and Cliff Hanger, which were audited by the MR Defendants. The first auditors' report that included Cliff Hanger was issued on October 15, 2014, the period ending June 30, 2014.

26. Michael Quint Waggoner has two sons, Tucker and Tyler. Quint Waggoner says that he desired to get his sons interested in the financial aspect of the family cattle business, so Quint says that he created an arrangement were Tucker and Tyler would receive a percentage of the profits on certain lots of cattle transferred by Waggoner Cattle to Cliff Hanger, and subsequently paid for by Cliff Hanger, after the calves were fed and sold.

27. At a point in time, as Waggoner Cattle's cattle were transferred to Cliff Hanger, which was financed by Rabo Agrifinance, the accounting records of the Waggoner Entities showed that a percentage of certain lots of these cattle transferred from Waggoner Cattle to Cliff Hanger were owned by Tucker Waggoner and Tyler Waggoner. There then appeared a corresponding receivable of Waggoner Cattle from Tucker and Tyler Waggoner. Lone Star made inquiry of Waggoner Cattle regarding the validity and collectability of the booked receivables from Tucker Waggoner and Tyler Waggoner, and was assured there were cattle in the feedyards to back up the Tucker and Tyler receivables, and Lone Star was further assured that, upon the ultimate sale of these cattle in which Tucker Waggoner and Tyler Waggoner owned a percentage, Waggoner Cattle would be repaid, and such repayment could then be applied to the Lone Star loans to Waggoner Cattle.

28. After the sudden and unexplained November 2016 removal of the Tucker and Tyler receivables from the borrowing base, and after the claim by Quint Waggoner that Tucker Waggoner and Tyler Waggoner never held an ownership interest in these lots, but only a profits interest, many millions of dollars of borrowing base collateral was deleted from the Lone Star borrowing base. Quint

Waggoner says that accounting irregularities caused the Tucker and Tyler receivables to be recorded in the Waggoner Cattle accounting, and that Defendants should have noted this accounting irregularity and reported it to him.

29.     MR Defendants neglected to check and audit, or failed to observe, the irregularity in the Tucker and Tyler receivable issue, and failed to determine how the ownership of Tucker and Tyler was created or carried. MR Defendants further failed to note that no independent separate receivable from Tucker and Tyler ever existed, but such receivables were, apparently, only a partial duplication of the payable which Cliff Hanger owed to Waggoner Cattle.

30.     Based on information and belief and Lone Star's investigation to date, Tucker and Tyler never paid anything for their interest in the cattle or in the "profits interest" in those cattle. Curiously, some of the feedyard statements from the feedyards where the Cliff Hanger cattle were being fed also reflected that Tucker and Tyler had an equity ownership interest in the cattle, not just an interest in any profits. This ownership interest was reported as a receivable in the Waggoner Cattle accounting records, and in the resulting borrowing base reports submitted to Lone Star. This receivable eventually increased to approximately $6-7 million, which resulted in an inflated borrowing base for the Lone Star line of credit. Recording these cattle as having been sold to Tucker and Tyler, incorrectly inflated the reported net income to Waggoner Cattle.  The MR Defendants failed to note and report this irregularity in their audits.

31.     Beginning in June 2015, the Waggoner Cattle records showed additional irregularities. For example, there was insufficient detail relating to the cattle being paid for by Cliff Hanger Cattle to Waggoner Cattle. Prior to June 2015, the Cliff Hanger payments would correlate to the calf transfers made by Waggoner Cattle and could be traced by the number of calves shipped, the value of shipments, and lot numbers. By June 2015 and thereafter, the payment detail was absent. The monies paid to Waggoner Cattle by Cliff Hanger were all in round numbers (highly unlikely, considering varying cattle weights and market prices), and these payments were not tied to any particular cattle lot numbers. Further, approximately $7.5 million of these payments made by Cliff Hanger Cattle to

Waggoner Cattle were booked as loans, not payments, resulting in the creation of a $7.5 million receivable of Cliff Hanger from Waggoner Cattle.

32. Booking the $7.5 million as loans has a two-fold effect. First this was recognized as a receivable for Cliff Hanger and increased the Rabo borrowing base for the Cliff Hanger operating line of credit. Second, this failed to properly reduce Waggoner Cattle's inventory, and therefore increased the inventory value on Lone Star borrowing base for the Waggoner Cattle Co. operating line of credit. The MR Defendants failed to note and report this irregularity.

33. At a point in time, Quint Waggoner determined that the dairy calves he was feeding in feedyards of Dean Cluck Feeders, Bar G Feeders, Barrett & Crofoot, and Great Western were not being properly fed for such a long-term feeding period. This long-term feeding period, combined with the high carbohydrate diet (such as would be typical for beef cattle while on feed), was creating carcass quality problems for the Holstein dairy cattle upon slaughter. Accordingly, Quint Waggoner determined it would be in his best interest to own a feedyard, so he could control the feeding to properly suit the particular needs of the dairy cattle which Cliff Hanger was feeding. Quint Waggoner entered into an agreement with the owner of Great Plains Feedyard to purchase the feedyard. Rabo Agrifinance agreed to finance the purchase, and progress into financing all fo the Waggoner Cattle's and Cliff Hanger's cattle.

34. As part of the purchase of the feedyard, upon contracting to purchase this feedyard, Quint Waggoner posted a $500,000 escrow deposit. Additionally, because Quint Waggoner was promised upon closing to receive the accrued feed mark-up for his cattle while in this feedyard, Quint Waggoner proceeded to buy a large quantity of cattle to place in this feedyard. Quint Waggoner bought these cattle at a time where it appeared those particular cattle would have a loss at the end of their feeding cycle. These cattle were purchased by Quint Waggoner to place in that feedyard, in reliance upon the assurances by Rabo Agrifinance they would finance the purchase, because the promised feed mark-up would more than make up for the anticipated market loss in the cattle then being purchased by Quint Waggoner.

35. In November of 2016, Rabo Agrifinance unexpectedly changed their plan and refused to finance Quint Waggoner's purchase of the feedyard, which in turn caused Quint Waggoner to lose both his $500,000 escrow deposit, as well as his promised feed mark up in the cattle which had accrued between the time of contract and the time Rabo Agrifinance revoked its agreement to finance the purchase. Additionally, this caused Quint Waggoner and the Waggoner Entities to "lock in" the loss on the cattle, and eventually recognize the market loss in the cattle which Quint Waggoner purchased and placed on feed in reliance on Rabo's promise to finance the feedyard purchase. Additionally, Rabo's decision to stop financing Cliff Hanger's cattle purchases stopped Waggoner Cattle's sales of cattle to Cliff Hanger, which impaired Waggoner Cattle's marketing of it cattle.

36. Beginning no later than 2016, the combined financial records for the Waggoner Entities revealed that their business operations were financially distressed, with many accounting irregularities and inconsistencies. For example, the November 21, 2016 audit report for the period as of June 30, 2016, reflected that accounts receivable and other receivables dropped dramatically. In 2015, the receivables were reported as $5.32 million. In 2016, the receivables dropped to $897,307. This is a material item that should have been addressed by the MR Defendants, yet there was no explanation for the large decrease in receivables in the auditors' report. Significantly, the November 21, 2016 audit report was issued as an unqualified opinion by the MR Defendants.

37. Moreover, the November 21, 2016 audit report reflected for the first time that the Lone Star borrowing base had severely deteriorated. For example, the value of the Waggoner Entities' collateral decreased by one-half, with no explanation for the factors attributing to this decrease. In spite of the vastly decreased borrowing base, the audit report was issued as an unqualified opinion by the MR Defendants.

38. About the time that Rabo Agrifinance revoked its prior agreement to finance the purchase of the feedyard, the borrowing base received by Lone Star reflected the deletion of the Tucker and Tyler receivable of $6 to $7 million. There was a large and unexplained reduction in borrowing base of Waggoner Cattle, Circle W and Bugtussle with Lone Star.

39. Further, the MR Defendants report for the first time in the audit report ending June 30, 2016 that the Rabo borrowing base covenant for Tangible Net Worth and Debt to Total Assets Ratio had been violated. Based on information and belief, the Waggoner Cattle receivable for the Tucker and Tyler Waggoner "profits interest" had been inexplicably written off the Waggoner Cattle books. Significantly, the MR Defendants report no subsequent events through November 21, 2016 that would have been recognized relating to the financial statements, but there were clear signs that the deteriorating financial condition of the Waggoner Entities should have been investigated further through additional audit testing for inventory, sales, receivables, and other relevant items.

40. In the fall of 2016, the value of Lone Star's collateral was written down by millions of dollars. The audits of the MR Defendants did not address or explain this deterioration. The first going concern reported by the MR Defendants was in September of 2016, but the deterioration in Lone Star's borrowing base was not addressed.

## IV.  APPLICABLE STANDARDS

41. The MR Defendants undertook to conduct, and issued, unqualified audits of the Waggoner Entities for the purpose of assuring Lone Star of the validity and reliability of the Waggoner Entities' financial statements. The stated purpose of such audits and compilations was to assure Lone Star that valid, accurate and reliable reports and compilations of the financial condition of the audited entities were being made available to, and could be relied upon by Lone Star. In undertaking these audits, the MR Defendants owed Lone Star the duty to independently conduct, prepare, and report the audits, compilations and its other accounting services with the exercise of the degree of care, skill, diligence required of a reasonably prudent accountant and auditor. As part of this obligation, the MR Defendants owed Lone Star a duty to fully and adequately review, investigate, and test the data, records, and transactions of the audited entities. The MR Defendants breached these duties, and such negligence proximately caused damages to Lone Star in an amount well in excess of the minimum jurisdictional limits of this Court.

42. The MR Defendants engaged to conduct audits and compilations for the Waggoner Entities from 2012 to 2016 under Generally Accepted Auditing Standards ("GAAS"). This constitutes a representation, among others, that the work performed by the MR Defendants would adhere to these professional standards.

43. A distinguishing mark of the auditing profession is its responsibility to the public. The accounting and auditing profession's "public watchdog function" extends not only to clients, but also to investors, creditors, governmental agencies, and the business and financial community who rely upon the objectivity and integrity of certified public accountants and auditors to maintain the orderly function of commerce through financial audit reports. The American Institute of Certified Public Accountants ("AICPA") has recognized the certified public accountant's responsibility to the public in promulgating its Ethical Standards for Certified Public Accountants.

44. By certifying the audit reports that are supposed to collectively depict the entities' financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the audited entities' creditors, particularly Lone Star, in providing audited financial information. This public watchdog function requires that the accountant maintain total independence from the client at all times. The auditor's role is as a disinterested analyst charged with public obligations. In conducting their audits and compilations, the MR Defendants failed to maintain independence and conducted the audits without adequate investigation, testing and validation of the entities' financial information. Such conduct was negligence which proximately caused damages to Lone Star in excess of the minimum jurisdictional limits of this Court.

45. GAAS are the minimum professional standards that the MR Defendants were required to follow in order to comply with their professional responsibilities in conducting the audits. An audit conducted in accordance with GAAS means that the auditor has complied with certain minimum standards as adopted and approved by the membership of the AICPA, including the promulgated

interpretations of those standards. The AICPA standards, however, do not set the controlling standard of care by which the auditor's conduct is measured.

46. As promulgated by the AICPA, GAAS requires, among other things, that:

(I) the auditors conduct an audit with adequately trained and proficient auditors;

(ii) the auditors maintain independence in mental attitude in performing the audit and preparing the report;

(iii) the auditors exercise due professional care in the performing their duties; and

(iv) the auditors adequately plan and supervise the audit, properly obtain an understanding of the client's internal controls, and obtain sufficient competent evidential matter to afford a reasonable basis for the expressing an opinion.

47. GAAS also includes standards of reporting which require the auditors to state whether the financial statements are presented in accordance with generally accepted accounting principles, identify where those principles have not been accurately or consistently observed, and state if the informative disclosures in the financial statements are not reasonably adequate.

48. Significantly, GAAS requires an auditor: "[T]o plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." Accordingly, GAAS does not differentiate between financial statement misstatements caused by fraud and misstatements cause by error. It is now apparent that the financial statements of the audited Waggoner Entities contained numerous material misstatements.

49. The MR Defendants were required to exercise due care, diligence and prudence, and comply with all applicable professional standards in performing their duties, including without limitation, examining the accounting records, financial statements, and tax returns for the Waggoner Entities from 2012 through 2016.

50. The MR Defendants were also required to promptly and accurately advise Lone Star (and if necessary, regulatory agencies), if as a result of performing their 2012 through 2016 audits, the MR Defendants determined that the Waggoner Entities' financial statements did not fairly present

the financial position of the Waggoner Entities, and of any matter that threatened the financial integrity of the Waggoner Entities.

51. As noted in the above examples, the MR Defendants breached a number of these standards in performing the audits.

## V. CAUSES OF ACTIONS

**Negligence and Negligent Misrepresentation**

52. Lone Star re-alleges paragraphs 1-51.

53. In addition to the negligent acts committed by the MR Defendants noted above in the "Applicable Standards" section, the MR Defendants also made numerous negligent misrepresentations in the course of their business of preparing, completing and publishing audits and compilations for Lone Star. The last audit for the Waggoner Entities was for the period ending September 30, 2016. The audit letter that accompanied this audit was dated December 21, 2016. No going concern was stated for Lone Star's borrowing base. The audited reports and letters, and the financial statements themselves were presented to Lone Star.

54. The negligent misrepresentations supplied false information for the guidance of Lone Star in connection with its decisions to loan or otherwise provide funds to the Waggoner Entities, and was intended for Lone Star's use in the course of its banking affairs.

55. In making the negligent misrepresentations, the MR Defendants did not exercise reasonable care or competence in obtaining, preparing, or communicating the audits and compilation information.

56. The MR Defendants failed to comply with generally accepted audit principles and accounting standards in preparing, completing, and publishing the audits, audit letters and compilations.

57. Lone Star justifiably relied, to its detriment, on the audit reports, compilations, letters and financial statements prepared and published by the MR Defendants which contained the negligent misrepresentations.

LONE STAR'S ORIGINAL COMPLAINT                                                                                                    Page 13
L:\Paula\DATA\Lone Star State Bank-Rabo (re Waggoner).7189\Adversary Proceeding\Pleadings\Original Complaint.04-10-18.wpd

58. As a proximate result of the negligence and negligent misrepresentations by the MR Defendants, Lone Star was damaged by the loss of the funds loaned to the Waggoner Entities in amounts that are well in excess of the minimum jurisdictional limits of this Court, for which Lone Star seeks recovery.

59. As a proximate result of the negligence and negligent misrepresentations by the MR Defendants, the Involuntary Plaintiffs were damaged by being alerted to the accounting irregularities, and not being alerted to the accruing business losses they were incurring. By not being so alerted, the Involuntary Plaintiffs missed the opportunity to change their business decisions so as to minimize their losses.

## VI. DAMAGES

60. As a direct and proximate result of the conduct describe above, Lone Star has been damaged in an amount in excess of the minimum jurisdictional limits of the Court, for which it seeks recovery.

61. As a direct and proximate result of the conduct describe above, the Involuntary Plaintiffs have been damaged in an amount in excess of the minimum jurisdictional limits of the Court, for which they seek recovery.

62. Lone Star has written off approximately $7-10 million of these loans, resulting in damages due to the MR Defendant's negligent conduct described above.

## VII. PRESERVING ELECTRONIC EVIDENCE

63. Demand is made to all MR Defendants and all Involuntary Plaintiffs to preserve all electronic information in each party's possession and control relating to the alleged claims. Electronic information includes, but is not limited to:

- all emails sent, received, and/or forwarded;
- all text messages sent, received and/or forwarded;
- all electronic documents, including text files and spreadsheets;
- all voice mail recordings;
- all computer hard drives;

LONE STAR'S ORIGINAL COMPLAINT
L:\Paula\DATA\Lone Star State Bank-Rabo (re Waggoner).7189\Adversary Proceeding\Pleadings\Original Complaint.04-10-18.wpd

Page 14

- all data from laptop computers, tablets, and cell phones;
- all accounting records, time/billing records, and work papers relating to the audits which are the subject of this suit;
- all memos, reports, work papers and opinions regarding the transactions which are the subject of this suit;
- all correspondence, contracts, agreements, arrangements, payments, memos, emails, and all other documents or communications relating to the MR Defendants scope of engagement in preparing audits, which are the subject of this suit;
- all QuickBooks accounting;
- all Turnkey accounting;
- all Excel accounting;
- all scale tickets; and
- all bills of lading.

62. Lone Star will vigorously pursue any remedies for spoliation or destruction of evidence. Such remedies may include an adverse inference instruction given at trial or the striking of your pleadings.

## VIII.  PRAYER

For these reasons, Lone Star State Bank of West Texas prays that the MR Defendants be cited to appear, and that Lone Star have judgment for:

(1) actual damages;

(2) costs of suit;

(3) prejudgment interest, at the maximum rate of interest permitted by law;

(4) post-judgment interest, at the legal rate; and

(5) such other relief to which Lone Star may be entitled.

DATED this 10th day of April, 2018.

                Respectfully submitted,

LOVELL LOVELL ISERN & FARABOUGH, LLP
John H. Lovell, State Bar No. 12609300
john@lovell-law.net
Joe L. Lovell, State Bar No. 12609100
joe@lovell-law.net
Deborah D. Reeves, State Bar No. 24006668
deborah@lovell-law.net
Matthew S. Merriott, State Bar No. 24100846
matthew@lovell-law.net
112 Southwest 8th Avenue, Suite 1000
Amarillo, Texas 79101-2314
Phone: (806) 373-1515
Fax:    (806) 379-7176

By:      /s/ *John H. Lovell*
    John H. Lovell

*Attorneys for Plaintiff, Lone Star State Bank*

**Certificate of Service**

The undersigned hereby certifies that on this 10th day of April, 2018, a true and correct copy of the foregoing *Plaintiff's Original Complaint* was served on counsel of record, via ecf filing service, as follows:

Mr. Max R. Tarbox *Via ecf service: max@tarboxlaw.com*
TARBOX LAW, P.C.
2301 Broadway
Lubbock, TX 79401
    *Attorney for Involuntary Plaintiffs,*
    *Waggoner Cattle, LLC, Cliff Hanger*
    *Cattle, LLC, Circle W of Dimmitt, Inc.,*
    *and Bugtussle Cattle, LLC*

R. Byrn Bass, Jr. *Via ecf service: bbass@bbasslaw.com*
4716 4th Street, Suite 100
Compass Bank Building
Lubbock, TX 79416-4953
    *Attorney for Involuntary Plaintiff,*
    *Michael Quint Waggoner*

Mr. Steven L. Hoard *Via ecf service: shoard@mhba.com*
MULLIN HOARD & BROWN, LLP
P.O. Box 31656
Amarillo, TX 79105-1656
    *Attorneys for Lone Star State Bank of West Texas*

Mr. Brad Odell *Via ecf service: bodell@mhba.com*
MULLIN HOARD & BROWN, LLP
P.O. Box 2585
Lubbock, TX 79401-3111
    *Attorneys for Lone Star State Bank of West Texas*

                                                                   /s/ *John H. Lovell*
                                                                   John H. Lovell