IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

In Re:                          )   **Case No. 18-20126-rlj-11**
                                )   Chapter 11
WAGGONER CATTLE, LLC,           )
et al.,                         )   Lubbock, Texas
                                )   February 25, 2019
          Debtors.             )   10:00 a.m.
                                )
                                )   MOTION FOR RELIEF FROM STAY
                                )   FILED BY LONE STAR BANK OF
                                )   WEST TEXAS (#204)
_____ )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT L. JONES,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtors:            Max Ralph Tarbox
                            TARBOX LAW, P.C.
                            2301 Broadway
                            Lubbock, TX  79401
                            (806) 686-4448

For Lone Star State Bank    Brad W. Odell
of West Texas:              MULLIN HOARD & BROWN, LLP
                            P.O. Box 2585
                            Lubbock, TX  79408
                            (806) 765-7491

For Lone Star State Bank    John H. Lovell
of West Texas:              LOVELL, LOVELL, ISERN & FARABOUGH,
                               LLP
                            112 S.W. 8th Avenue, Suite 1000
                            Amarillo, TX  79101-2314
                            (806) 373-1515

For Rabo Agrifinance:       W. Heath Hendricks
                            RINEY & MAYFIELD, LLP
                            320 S. Polk Street, Suite 600
                            Amarillo, TX  79101
                            (806) 468-3204

1    Recorded by:                Sheree Longoria
                                 UNITED STATES BANKRUPTCY COURT
2                                306 Federal Building
                                 1205 Lubbock Avenue
3                                Lubbock, TX  79401-4002
                                 (806) 472-5015
4
     Transcribed by:            Kathy Rehling
5                               311 Paradise Cove
                                Shady Shores, TX  76208
6                               (972) 786-3063

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
                 Proceedings recorded by digital sound recording;
25                transcript produced by transcription service.

1          LUBBOCK, TEXAS - FEBRUARY 25, 2019 - 10:17 A.M.

2          THE CLERK:  All rise.  United States Bankruptcy

3  Court for the Northern District of Texas is now in session,

4  The Honorable Robert L. Jones presiding.

5          THE COURT:  You may be seated.  Okay.  I apologize.

6  We were waiting for somebody to call in, and they still

7  haven't called in.  So we just decided to proceed.  The Court

8  calls the Waggoner Cattle, LLC case, Case No. 18-20126, on the

9  consolidated cases involving Waggoner Cattle, Cliff Hanger,

10 Circle W of Dimmitt, and Bugtussle -- I believe those are the

11 ones involved here -- on the motion for relief from stay filed

12 by Lone Star Bank of West Texas.  We have a response opposed

13 filed by the Debtor and limited objections filed by PNC

14 Equipment Finance and Rabo Agrifinance.

15     Let me get your appearances.

16          MR. ODELL:  Your Honor, Brad Odell on behalf of Lone

17 Star State Bank of West Texas.  And with me in the courtroom

18 is Mr. John Lovell.

19          THE COURT:  Okay.

20          MR. TARBOX:  Your Honor, Max Tarbox, attorney for

21 the Waggoner entities, and they're the Debtors in this case.

22          THE COURT:  Okay.  I assume you all are -- oh, I'm

23 sorry.

24          MR. HENDRICKS:  Heath Hendricks for Rabo

25 Agrifinance.

1           THE COURT:  Okay.  Mr. Hendricks.  All right.  Ready

2    to proceed?

3           MR. ODELL:  Yes, Your Honor.  Just as a couple of

4    matters, sort of housekeeping purposes, first is that the Lone

5    Star State Bank of West Texas has resolved their limited

6    objection with PNC Equipment.  And we've agreed that we are

7    not seeking to -- any type of stay relief as to any equipment

8    in which they are the lessor.  And I believe Mr. Arisco, who

9    filed the objection, has or will be in the process of

10   submitting an agreed order to that effect.  So there won't be

11   any issue with PNC Equipment.

12        Other than that, those are the only agreements that have

13   been reached as to any of the objections that have been filed.

14        And Your Honor, I believe we do have a couple agreements

15   as far as presentation of evidence.  It's my understanding

16   that -- and I apologize to him because I'm going to

17   mispronounce his last name -- but Mr. Schilderink has to

18   attend something this afternoon in San Angelo, and so I've

19   agreed with Mr. Tarbox, Debtors' counsel, that he can present

20   him as the first witness.  And so we'll proceed in that manner

21   and method, Your Honor.

22        But if I may, Your Honor, begin with a brief opening.

23           THE COURT:  Very well.

24      OPENING STATEMENT ON BEHALF OF LONE STAR STATE BANK

25           MR. ODELL:  Your Honor, again, Brad Odell on behalf

1    of Lone Star State Bank of West Texas.  We -- Lone Star State

2    Bank of West Texas was one of the large -- larger prepetition

3    lenders of the Debtors.  They held a claim in the approximate

4    amount of about $13 million at the time of the filing.  And

5    due to the sale of cattle that served as part of their

6    collateral, during the bankruptcy case that claim is

7    approximately $11.8 million at this time.

8      Lone Star State Bank acquired liens against the Debtors'

9    assets, including the prepetition cattle that existed at the

10    time of the filing, accounts receivable, equipment, farm

11    machinery, the Debtors' feed and medicine inventories used in

12    the business to care for the cattle, as well as accounts

13    receivable.  We also held liens against about 447 acres of

14    real property on which the Debtors operate what is -- I will

15    refer to as the calf ranch.

16      At the time of the Debtors' filing, the Debtors were in

17    default.  During these bankruptcy cases, we have been able to

18    enter into a cash collateral order regarding the use of Lone

19    Star State Bank's cash collateral, and in particular, the

20    treatment of the prepetition cattle and the use of any of

21    those proceeds and the application of those proceeds, as well

22    as the care of those cattle during the bankruptcy case.

23      The Debtors have also entered into a debtor-in-possession

24    loan in which they, as I understand it, are currently

25    acquiring new cattle or postpetition cattle.

1          The Debtors assets that secure Lone Star State Bank's

2     claim, the value of them are insufficient to fully secure Lone

3     Star State Bank, and therefore the Debtors do not hold any

4     equity in that collateral.

5          We would argue, Your Honor, that cause also exists in the

6     form of the Debtors' operations during this bankruptcy case,

7     as well as insurance coverage for Lone Star State Bank on the

8     collateral that it holds, and it being insufficient.  We

9     believe, because there's no equity in the collateral, as well

10    as these issues of cause, that the stay under Section 362(d)

11    should be lifted, both under (d)(1) and (d)(2).  Currently, at

12    this time, Lone Star is not receiving any adequate protection

13    payments, and the Debtors have not offered any adequate

14    protection payments.

15         The Debtors have filed a plan, but it's the position of

16    Lone Star State Bank that they have admittedly stated that

17    that plan, as currently filed and on record with the Court, is

18    not feasible and would not be what they are moving forward

19    with.  However, at this time, the Debtors have not proposed

20    any amended plan or second plan.

21         Because Lone Star believes that the prospect of

22    reorganization in these cases is not likely and not reasonably

23    likely, we believe that the Court should lift the stay and

24    allow for Lone Star State Bank to move forward with its state

25    law remedies and foreclosing on the collateral that secures

1  its loans.

2      And for these reasons, Your Honor, we filed our motion

3  for relief from stay and are here today to present the

4  evidence necessary to show that the Court should lift the

5  automatic stay under Section 362 and allow for Lone Star to

6  move forward in recovering what it can to recover its claim.

7  Thank you, Your Honor.

8          THE COURT:  Let me you ask you just briefly before

9  you sit down.  The DIP loan that you referred to, in

10  conjunction that you were -- you were discussing the cash

11  collateral order that had been entered into between Lone Star

12  and, as I recall, at least two of the debtor entities.  On the

13  DIP loan, is that the DIP loan of S&R Cattle, as I --

14          MR. ODELL:  That's correct, Your Honor.

15          THE COURT:  Okay.

16          MR. ODELL:  That's my understanding is the only DIP

17  loan with the Debtors.

18          THE COURT:  Okay.  Thank you.

19          MR. ODELL:  Thank you, Your Honor.

20          MR. TARBOX:  Your Honor, Max Tarbox.  I hope my

21  opening remarks are brief as well.

22           OPENING STATEMENT ON BEHALF OF THE DEBTORS

23          MR. TARBOX:  We did discuss briefly in the

24  teleconference about the burdens of proof.  And as I

25  understand it, and I want to make sure the Court lets me know

1   if this isn't the Court's position as well, is that, number

2   one, is that the Movant would need to show a lack of equity.

3   And we are stipulating to that.  But we also believe that the

4   Movant has to put on a *prima facie* case that they have a lien

5   that they are asserting in this motion to lift stay.  And we

6   will be contesting at least their lien on the Debtors'

7   personal property, including equipment, feed, account

8   receivables, so forth.

9       It's my understanding that the burdens of the Debtors is

10  lack of cause, existence of adequate protection necessary to

11  protect the collateral, and the ability to do an effective

12  reorganization, or that the collateral is necessary to do an

13  effective reorganization.

14      Your Honor, let me just briefly tell you where we're

15  going with these items.  We believe there is no cause for the

16  stay to be lifted.  Number one, we do believe we can put

17  together a feasible plan.  When we had the continuance -- and

18  it was a mutual continuance, as I recall -- we basically told

19  the Court that we needed to have what values we were going to

20  use in a plan and also to address other issues that Mr. Odell

21  brought up, one of them being the absolute priority rule,

22  which we will address in just a second.

23      But the main reason we have waited to file an amended

24  plan is because we've been waiting for an opportunity to look

25  at the appraisal and also an opportunity to examine the

1   appraiser and have a -- in order to question his conclusions

2   that he made in his appraisal.

3       We were told that the appraiser would not be available

4   for depositions, and therefore we were told that if we had

5   issues with the -- discrepancies with the values of the

6   deposition, that we would be -- enter into a joint agreement,

7   a continuance.  It was subsequently ruled by the Court that we

8   could not have that continuance, but that was the reason that

9   we -- we cannot do a plan until we are satisfied with the

10  legitimacy of the appraisal, which we have yet been able to

11  examine the appraiser regarding his conclusions.

12      The other matters that would be corrected in a plan would

13  simply be items that we can insert very easily.  The biggest

14  issue would be absolute priority, and we do have a person here

15  today to testify that he's willing to inject money into the

16  business organization.

17      As far as loss of value of collateral, loss of value to

18  the collateral, we do not believe, and we'll have testimony to

19  support this, that we do not believe that the land will

20  diminish in value during the several weeks, or, excuse me,

21  several months that we will need to have the plan considered

22  for confirmation.  The only thing that could be subject to a

23  loss of value would be the personal property, and we are going

24  to argue today that they do not have a lien on the personal

25  property.

1      So, we have not -- Mr. Odell has stated that we have not

2    offered adequate protection.  We have not been asked for

3    adequate protections.  We've been through several proceedings

4    before this Court and discussed the issues regarding this case

5    numerous times, and the Bank has never asked for adequate

6    protection.  And, again, the only -- we believe the only

7    property they could ask for adequate protection would be on

8    the real property, and we do not believe that will be

9    diminishing.

10      So, you know, obviously, we feel like if the Debtor is

11    involved in a calf operation, that these pens and hutches and

12    so forth are absolutely necessary for the Debtor to effectuate

13    a reorganization.

14      That's all I have at this time, Your Honor.

15          THE COURT:  Okay.  Thank you.  All right.  So, were

16    we -- was the agreement to proceed with the testimony of -- is

17    it Mr. Schilderink?  Is that the name that I heard?

18          MR. TARBOX:  I can spell it, Your Honor.

19          MR. ODELL:  That's correct, Your Honor.

20          MR. TARBOX:  S-C-H-I-L-D -- Schild -- E-R-I-N-K.

21    Schilderink.

22          THE COURT:  Okay.  Is that -- that's your witness,

23    Mr. Tarbox?

24          MR. TARBOX:  Yes, it is.

25          THE COURT:  Okay.

1          MR. TARBOX:  I have a list of exhibits for the

2   Court.

3          THE COURT:  Very well.

4          MR. TARBOX:  At this time, I'd like to call Laurens

5   Schilderink to the stand.

6          THE COURT:  Okay.  Mr. Schilderink.  If you'll have

7   a seat up here, Mr. Schilderink.  It looks like you've got a

8   mountain of exhibit volumes there.

9          MR. TARBOX:  We only have one exhibit, Your Honor.

10          THE CLERK:  Mr. Schilderink, please raise your right

11   hand.

12          LAURENS SCHILDERINK, DEBTORS' WITNESS, SWORN

13                      DIRECT EXAMINATION

14   BY MR. TARBOX:

15   Q    State your name for the record, please.  State your name,

16   please.

17   A    Laurens Schilderink.

18   Q    And would you spell your last name for the benefit of the

19   --

20   A    S-C-H-I-L-D-E-R-I-N-K.

21   Q    Mr. Schilderink, where were you born?

22   A    I was born and raised in Holland, in The Netherlands.

23   Q    Okay.  And when did you come to the United States?

24   A    That's about 16 years ago.

25   Q    Okay.  And what business did you get into once you

Schilderink - Direct                              12

1   arrived in the United States?

2   A    It was mainly dairy business.

3   Q    Okay.  And is that what you've done since then?

4   A    Yes.

5   Q    Okay.  And how many dairy total do you have right now?

6   A    Well, the cows and calves and all, in total it's about

7   44,000.

8   Q    Okay.  Any other cattle or calves that you might have in

9   addition to the dairy cows?

10  A    Well, the dairy cows is about 16,000 and the -- so, in

11  total, with the calves and heifers, it's 44,000.

12  Q    44,000?

13  A    Yes.

14  Q    Would that make you one of the largest dairy farmers in

15  the United States?

16  A    Yeah.  That's -- it's not the largest, but one of them,

17  yes.

18  Q    Okay.  And have you acquired dairies before?

19  A    Yes, I have.

20  Q    Okay.  Have you been involved in any bankruptcies before?

21  A    I have -- I've been a DIP lender in a bankruptcy case.

22  Q    What case was that?

23  A    That was *Robinson Premium Beef* --

24  Q    Out of --

25  A    -- in San Angelo.

Schilderink - Direct                          13

1   Q    Okay.  And has that organization, the debtor that was in

2   bankruptcy there, I guess it's changed its name now; is that

3   right?

4   A    Yes.  It's Texas Packing now.

5   Q    Okay.  And the entity did survive after you gave it DIP

6   financing?  Is the business still in existence?

7   A    Yes, it is.

8   Q    Okay.

9   A    Yes.

10  Q    Now, we talked a while ago about the DIP lending for this

11  particular case, the Waggoner case.  And that DIP lending came

12  from S&R Cattle, Inc.?

13  A    That's correct.

14  Q    And who is the R in that case?

15  A    That's Alan Rhodes, is my partner in there.  And he's

16  also the partner in that San Angelo business.

17  Q    Okay.  And Mr. Rhodes, is he an attorney?

18  A    Yes, he is.

19  Q    Okay.

20  A    From Underwood Amarillo.

21  Q    Law firm?

22  A    Law firm.  On the board.  Yes.

23  Q    Okay.  And then you are the S; is that correct?

24  A    Yes.  The S from Schilderink.  Schilderink and Rhodes.

25  Q    Okay.  And you have an extensive background in the cattle

Schilderink - Direct                     14

1  industry, particularly the dairy industry?

2  A    Yes, I do.

3  Q    Okay.

4  A    All my life.

5  Q    And how long have you known Mr. Waggoner?

6  A    When I came here 16 years ago, he was one of the

7  neighbors, and he was -- start buying bull calves.  And so

8  I've basically known him for 16 years.

9  Q    And how would you assess his ability to operate a calf

10 ranch?

11 A    I think he's -- he's really able to operate a calf ranch.

12 I toured his facility last week, and the calves looked really

13 good.  And I've been there several times.

14 Q    Okay.

15 A    And he is very good, very able to run it.

16 Q    And I'd ask you to look at Exhibit 1, which you should

17 have in front of you.  If you don't, let me come give it to

18 you.

19            MR. TARBOX:  May I approach the witness, Your Honor?

20            THE COURT:  That's fine.

21 BY MR. TARBOX:

22 Q    That exhibit is also shown on the monitor.  But

23 basically, you are the DIP financer for the Waggoner Cattle

24 entities; is that right?

25 A    That's right.

Schilderink - Direct                           15

1    Q    And you committed to loaning them $2 million?

2    A    That's correct.

3    Q    And have you had any regrets about that loan?

4    A    No, not at all.

5    Q    Okay.  Now, there may be some allegations that the Debtor

6    is maxed out.  How does the cattle business work?  Is there

7    selling cattle and buying cattle; is that right?

8    A    As far as Waggoner Cattle, you mean, --

9    Q    Yes.

10   A    -- or in -- yeah.  The -- yes, they are buying cattle,

11   feed them to a certain weight, and then sell them again.

12   Q    Okay.  So you sell -- when he sells the cattle, when a

13   rancher or cattleman sells cattle, what does he normally do

14   with those proceeds?

15   A    Well, of course, they pay the feed first and the interest

16   and everything on that.

17   Q    And does he buy any cattle?

18   A    Yes.  He buys new cattle --

19   Q    Okay.  So, --

20   A    -- all the time.

21   Q    Well, my major concern is, did he just use this money up

22   and now he's out of the ability to finance any more

23   production?

24   A    Could you repeat that?

25   Q    Has -- is the allegation whether he's used all this

Schilderink - Direct                              16

1   money, this $2,200,000, and there's no more money available,

2   is that a correct statement?  In mean, insofar as he's

3   generating income from the sale of cattle?

4   A    I don't know if he used it all.  He might have cash on

5   hand.  That's possible.

6   Q    Okay.

7   A    But, yes, he loaned the whole -- the full amount.

8   Q    And are you willing to -- S&R Cattle, which consists of

9   you and Mr. Alan Rhodes, are you willing to commit money to

10  the Waggoner entities subsequent to the confirmation of this

11  plan?

12  A    Yes, we are.

13  Q    And would that be either in a loan or investment?

14  A    There could be either one, or a combination of it.

15  Q    Okay.  And have you suggested or has your company

16  suggested to the Bank that we enter into some sort of

17  mediation to negotiate a purchase or sale of the property?

18  A    We are willing to do that.

19  Q    Okay.  But did Lone Star accept the offer to enter into a

20  mediation?

21  A    No.

22          MR. ODELL:  Your Honor, I'm going to object.  To the

23  extent that this is any type of settlement negotiations, this

24  is improper evidence under --

25          MR. TARBOX:  I'll withdraw the question, Your Honor.

1           THE COURT:  Very well.

2    BY MR. TARBOX:

3    Q    Okay.  But, anyway, the bottom line is if the plan is

4    confirmed, you're going to inject new money into the company,

5    the Waggoner entities, --

6    A    That's correct.

7    Q    -- going forward?

8    A    Yes, that's correct.

9    Q    Okay.  And the amount is undetermined at this point in

10   time, that we'll put an amount in our plan?

11   A    We have been talking about an amount, yes.

12   Q    All right.  You have been talking about an amount?  Okay.

13   And let me just ask you this question.  Would you be willing

14   to purchase the amount -- allowed amount of the -- Lone Star's

15   collateral?

16   A    That's a possibility, yes.

17   Q    Okay.  Okay.

18           MR. TARBOX:  That's all the questions I have, Your

19   Honor.

20                      CROSS-EXAMINATION

21   BY MR. ODELL:

22   Q    Mr. Schilderink, my name is Brad Odell and I'm an

23   attorney for Lone Star State Bank of West Texas.  I just have

24   a few questions for you based on the testimony you've just

25   given.

1    In particular, would you look with me to Exhibit 1 in

2  front of you?

3         MR. TARBOX:  Debtors' exhibit?

4         MR. ODELL:  Yes.  That would be the Debtors'

5  exhibit.  The volume you have there in front of you.

6         THE WITNESS:  Yes.

7  BY MR. ODELL:

8  Q    Do you recognize that document?

9  A    Yes.

10 Q    Okay.  And would you look with me at the title where it

11 says Borrower?  Do you see that?

12 A    Yes.

13 Q    Okay.  And it provides that the borrower is Waggoner

14 Cattle, LLC, a Delaware limited liability company.  Is that

15 correct?

16 A    That's what it says.

17 Q    Okay.  Now, do you know whether or not -- well, I believe

18 your testimony was that you lent money to the Debtor, Waggoner

19 Cattle, LLC.  Is that correct?

20 A    That's correct.

21 Q    Do you have any idea whether or not it's a Delaware LLC

22 or a Texas LLC?

23 A    I don't know that.

24 Q    Okay.  Do you know, has Quint Waggoner created a new

25 entity called Waggoner Cattle, LLC which is a Delaware limited

1   liability company?

2   A    I am not aware of that.

3   Q    Okay.  So, to your knowledge, the money that S&R Cattle

4   lent to Waggoner Cattle, LLC and Michael Quint Waggoner are

5   the ones that are in bankruptcy; is that correct?

6   A    Sorry.  Could you repeat that?

7   Q    Yes.  To your knowledge, S&R Cattle, LLC has lent money

8   to Waggoner Cattle, LLC and Michael Quint Waggoner, who are

9   both in bankruptcy; is that correct?

10  A    To my knowledge, I loaned money to Waggoner Cattle, LLC.

11  Q    Okay.  But you don't know whether or not it's a Delaware

12  entity or a Texas entity?

13  A    No.  I just see that -- this now.  I didn't know if it's

14  a Delaware or a Texas.

15  Q    Okay.  You didn't sign this document, correct?

16  A    I probably did.

17  Q    Would you turn with me to --

18  A    I'm not sure.  Let me see that my -- oh, that's the -- my

19  attorney signed this one.

20  Q    Okay.  Now, you say your attorney.  Who is your attorney?

21  A    Alan Rhodes.

22  Q    Okay.  Is he also -- I believe you also testified he's

23  your business partner?

24  A    Yes.  He's a partner.

25  Q    Okay.  Now, Mr. Schilderink, I believe you said that you

1   lent the Debtors $2.2 million; is that correct?

2   A    Yes, that's correct.

3   Q    And they've already drawn the full $2 million -- $2.2

4   million?

5   A    I think they do, but I don't have the latest records on

6   that.

7   Q    Okay.  Have they paid down any of the principal of that

8   debt since they've been in bankruptcy?

9   A    No, but they -- they are current on interest.

10  Q    Okay.  So they've paid interest, correct?

11  A    That's correct.

12  Q    Now, do you see, under Terms & Modification on the first

13  page there, --

14  A    Yes.

15  Q    -- do you see where it says Maturity Date?

16  A    Yes.

17  Q    What is the maturity date of this loan with S&R Cattle,

18  LLC?

19  A    It says March 31, 2019.

20  Q    Okay.  And that's just about a month away?

21  A    Correct.

22  Q    Okay.  And do you know what they're -- have to pay you if

23  the -- when the loan matures?

24  A    Well, when the loan matures, then this needs to be paid

25  in full.

1  Q    Okay.

2  A    That's what it says.

3  Q    Okay.  Now, will you look at, further down the page

4  there, where it says Due on Demand?  Do you see that

5  paragraph?

6  A    I see it, yes.

7  Q    And it provides, if I'm reading -- let me read it to you

8  and confirm that I'm reading that correctly.  But the second

9  full sentence that says, "Lender is under no obligation to

10 extend the maturity date or otherwise renew, extend, or

11 refinance the balance due at maturity."  Do you see that

12 sentence?

13 A    Yes.

14 Q    And did I read that correctly?

15 A    Yes.

16 Q    Have you -- has -- let me back up.  Has S&R Cattle, LLC

17 entered into a contractual agreement to renew this loan?

18 A    Not yet.

19 Q    Okay.  Now, will you turn with me to the second page of

20 that document?  And do you see the paragraph where it starts,

21 "No oral agreements"?

22 A    Yes.

23 Q    Okay.  And do you see the sentence where it says, "It may

24 not be contradicted by evidence of prior, contemporaneous, or

25 subsequent oral agreements by the parties"?

Schilderink - Cross                          22

1    A    Yes.

2    Q    Okay.  And, again, this loan matures on March 31st, 2019,

3    correct?

4    A    Correct.

5    Q    And you don't have a written contract or agreement to

6    extend this loan, correct?

7    A    Not yet.

8    Q    Okay.  Now, Mr. Schilderink, you mentioned that you may

9    be willing to or S&R Cattle may be willing to provide some

10   sort of money to Mr. Waggoner or his entities; is that

11   correct?

12   A    That's correct.

13   Q    And how much is that?

14   A    We are -- we have been talking about $2-1/2 million.

15   Q    Okay.  And how come $2-1/2 million?

16   A    That's what we think the facility -- is the value of the

17   facility.

18   Q    Okay.  Have you seen the appraisal on the facility?

19   A    No, I haven't.

20   Q    Okay.  Will you turn with me to Exhibit 2 in that

21   notebook?  Do you see that document?

22   A    Yes.

23   Q    And do you see the title of it being an appraisal report?

24   A    Yes.

25   Q    And do you see the section where it says, on the first

Schilderink - Cross                                    23

1   page, Concluded Value?

2   A    Yes.

3   Q    And what is the concluded value of this appraisal report?

4   A    It says $2.9 million.

5   Q    And so that's more than the $2.5 million you think it's

6   worth?

7   A    Yes, it is.

8   Q    Now, are you an appraiser?

9   A    No, I'm not.

10  Q    Okay.  Now, Mr. Schilderink, you also stated that, if I

11  recall your testimony correctly, that you are willing to put

12  in what we now know to be $2.5 million after the plan is

13  confirmed; is that correct?

14  A    That's correct.

15  Q    So you're not willing to put it up until you have a

16  confirmed plan?

17  A    That's correct.

18  Q    Okay.

19          MR. ODELL:  I'll pass the witness.

20                      REDIRECT EXAMINATION

21  BY MR. TARBOX:

22  Q    Mr. Schilderink, at this time, is there any reason why

23  you would not extend that $2.2 million loan past March of

24  2019?

25  A    I don't see any reason why not.

Schilderink - Redirect                        24

1  Q    Okay.   Thank you.

2             MR. TARBOX:   That's all I have, Your Honor.   And I

3  would like to enter the loan agreement, Exhibit 1, at this

4  time.

5             MR. ODELL:   No objections, Your Honor.

6             THE COURT:   Very well.   Exhibit 1 will be admitted.

7        (Debtors' Exhibit 1 is received into evidence.)

8             THE COURT:   Any further questions of Mr.

9  Schilderink?

10            MR. TARBOX:   No, Your Honor.

11            MR. ODELL:   No, Your Honor.

12            MR. TARBOX:   And may Mr. Schilderink leave, Your

13 Honor?

14            THE COURT:   You may step down.   Thank you, Mr.

15 Schilderink.

16       (The witness steps down.)

17            THE COURT:   I assume no objection to excusing Mr.

18 Schilderink?

19            MR. ODELL:   No, Your Honor.

20            THE COURT:   Very well.

21            MR. ODELL:   I believe, with that, Your Honor, we'll

22 go ahead and move to call our first witness.

23            THE COURT:   Very well.

24            MR. ODELL:   Your Honor, Lone Star State Bank calls

25 Melisa Roberts.

1          MR. TARBOX:  (faintly)  Your Honor, may I question

2     Mr. Odell?  I believe you were saying there's time to -- more

3     than enough time in the afternoon to have a deposition.  Do I

4     have permission to expand my questions to direct or just to

5     cross-examine?  I think we can save time if there is any

6     proper testimony.

7          MR. ODELL:  I don't have any problem with that, Your

8     Honor.  He's listed -- he cross-designated --

9          THE COURT:  Well, we couldn't really hear that.  I

10    don't know if -- did you -- Mr. Tarbox, if you'll --

11         MR. TARBOX:  Your Honor, in order to expedite the

12    hearing, I was asking if it would be -- if Mr. Odell would

13    agree that I could extend my examination of her to direct as

14    well as cross.  If not, I can call her back this afternoon.

15    But I would have thought we could expedited the hearing if I

16    could go ahead and ask her questions that are outside of Mr.

17    Odell's examination.

18         THE COURT:  Very well.  And I assume that -- no

19    objection to that?

20         MR. ODELL:  Your Honor, I don't have any objection.

21    He cross-designated the witness.

22         THE COURT:  Very well.

23         THE CLERK:  Ms. Roberts, please raise your right

24    hand.

25       MELISA ROBERTS, LONE STAR STATE BANK'S WITNESS, SWORN

1         THE CLERK:  Thank you.

2                    DIRECT EXAMINATION

3   BY MR. ODELL:

4   Q    Ms. Roberts, will you please state your name for the

5   record?

6   A    Melisa Roberts.

7   Q    And Ms. Roberts, how are you currently employed?

8   A    Lone Star State Bank of West Texas.

9   Q    And what is your position with Lone Star State Bank?

10  A    I'm executive vice president, chief lending officer.

11  Q    Okay.  And what is your familiarity with these Debtors?

12  A    I met him when he came to the bank at Lone Star State

13  Bank in 2011.

14  Q    Okay.  And has Lone Star State Bank provided various

15  types of credit facilities to the Waggoner entities?

16  A    Yes, sir.

17  Q    And Ms. Roberts, for purposes of this hearing, when I

18  refer to the Waggoner entities, I'm referring to Waggoner

19  Cattle, LLC, Circle W of Dimmitt, Inc., Bugtussle Cattle, LLC,

20  and Cliff Hanger Cattle, LLC.  Is that okay?

21  A    Yes, sir.

22  Q    Okay.  Now, at first when the Waggoner entities came to

23  Lone Star, did Cliff Hanger Cattle, LLC exist?

24  A    I don't believe so.

25  Q    Okay.  And so it was just the three entities:  Waggoner

1    Cattle, Circle W of Dimmitt, and Bugtussle Cattle.  Correct?

2    A    I think that's correct.

3    Q    And do you have a general understanding as to what those

4    three entities do?

5    A    Yes, sir, I do.

6    Q    And what are those -- what's the general understanding

7    that you have about those entities?

8    A    Bugtussle owns the real estate and equipment.  Waggoner

9    Cattle owns the cattle.  And Circle W feeds the cattle.

10   Q    Okay.

11   A    So it would own the A/R and inventory.

12   Q    Okay.

13   A    Feed.  Medicine.

14   Q    Now, Lone Star extended various loans to the Debtors; is

15   that correct?

16   A    Yes, sir.

17   Q    And those loans related to the real estate; is that

18   correct?

19   A    In part, yes.

20   Q    Okay.  And also to the cow or the cattle operation, the

21   acquiring the cattle?

22   A    Yes.

23   Q    As well as any feed that needed to be purchased?

24   A    Yes.

25   Q    Essentially, Lone Star prepetition was providing the

1 financing necessary for those three entities to perform their

2 operations?

3 A    Yes.

4 Q    And I think you briefly mentioned it, but what was the

5 collateral that Lone Star State Bank acquired to secure its

6 loans?

7 A    Real estate, equipment, inventory, accounts receivable,

8 feeds, medicines, cattle.

9 Q    Okay.  Now, at the time that Lone Star was loaning or

10 lending to Waggoner or the Waggoner entities and before the

11 creation of Cliff Hanger, what was the operation of the

12 Debtor?  How far did the Debtor feed his cattle?

13 A    350 pounds.

14 Q    And then, after that, he sold them?

15 A    Yes.  Or eventually moved them to a feed lot.

16 Q    Okay.  And did Lone Star provide any financing for the

17 feeding of those cattle at the feed yards?

18 A    Not that I recall.

19 Q    Okay.  Did eventually another bank come in and provide

20 financing for that piece of his business model?

21 A    There were actually two banks.  The first bank was First

22 Capital Bank, and then later the feed yards, I think, financed

23 it, and then also the Rabo Bank.

24 Q    Okay.  And as it pertains to Rabo Bank, did they also

25 extend credit, to your knowledge, to the -- all the Waggoner

1    entities?

2    A    I do recall seeing all of those as borrowers.

3    Q    Okay.  And did they also acquire liens?

4    A    Yes, sir.

5    Q    Okay.  And in order to define the relationship between

6    the two lenders, did Rabo Bank or Rabo Agrifinance and Lone

7    Star enter into any type of an intercreditor agreement?

8    A    Yes, we did.

9    Q    And will you look with me at Exhibit 28?  And yes, Ms.

10   Roberts, those are going to be in the combed volumes there.

11   A    Okay.

12   Q    Do you recognize that document?

13   A    I do.

14   Q    And what is that document?

15   A    It is the intercreditor agreement between Lone Star State

16   Bank and Rabo Bank.

17   Q    Okay.  And this is the document that governed the

18   priority relationship between Lone Star and Rabo as it

19   pertains to the Waggoner entities, correct?

20   A    Yes, sir.  That's correct.

21   Q    Now, Ms. Roberts, in your capacity as the chief lending

22   officer, are you familiar with the books and records -- or,

23   the records of Lone Star State Bank?

24   A    Yes, sir.

25   Q    And would this intercreditor agreement have been --

1   accurately depict the transaction that occurred at or around

2   November 26, 2014?

3   A    I think so, yes.

4   Q    And would it have been kept in the normal course of

5   business of Lone Star?

6   A    Yes.

7   Q    And now, the Recital A of the intercreditor agreement,

8   does that define the loans that are related to the lending by

9   Lone Star?

10   A    Can you repeat the question?

11   Q    Yes.  In the Recital A, Paragraph A of the intercreditor

12   agreement on the first page, does that recite the credit

13   facilities that were extended -- does it, I should say, does

14   it generally recite the credit facilities that were extended

15   between Lone Star and the Waggoner Cattle entities?

16   A    It discusses the entities, yes.

17   Q    Okay.  And at the time that Lone Star entered into this

18   agreement, did you all have loans outstanding to Waggoner

19   Cattle, Bugtussle Cattle, and Circle W of Dimmitt?

20   A    And Cliff Hanger, I believe.

21   Q    And Cliff Hanger?

22   A    All of them, yes.

23   Q    Okay.  Including this Waggoner Trust?

24   A    I don't think we -- I don't remember the Waggoner Trust

25   --

1   Q    Okay.

2   A    -- being part of it, but --

3   Q    And at the time that you entered into this or Lone Star

4   entered into this agreement, the collateral that you described

5   for the Court earlier, was that collateral on which you had

6   security agreements with the Debtors?

7   A    Correct.

8   Q    And you had -- they had granted you liens against that

9   collateral?

10  A    Yes, sir.

11  Q    Okay.  Now, if you'd look now at the definition of

12  Waggoner Collateral, do you see that at the bottom on Page 1?

13  A    Yes.

14  Q    And does it define Waggoner Collateral as that portion of

15  the collateral that is located at the Waggoner Calf Ranch, is

16  related to or arises from or in connection with Waggoner's

17  operations on the Waggoner Calf Ranch?

18  A    Yes, it does.

19  Q    And what is your understanding as to what is the Waggoner

20  Calf Ranch?

21  A    It's south of Dimmitt.  It's at Sunny Side.

22  Q    Okay.  Is that the location where the Debtors operate

23  their business?

24  A    It is.

25  Q    Okay.  And are you familiar with whether or not the

1  collateral or the farm machinery and equipment of Bugtussle

2  Cattle, LLC was used in the operations of the Waggoner Calf

3  Ranch?

4  A    Yes.  I believe it was.

5  Q    Okay.  And it was used as part of the operations for both

6  Circle W as well as Waggoner Cattle?

7  A    Yes.

8  Q    Okay.  Now, will you turn with me to the second page of

9  that agreement?  And in Paragraph 2(b), do you see where it

10 says that any RAF security interest in or lien or encumbrance

11 on or claim to Waggoner Collateral, including proceeds thereof

12 or rights relating thereto, shall be junior in priority to the

13 security interest, lien, encumbrance on, claims or rights of

14 Lone Star to the Waggoner Collateral?

15 A    Yes, I do.

16 Q    Did I read that correctly?

17 A    Yes, sir.

18 Q    And so this agreement was meant to subordinate the

19 position of RAF, which is Rabo Agrifinance; is that right?

20 A    Yes, that is correct.

21 Q    And it was -- the purpose of this was to subordinate the

22 lien position of Rabo to that of Lone Star on the collateral

23 that's --

24 A    On the Waggoner collateral, yes.

25 Q    Okay.  And, again, the collateral of Bugtussle Cattle was

1   used in the operations of the Waggoner Calf Ranch?

2   A    That is correct.

3   Q    Okay.  Now, going back for a second to the various pieces

4   of collateral that served as security for the Bank, will you

5   turn with me to Exhibit 27?  Do you see those documents?

6   A    Yes, sir.

7   Q    And are these UCC financing statements that were filed on

8   behalf of the Bank?  As well as other entities?

9   A    It is UCC financing statements.  I'm seeing multiple

10  entities for --

11  Q    Okay.  Now, will you turn with me to the UCC that was

12  filed against Bugtussle Cattle, LLC?  And if you look at the

13  top, Ms. Roberts, you'll see some page numbers.  Page 23 of

14  30.  That's where I'll be looking at.

15  A    Okay.  I'm there.

16  Q    Okay?  Now, is this the UCC that was filed on behalf of

17  the Bank against Bugtussle, LLC?

18  A    Yes, it is.

19  Q    And can you read for the Court the collateral that was

20  covered by this financing statement?

21  A    Sure.  "All inventory, accounts, equipment, general

22  intangibles, farm products, livestock,..."  Do you want me to

23  keep going?

24  Q    Just if you can finish up to that colon.

25  A    ... "including all increase in supplies and farm

1    equipment."

2    Q    Okay.  And so this UCC covers the farm machinery and

3    equipment and personal property of the Bugtussle Cattle?

4    A    It does.

5    Q    Now, where was this UCC filed?

6    A    It was filed in the State of Texas.

7    Q    Okay.  Do you happen to know the filing status or what

8    type of entity Bugtussle Cattle, LLC is?

9    A    I believe it's a Delaware corp.

10   Q    Okay.  And so do you know whether or not Lone Star filed

11   in Delaware?

12   A    To my knowledge, we did not.

13   Q    Okay.  Now, Lone Star is asserting a lien against

14   equipment owned by Bugtussle.  Is that on account of the

15   subordination by Rabo Bank to the collateral -- or, to the

16   claims and liens of Lone Star?

17   A    That is correct.

18   Q    Would you turn with me back now to Exhibit 28?  And do

19   you see on Page -- again, up at the top, there are some page

20   numbers -- at Page 9 of 10?

21   A    Okay.

22   Q    Now, do you see this -- or, do you recognize this

23   document at all?

24   A    Yes.  It's also a lien filing by Rabo.

25   Q    Okay.  And who filed this lien?

1  A     Rabo Bank.

2  Q     And where was this UCC financing statement filed?

3  A     Delaware.

4  Q     Okay.  Now, would you go to the collateral section and

5  read for me the collateral -- or, the collateral that Rabo

6  asserts covers -- is covered by this UCC?

7  A     "All accounts, contract rights, documents, documents of

8  title, claim and intangibles, investment property, chattel

9  paper, instruments, and deposit accounts, all inventory, all

10 equipment, all fixtures, all farm products, including crops

11 grown, growing, or to be grown, livestock, water, and water

12 supplies used to produce in Debtors' farming operation and

13 products of crops and livestock in their unmanufactured state,

14 all general intangibles, including all trade secrets, computer

15 software, service marks, trademarks, trade names, trade

16 styles, copyrights, patents, applications for any of the

17 foregoing, customer lists, working drawings, instructional

18 manuals, rights and process for technical manufacturing,

19 packaging, or labeling in which Debtor has any right or

20 interest, whether by ownership, license, contract, or

21 otherwise."

22 Q     Ms. Roberts, I'll go ahead and just stop you there.

23 A     Okay.  Thank you.

24 Q     Does the collateral description that you just read

25 through, does that provide the same description that -- of the

1   collateral that Lone Star had?

2   A    Yes, sir.

3   Q    And as well as what was on Exhibit 27, Page 23, if I

4   recall the correct page?

5   A    I don't remember that page, so let me go back.

6   Q    If you would turn back, then, to Page 23 of Exhibit 27.

7   A    Yes.  I do believe it has the same information.

8   Q    Okay.

9          MR. ODELL:  Your Honor, at this time I'd move to

10  admit Exhibit 28.

11         MR. TARBOX:  No objections, Your Honor.

12         MR. HENDRICKS:  No objection.

13         THE COURT:  28 will be admitted.

14     (Lone Star State Bank's Exhibit 28 is received into

15  evidence.)

16  BY MR. ODELL:

17  Q    Now, Ms. Roberts, will you turn back with me to Exhibit

18  27?

19  A    Okay.

20  Q    Do you know whether or not, prior to Lone Star being

21  involved with the lending, that there was other banks involved

22  providing financing to the Debtors?

23  A    Yes.  As I mentioned earlier, I think First Capital.  Is

24  that what you're referring to?

25  Q    Well, I'm referring to before Lone Star started providing

1   financing in 2011.

2   A    I don't recall --

3   Q    Okay.

4   A    -- who was involved.

5   Q    Will you turn to that -- it's the first page of the

6   exhibit.  It's Page 2 of 30 at the top, but it's the first

7   page of Exhibit 27.

8   A    Okay.  Thank you.

9   Q    Now, this UCC was filed on behalf of Happy State Bank; is

10  that correct?

11  A    Yes.

12  Q    But if you turn the page, was this assigned over to Lone

13  Star State Bank?

14  A    Yes.

15  Q    And what is the collateral that is covered by this UCC?

16  A    "All inventory and livestock, including all increase in

17  supplies, whether any of the foregoing is now owned or

18  hereafter acquired, now-existing or hereafter born, all

19  accessions, additions, replacements, and substitutions related

20  to any of the foregoing."  Do you want me to keep going?

21  Q    Just briefly, would it cover also any payments that were

22  received for the sale of the collateral?

23  A    "All proceeds relating to any of the foregoing."

24  Q    Okay.  And --

25  A    So, yes.

1  Q    And what would be, based on your understanding of

2  Waggoner Cattle, LLC, how would Waggoner Cattle, LLC generate

3  accounts receivable?

4  A    By selling the cattle.

5  Q    Okay.  Now, will you turn with me -- now, will you turn

6  with me again to -- oh.  Will you turn with me to Exhibit --

7  to -- stay in the same exhibit, but Page 12 now.

8  A    Okay.

9  Q    Now, I believe you said that the Debtors provided blanket

10 liens to Lone Star on all the accounts receivable, feed and

11 medicine inventories, cattle, farm machinery and equipment.

12 Do you recognize this UCC?

13 A    Yes.

14 Q    And is this one that was filed on behalf of Lone Star?

15 A    Yes.

16 Q    And does this UCC-1 cover the accounts and inventory as

17 well as equipment, farm products, livestock, and farm

18 equipment and any proceeds of those that are owned by Waggoner

19 Cattle, LLC?

20 A    Yes.

21 Q    So, to the extent that Waggoner Cattle, LLC has accounts

22 receivable, Lone Star asserts a lien on those?

23 A    Yes.

24 Q    And this UCC would perfect that lien, to your knowledge?

25 A    Yes.

Roberts - Direct                                    39

1  Q    Now, will you turn with me to Page 16 of 30?  And, again,

2  Circle W of Dimmitt is the entity that provides the feeding

3  and care to the cattle; is that correct?

4  A    That's correct.

5  Q    Okay.  And do you recognize this UCC financing statement?

6  A    I don't know that I've seen it before, but I recognize

7  the format.

8  Q    Okay.  And this also was in -- was originally granted or

9  filed by Happy State Bank; is that right?

10  A    Yes.

11  Q    And then if you'll turn with me just two pages to Page 18

12  of 30, was this UCC assigned to Lone Star State Bank?

13  A    It was.

14  Q    Okay.  Can you flip back to Page 16?  And do you -- can

15  you just highlight for us, if you can, the bolded or all-caps

16  collateral that is described there?

17  A    "Farm products and supplies, equipment, general

18  intangibles, government payments and programs."

19  Q    Okay.

20  A    And deposit accounts on Page 2.

21  Q    Okay.  Now, will you turn with me now to Page 21 of that

22  same exhibit?  And do you recognize that UCC-1?

23  A    Yes.

24  Q    And is that one that was filed on behalf of Lone Star

25  State Bank?

1   A    Yes.

2   Q    And can you again provide me with what collateral this

3   covers of Circle W of Dimmitt, Inc., up until that first

4   colon?

5   A    "All inventory, accounts, equipment, general intangibles,

6   farm products, livestock, including all increase in supplies,

7   and farm equipment."

8   Q    Okay.  And is it your understanding that the assets of

9   Circle W have typically been feed, feed inventories, medicine,

10  and then any type of accounts receivable earned based on

11  providing care to cattle for either Waggoner Cattle or other

12  customer cattle?

13  A    Yes, that is correct.

14  Q    Okay.  And now is -- let me back up and just ask you

15  this.  Is Waggoner Cattle, LLC a Texas or a Delaware

16  corporation?

17  A    I believe it is a Texas corporation.

18  Q    Okay.  And is Circle W of Dimmitt a Texas corporation?

19  A    Yes, sir.

20  Q    Okay.  And where were these UCCs that we've gone through

21  filed?

22  A    Texas.

23  Q    Okay.  Now, Ms. Roberts, prior to the filing of the

24  bankruptcy case, have the Debtors defaulted on their debts?

25  A    Yes.

1  Q    And around June or July of 2017, did Lone Star State Bank

2  enter into a forbearance agreement with the Debtors?

3  A    Yes.

4  Q    And would you turn to Exhibit 1?

5  A    Okay.

6  Q    Is that the commercial credit and forbearance agreement

7  that was entered into between the Debtors and Lone Star State

8  Bank?

9  A    Yes, it is.

10 Q    Now, earlier, you testified that there was various loans

11 that were extended by the Bank to the various debtors.  Did

12 this forbearance agreement essentially restructure those into

13 a -- kind of a three-loan format?

14 A    It did.

15 Q    And do you recall what kind of a format that was?

16 A    Can you --

17 Q    In other words, could you describe the loans as they

18 currently exist -- well, as they existed prepetition with the

19 Debtors?

20 A    There was an $8 million line that it's -- I think all

21 entities were co-borrowers and all entities were co-grantors.

22 But there was an $8 million line that mainly supported the

23 cattle that I think changed in the bottom part of that page,

24 decreasing commitment from $11 million to $10.2 million.

25 There was a, number two, a $1.3 million promissory note.

1    Well, I think these are actually the notes that were

2    consolidated in the beginning.  These aren't where we ended

3    up, if that makes sense.

4    Q    Yes.  And where did we end up, is what my question is to

5    you.

6    A    Okay.  I need to find that page.

7    Q    Okay.  And let me see if I can help point you to that.

8    Will you turn to Page 11 of 44 of that exhibit?

9    A    So, the modified revolving net became $2 million under

10   Section D there.  And then there was a real estate note on the

11   next page.  And then the workout loan.  And then the advancing

12   loan.

13   Q    Okay.  And of those four loans that came out of this

14   credit or forbearance agreement, has the advancing loan been

15   paid off?

16   A    Which one?

17   Q    The, sorry, the one on Page 13 that was about $140,000.

18   A    Yes.

19   Q    And so the only three loans that existed at the time of

20   the bankruptcy filing were what are called the modified

21   revolving loan on Page 11, the real estate and equipment term

22   loan on Page 12, and the workout loan on Page 13?

23   A    That's correct.

24   Q    Okay.  Now, in order to document the forbearance

25   agreement and the various loans and modifications, did they --

Roberts - Direct                    43

1   did the Bank provide or create loan documents to do so?

2   A    Yes.

3   Q    And would you briefly look through Exhibits 2 through 20

4   of the exhibit volume?  And I'll ask you questions after

5   you've had a second to look through those.

6        (Pause.)

7   A    Okay.

8   Q    Now, after having reviewed Exhibits 2 through 20, Ms.

9   Roberts, are those the loan documents that modified the loans

10  under the forbearance agreement?

11  A    Yes, sir.  I believe so.

12  Q    As well as the collateral documents related to those

13  loans?

14  A    Yes.

15  Q    And are those -- were those created at or around the time

16  that the loan modification happened?

17  A    I believe they were.

18  Q    And were these documents kept in the ordinary course of

19  Lone Star's business?

20  A    Yes.

21  Q    And they were created by someone who would have had

22  knowledge?

23  A    That is correct.

24  Q    And in fact, if I'm not mistaken, you actually signed all

25  of these documents; --

Roberts - Direct                                    44

1   A    I did.

2   Q    -- is that correct?  Or any of the documents the Bank

3   needed to sign.

4        Now, --

5        MR. ODELL:  Your Honor, I'd move for admission

6   Exhibits 1 through 20.

7        MR. TARBOX:  No objection, Your Honor.

8        THE COURT:  Okay.  Exhibits 1 through -- these are

9   the Bank's exhibits -- 1 through 20 will be admitted.

10       (Lone Star State Bank's Exhibits 1 through 20 are

11  received into evidence.)

12  BY MR. ODELL:

13  Q    Now, in this -- if you'll turn with me, Ms. Roberts, to

14  Exhibit 20.  Is that the ratification and amendment to the

15  security agreements?

16  A    It is.

17  Q    And those were the security agreements that had

18  previously been entered into by the Waggoner entities?

19  A    That's correct.

20  Q    And they were the ones that granted liens or security

21  interests in the various collateral or assets of those

22  Debtors?  And, again, those assets included real estate,

23  accounts receivable, feed and medicine inventories, cattle,

24  farm machinery and equipment, as well as some other general

25  collateral or assets of the Debtors?

1    A    That is correct.

2    Q    Now, could you state for the Court what Lone Star State

3    Bank is seeking stay relief for?  In other words, is Lone Star

4    seeking stay relief just on its hard collateral, or is it also

5    seeking stay relief at this time against what may be

6    considered causes of action?

7    A    It's my understanding that we're seeking it on all

8    collateral that's left available after the cattle were sold.

9    Q    Okay.  And in this ratification and amendment to the

10   security agreements, did Mr. Waggoner grant a security

11   interest to Lone Star in the Debtors' causes of action that he

12   might have against Rabo Agrifinance as well as Moseley &

13   Riddle?

14   A    Yes.

15   Q    Okay.  Now, we've mentioned that, at the time that these

16   modifications were entered into, the Debtor had been in

17   default.  Is that correct?

18   A    Yes.

19   Q    And what were those types of defaults that he was in?  Or

20   they were in?

21   A    Prior to this agreement?

22   Q    Yes, ma'am.

23   A    The matured notes.

24   Q    Okay.

25   A    And that's a default related to the cattle value didn't

1    support the borrowing base anymore.

2    Q    Okay.  So he was in payment default?

3    A    Yes.

4    Q    As well as in default under certain covenants under the

5    loan documents?

6    A    That's correct.

7    Q    In particular, the providing of borrowing bases and being

8    in compliance?

9    A    That's correct.

10   Q    Now, Mrs. Roberts, would you turn with me to Exhibit 24?

11   We've talked today about the Waggoner entities that were

12   borrowers.  Was Mr. Michael Quint Waggoner a guarantor of

13   these debts?

14   A    Yes, he was.

15   Q    And did he also provide security for the repayment of

16   those debts?

17   A    Yes, he did.

18   Q    And how -- in what form did he do that?

19   A    Life insurance.

20   Q    And so, looking at Exhibit 24, is this the ratification

21   and amendment to the collateral assignments on his life

22   insurance?

23   A    It is.

24   Q    And so he had granted you or granted Lone Star State Bank

25   a collateral assignment in the insurance policies he had?

1    A    Yes, sir.

2    Q    Now, will you turn with me to Exhibit 25?  Is this one of

3    the assignments of the life insurance policies that Mr.

4    Waggoner granted to Lone Star?

5    A    It is.

6    Q    And will you look with me to Exhibit 26?  Is this

7    likewise a collateral assignment of life insurance proceeds to

8    the Bank by Mr. Waggoner?

9    A    Yes.

10    Q    So, in addition to the collateral that Lone Star had

11    related to the entities, it also had collateral assignments of

12    life insurance policies in the name of Mr. Waggoner?

13    A    That's correct.

14    Q    Okay.  Now, of course, Mr. Waggoner hasn't passed away,

15    correct?

16    A    Not that I know.

17    Q    Not yet.  And we're not hoping that he does.

18         MR. ODELL:  Your Honor, I'll move to admit Exhibits

19    24 through 26.

20         MR. TARBOX:  No objection.

21         THE COURT:  24 through 26 will be admitted.

22    (Lone Star State Bank Exhibits 24 through 26 are received

23    into evidence.)

24         MR. ODELL:  And Your Honor, I'm also going to move

25    at this time, if I failed to do so, Exhibit 27.

Roberts - Direct                              48

1            MR. TARBOX:  No objection.

2            MR. HENDRICKS:  No objection.

3            THE COURT:  27 will be admitted.  27 is a -- oh,

4    that's the -- all the UCCs.

5            MR. ODELL:  That's correct, Your Honor.

6            THE COURT:  Okay.  Very well.  27 will be admitted.

7        (Lone Star State Bank Exhibit 27 is received into

8    evidence.)

9    BY MR. ODELL:

10   Q    Now, Ms. Roberts, as a chief lending officer, are you

11   familiar with typical terms associated with lending?

12   A    I am.

13   Q    And how long have you been the chief lending officer for

14   Lone Star State Bank?

15   A    Since the Bank started in 2007.

16   Q    Okay.  And prior to your time at Lone Star State Bank,

17   where were you at?

18   A    I was at State National Bank.

19   Q    Okay.  And what was your role and responsibilities there?

20   A    EVP, branch manager of 82nd Street, in charge of the West

21   Texas lending loan committee.

22   Q    So, for how long have you been in the banking industry?

23   A    Since 1984.

24   Q    Okay.  Now, are you -- so you testified you're generally

25   familiar with the terms associated with loans?

1  A    I am.

2  Q    And typical on a real estate loan, what are typical terms

3  for those?

4  A    Fifteen to twenty years.

5  Q    Okay.  And that's the amortization rate?

6  A    Correct.

7  Q    And typically, even though they're amortized over 15 to

8  20 years, do they have an earlier maturity?

9  A    Yes.  Typically five years.

10  Q    Okay.  And that's referred to as a balloon payment?

11  A    Correct.

12  Q    Okay.  Now, what is the typical interest rate on a real

13  estate loan?

14  A    Anywhere from prime to prime plus two percent.

15  Q    Okay.  And would that be dependent on whether or not

16  there's equity in the collateral that you're relying on?

17  A    Certainly.

18  Q    Okay.

19  A    Uh-huh.  And I would say some real estate loans we

20  actually put on ten years, to tie it to the leases that are

21  out there.  So it depends how specialized it is, how much

22  equity is in it.

23  Q    Okay.  What about on farm machinery and equipment?

24  What's the typical term?

25  A    I would say normally five years on the amortization.  It

1   depends on the useful life of the asset.  That is, so

2   sometimes it may be shorter than that.

3   Q    Uh-huh.

4   A    And sometimes there's a one-year maturity.

5   Q    Okay.  And what about a typical interest rate on that?

6   A    Again, prime to prime plus two, I would say.

7   Q    And, again, I would assume that that would vary or be

8   based on the collateral value and potentially equity in that

9   collateral?

10  A    Both that as well as the creditability of the borrower.

11  Q    Okay.  And what about on feed inventories and medicine?

12  A    Typically, those are shorter term.  You know, maybe one-

13  year notes.  Maybe supporting number involving a line of

14  credit.

15  Q    And, again, interest rates typically on that?

16  A    I would say about the same range again for most

17  borrowers.

18  Q    Okay.  And that was prime or prime plus two?

19  A    Yes.

20  Q    And what about on accounts receivable?

21  A    Accounts receivable, again, it could support the

22  revolver, in which case it'd probably be a one-year note.  If

23  it's core working capital that's something that you need to

24  term out, you typically would go three to five years.

25  Q    Okay.  Interest rates similar on those types of loans?

1   A    Yes, I would say so.

2   Q    All right.  Now, what -- do you know what today prime

3   rate is?

4   A    5-1/2.

5   Q    Okay.  So if prime plus two, you're looking about 7-1/2?

6   Somewhere between 5-1/2 to 7-1/2 would be --

7   A    Yes, sir.

8   Q    And on the low end, 5-1/2 would be based on potentially

9   equity in the property, the credit status of the borrower, the

10  useful life of the collateral.  Is that -- would those be

11  accurate ways --

12  A    That's correct.  The better deals as far as borrower's

13  ability and collateral tend to get better rates.

14  Q    Okay.  Now, Ms. Roberts, are you -- well, in order to

15  finance Bugtussle and the real estate, did Bugtussle grant a

16  lien against the calf ranch?

17  A    They did.

18  Q    Okay.  And was that lien perfected by filing of deeds of

19  trust?

20  A    Yes.

21  Q    And the real property actually sits on the border of two

22  counties; is that right?

23  A    That is correct.

24  Q    And what two counties are those?

25  A    Castro and Lamb.

1  Q    And do you know whether or not Lone Star filed deeds of

2  trust in both Lamb and Castro County?

3  A    We did.

4  Q    Okay.  Now, as part of the covenants that exist in the

5  deeds of trust, is there insurance requirements that the Bank

6  requires of the borrower?

7  A    Yes, there is.

8  Q    And do you know what those generally are?

9  A    The value of the property.

10 Q    Okay.  Now, will you turn with me to Exhibit 90?

11 A    Can you tell me which volume?

12 Q    Going to either be -- we're going to be looking at

13 Exhibit 90 there, Ms. Roberts.

14 A    Okay.

15 Q    Do you recognize this document?

16 A    I do.

17 Q    And what is this document?

18 A    It's an insurance policy.

19 Q    And is this a document that Lone Star received from Texas

20 Farm & -- from Texas Farm Bureau Insurance?

21 A    Yes, it is.

22 Q    And is this something that Lone Star would have normally

23 received in the normal course of its business?

24 A    It is.

25 Q    Okay.  And what does this policy cover?

1    A    Well, there's multiple pages here.  Do you want me to

2    read them all?  I mean, it says --

3    Q    Well, just generally speaking, what does this cover?

4    A    It's on Bugtussle Cattle and it covers the assets of

5    Bugtussle Cattle, the real estate and fixtures.

6    Q    Okay.  So this would cover the calf ranch property, the

7    improvements, equipment, or the fixtures?

8    A    Yes, that's correct.

9    Q    Okay.  Now, let's see.  Does this at any point tell us --

10   it does not, I don't believe.  Okay.  Would you turn now to

11   Exhibit 91?

12   A    Okay.

13   Q    And do you recognize this document?

14   A    I do.

15   Q    And, again, is this an insurance policy that was received

16   by Lone Star from Texas Farm Bureau Insurance?

17   A    It is.

18   Q    And do you see up at the top where it's marked Amended?

19   Is that -- do you see that up at the --

20   A    Yes, I do see that.

21   Q    And is this the same policy, then, that we just looked at

22   in Exhibit 90?

23   A    I think so.

24   Q    How was it amended?

25   A    I think the values were amended.

1  Q    Okay.  And when you say the values, do you mean that --

2  the coverages on various improvements?

3  A    That's correct.

4  Q    Okay.  Now, will you turn with me to Exhibit 92?  Do you

5  recognize this document?

6  A    I do.

7  Q    And what is this?

8  A    It's a comparison of the two policies.

9  Q    Okay.  And when you say the two policies, you're

10  referring to Exhibits 90 and 91?

11  A    That's correct.  The original and then the amended.

12  Q    Okay.  And so under the fourth column from the left, is

13  that the limits of liability for the original?

14  A    Yes, I think so.

15  Q    And then the second column from the right, is that the

16  limits on the amended policy?

17  A    Yes.

18  Q    Now, will you turn with me to the last page of this

19  exhibit?  Does this provide a comparison as to the amounts of

20  the total limit of liability?

21  A    It does.

22  Q    And what does -- what was the original limit of liability

23  in the policy under Exhibit 90?

24  A    $4.2 million.

25  Q    And what about under the amended policy under Exhibit 91?

1   A    $2.1 million.

2   Q    Now, did Mr. Waggoner on behalf of Bugtussle Cattle call

3   and discuss this with the Bank?

4   A    No, sir.

5   Q    Did the Bank approve dropping its -- or, allowing

6   Bugtussle to drop its insurance limits down to $2.1 million?

7   A    No, sir.

8   Q    So this came as a surprise to the Bank?

9   A    It was.

10  Q    Okay.

11         MR. ODELL:  Your Honor, I'd move to admit Exhibits

12  90 through 92.

13         MR. TARBOX:  No objection.

14         THE COURT:  90 through 92 will be admitted.

15      (Lone Star State Bank's Exhibits 90 through 92 are

16  received into evidence.)

17  BY MR. ODELL:

18  Q    Now, Ms. Roberts, I believe you testified that the

19  covenants in the deeds of trust required that the Debtor

20  provide the fair value of the property.  Is that correct?  Or

21  insure the fair value of the property?

22  A    Yes.

23  Q    Now, one of the issues that is out there is what is the

24  value of the property, correct?

25  A    That's correct.

Roberts - Direct                              56

1   Q    And we have two what I'll call competing appraisals,

2   correct?

3   A    Correct.

4   Q    One by the Debtors and Mr. Phillips?

5   A    That's correct.

6   Q    And then another one by West -- or, West Texas Appraisals

7   and Mr. Bumguardner, correct?

8   A    Yes, sir.

9   Q    And that one was ordered by the Bank; is that correct?

10  A    Correct.

11  Q    Now, --

12          MR. TARBOX:  (faintly)  Your Honor, the Debtor

13  objects to reference to the Bumguardner appraisal until such

14  time as Debtors have a chance to conduct a deposition.

15          THE CLERK:  Mr. Tarbox, can you speak into the mic?

16          MR. TARBOX:  I'm sorry.  My voice is not good today.

17      Debtor objects to the references to the Bumguardner

18  appraisal since the Debtor has not had an opportunity to

19  depose Mr. Bumguardner.

20          THE COURT:  I don't have any problem with

21  referencing to the Bumguardner appraisal, as such.  Now,

22  obviously, the Court has already ruled that we'll take up the

23  Bumguardner testimony and appraisal after Mr. Tarbox has had

24  an opportunity to depose him.  But there's nothing I've heard

25  yet that crosses the line, as far as I'm concerned.

Roberts - Direct                              57

1        So I'll overrule the objection.

2              MR. ODELL:  Thank you, Your Honor.

3    BY MR. ODELL:

4    Q    Now, Ms. Roberts, will you turn with me in the binder

5    that looks similar to this -- so this would be Debtors'

6    Exhibits.  And I'm going to have you, if you would, turn to

7    Exhibit 2.

8    A    Okay.

9    Q    Have you seen this document before?

10   A    I have.

11   Q    And is the appraisal that was acquired by the Debtors?

12   A    Yes.

13   Q    Now, do you see there, under the -- on the first page,

14   under the Concluded Value?

15   A    Yes.

16   Q    And what is the concluded value by this appraiser for

17   this property?

18   A    $2.9 million.

19   Q    Now, is that value greater than the insurance coverage

20   that the Debtor has?

21   A    It is.

22   Q    And this appraisal, to your knowledge, is the appraisal

23   as a fair value of the property?

24   A    This is the Debtors' appraisal, but yes.

25   Q    Yes.  But it was -- the Debtors' appraisal was for a fair

1  value?

2  A    Was for fair value.

3  Q    Okay.

4  A    Yes.

5  Q    And so that wouldn't meet -- the insurance requirements

6  or the insurance limits that the Debtor has now on the

7  property would not cover the fair value, according to the

8  Debtors' appraiser, correct?

9  A    That is correct.

10  Q    Now, Ms. Roberts, would you turn with me to Exhibit 89?

11  And that should be in Volume 8 as well.

12          MR. TARBOX:   89?

13          MR. ODELL:   Exhibit 89, and it should be in Volume

14  8.

15          THE WITNESS:   Okay.

16  BY MR. ODELL:

17  Q    Do you recognize that document, Ms. Roberts?

18  A    Yes, I do.

19  Q    And do you know -- do you recall when the Debtors filed

20  for bankruptcy?

21  A    April 9th of 2018.

22  Q    And when the Debtors filed for bankruptcy, did they come

23  to the Bank with a need to be able to borrow money in order to

24  pay payroll as well as cover some feed expenses?

25  A    Yes.

1    Q    And did Lone Star agree to advance those funds?

2    A    Yes, we did.

3    Q    And will you turn with me to Page 7 of Exhibit 89?

4    A    Okay.

5    Q    There on the bottom, do you see the amount that was

6    advanced in order to cover the employee compensation?

7    A    $26,912.23.  So, $26,912.23.

8    Q    And then would you turn to the next page?

9    A    Yes.

10   Q    And do you see the amount there that was advanced to

11   cover two particular feed bills, one for White Plains Energy

12   and the other for High Pro Feeds?

13   A    Yes.

14   Q    And what was that amount?

15   A    $79,187.27.

16   Q    Now, did Lone Star agree to advance those funds so long

17   as it received an administrative expense claim?

18   A    That is correct.

19   Q    And does this order, to your knowledge, provide that Lone

20   Star received an administrative expense claim?

21   A    Yes.

22   Q    Okay.  Ms. Roberts, I apologize, and I also apologize to

23   the Court for the hopping around in the exhibit volumes here,

24   but would you please turn with me in Volume 7 to Exhibit 84?

25   A    Okay.

1   Q    Do you recognize this document?

2   A    I do.

3   Q    And what is this one, this document?

4   A    It's the Debtors' plan of reorganization.

5   Q    Okay.  Have you had a chance to go through this plan?

6   A    Yes.  I've seen parts of it.

7   Q    Okay.  Now, will you turn with me to what is Page 25 of

8   35 of Exhibit 84?

9           THE COURT:  Before we do that, let's take a ten-

10  minute recess and then we'll pick back up.

11          MR. ODELL:  That'll be fine, Your Honor.

12          THE COURT:  We'll be in recess.

13          THE CLERK:  All rise.

14      (A recess ensued from 11:35 a.m. until 11:55 a.m.)

15          THE CLERK:  All rise.

16          THE COURT:  You may be seated.

17          MR. ODELL:  Your Honor, may I proceed?

18          THE COURT:  You may, Mr. Odell.

19  BY MR. ODELL:

20  Q    Ms. Roberts, just prior to the recess we were talking

21  about the administrative claim that Lone Star acquired as part

22  of the cash collateral order.  Do you recall that testimony?

23  A    Yes.

24  Q    Now, I've had you turn to Exhibit 84, and in particular

25  Page 25.  Are you there?

1   A    Yes.

2   Q    Now, I believe you testified that this is the plan that

3   the Debtors have on file with the Court; is that correct?

4   A    That's correct.

5   Q    And do you see there at the bottom the Class 1F?

6   A    I do.

7   Q    And do you see the amount there of the claim?

8   A    $106,099.50.

9   Q    Now, is this the claim that exists relating to the

10  postpetition advances that Lone Star made?

11  A    That's correct.

12  Q    And what is the treatment that this plan provides for

13  Lone Star?

14  A    Four percent interest on the claim from petition date,

15  resulting in an adjusted claim as of January 15th of

16  $108,657.52.  Will be paid out over 60 months at four percent

17  interest.

18  Q    Now, Ms. Roberts, has Lone Star agreed to a payout of its

19  administrative claim?

20  A    No.

21  Q    Okay.  As part of the cash collateral order, was there an

22  agreement between Lone Star and Waggoner Cattle relating to

23  what were called prepetition cattle?

24  A    Yes.

25  Q    And what was that agreement, based on your understanding?

1   A    That Waggoner Cattle would continue to feed the cattle

2   and market the cattle and sell the cattle, with proceeds going

3   to Lone Star State Bank, to be applied first to the feeding

4   cost of the cattle, and second, to the debt.

5   Q    Okay.  You mentioned feeding costs of the cattle.  Did

6   Lone Star pay the feeding costs?

7   A    We did.

8   Q    And did Circle W separately invoice Lone Star?

9   A    That's correct.

10  Q    And do you recall at what average daily cost?

11  A    $2.25 per head per day.

12  Q    Okay.  And did the -- did Circle W invoice Lone Star for

13  those amounts?

14  A    Weekly.

15  Q    And did you pay those amounts?

16  A    We did.

17  Q    Okay.  And so then the cattle, the prepetition cattle

18  were eventually marketed and sold?

19  A    That's correct.

20  Q    And do you recall roughly about how much came in?

21  A    $3.3 million.

22  Q    Okay.  And do you recall roughly about how much in feed

23  expense was paid by Lone Star postpetition?

24  A    Roughly $1.5 million.

25  Q    And so the amount that would be net after the payment of

1  the feed would be roughly what?

2  A    $1.885 million.

3  Q    Okay.  And does the cash collateral order provide that

4  the proceeds would be applied first to recover those feed

5  costs?

6  A    It did.

7  Q    Okay.  Now, will you look with me at Exhibit 97?  It's

8  going to be a binder clip.

9  Q    Okay.

10          MR. ODELL:  Your Honor, yours is actually in a

11  combed volume.  It's -- there's no cover page on the front.

12  It should just be the front of a proof of claim.

13  BY MR. ODELL:

14  Q    Do you recognize that document?

15  A    I do.

16  Q    Now, Ms. Roberts, what is this document?

17  A    It's the proof of claim for Lone Star State Bank, and the

18  first page is Bugtussle.

19  Q    Okay.  And so was this the proof of claim that was filed

20  in the Bugtussle bankruptcy case?

21  A    It appears to be, yes.

22  Q    And will you turn with me to the second page?  And it's

23  printed on both sides, so this will be the second page on the

24  reverse.

25  A    Okay.

1   Q    And at the time that the -- or, what is the amount that

2   this claim states is owed by Bugtussle Cattle?

3   A    $11,815,300.69.

4   Q    Now, if I'm not mistaken, all of the borrowers or all of

5   the debtors were co-borrowers on the debts owed to Lone Star;

6   is that correct?

7   A    That's correct.

8   Q    And in fact, Mr. Waggoner was also a guarantor of those

9   debts?

10  A    Correct.

11  Q    So, all of these debts, though they may have arisen based

12  on different operations, each entity owed that amount?

13  A    That's correct.

14  Q    But Lone Star is only owed one full amount, correct?

15  A    That's correct.

16  Q    Okay.  Now, do you know if this $11,815,000 and some

17  change is the amount that was owed on the petition date or was

18  this after having applied some of the proceeds against the

19  feed and the debt?

20  A    This was after applying the bulk of the proceeds.

21  Q    Okay.  And, in fact, if you turn to Page 4 and 5 of 7 of

22  that Exhibit 97, does that summary provide a summary as to how

23  the proceeds --

24  A    I haven't found it yet.

25  Q    Okay.  Up at the top, again, Ms. Roberts, there's going

1   to be page numbers.

2   A    Are you saying the summary as of the petition date?

3   Q    The -- there's the summary as of the petition date and

4   then also after the cattle proceeds.  Is that --

5   A    Yes.

6   Q    And that would be on Page 5.

7   A    Yes, I see that.

8   Q    Okay.  And so at the time of the filing of the proof of

9   claim, after application of some of the proceeds from the

10  cattle debt, or the cattle liquidation, there is owed

11  approximately $11.8 million?

12  A    That's correct.

13  Q    Okay.

14          MR. ODELL:  Your Honor, I would move to admit

15  Exhibit 97.

16          MR. TARBOX:  No objection.

17          THE COURT:  97 will be admitted.

18      (Lone Star State Bank's Exhibit 97 is received into

19  evidence.)

20  BY MR. ODELL:

21  Q    Now, Ms. Roberts, will you turn back with me to Exhibit

22  84?

23  A    Okay.  What volume?

24  Q    That should be in Volume 7.

25  A    Okay.

1  Q    And will you turn to Page 23 of 35?

2  A    Okay.

3  Q    Now, if you look at what's designated as Class 2, do you

4  see that that is the claim of Lone Star?

5  A    Yes, sir.

6  Q    And it's got an amount there of $11,815,000; is that

7  correct?

8  A    Yes.

9  Q    Now, again, that's the amount after having applied a bulk

10 majority of the cattle proceeds?

11 A    I believe so, yes.

12 Q    Okay.  Now, if you continue in that paragraph, we have a

13 -- what's -- at the end of that paragraph, what's stated as

14 leaving a balance of $8,458,388.  Is that correct?

15 A    Yes.

16 Q    And is that a correct amount of the debt that's owed?

17 A    It is not.

18 Q    The correct amount is the $11.8 million?

19 A    Less a small amount of cattle that came in after that.

20 Q    Okay.  But the $8.4 million is not correct?

21 A    That is not correct.

22 Q    Okay.

23         THE COURT:  Where are you again on that --

24         MR. ODELL:  Your Honor, I'm looking --

25         THE COURT:  -- in the plan?

1              MR. ODELL:  Page 23 --

2              THE COURT:  Oh, 23.

3              MR. ODELL:  -- of 35.

4              THE COURT:  Okay.

5              MR. ODELL:  Class 2 is the paragraph.

6              THE COURT:  I just turned to the wrong page.  Thank

7   you.

8   BY MR. ODELL:

9   Q    Now, Ms. Roberts, will you turn with me to Page 24?

10  Well, will you turn with me to Page 22 of that -- of Exhibit

11  84?  So, just one page ahead.

12  A    Okay.

13  Q    And do you recall whether or not the administrative claim

14  that was granted to Lone Star was granted against all of the

15  Debtors, except for Mr. Waggoner individually?

16  A    Can you rephrase that?

17  Q    Yes.  Do you recall whether or not the administrative

18  expense claim that was granted under the cash collateral order

19  was to be satisfied by -- was to be satisfied by all the

20  Debtors?  In other words, that all the Debtors were liable for

21  the administrative expense claim?

22  A    Yes.  I believe that's true.

23  Q    Okay.  And would you look there on Page 22, about middle

24  of the page.  Do you see that the plan provides for the

25  classes of claims related to Waggoner Cattle?

1   A    Yes.

2   Q    And do you see, by flipping through Page 22 through 24,

3   any reference or any classification of the administrative

4   claim of Lone Star?

5   A    I do not.

6   Q    Okay.  Now, looking -- starting on again now Page 24 and

7   flipping through Pages 24 through 26, is there a mention of

8   the administrative claim of Lone Star for Circle W?

9   A    Yes, there is.

10  Q    And, again, that was the treatment that you previously

11  read?

12  A    Correct.

13  Q    And, again, Lone Star has not agreed to accept that

14  treatment?

15  A    That is correct.

16  Q    Now, will you turn with me to Page 26?  And looking

17  through Pages 26 through 29, do you see any reference to the

18  Lone Star administrative claim for Bugtussle Cattle?

19  A    I do not.

20  Q    Okay.  Now, will you turn with me on Page 29?

21  A    Okay.

22  Q    And, again, looking at Page 29 and 30, do you see any

23  reference to administrative claim for Cliff Hanger cattle?

24  A    No, I do not.

25  Q    Okay.  Now, Mrs. Roberts, turning back to Page 26 of the

1  Exhibit 84, there's a Class 2 claim at the top of the page.

2  Do you see that?

3  A    I do.

4  Q    And is that the claim -- or is that represented to be the

5  claim for Lone Star?

6  A    It's represented that way.

7  Q    Okay.  And, again, it's not in a correct amount?

8  A    It is not.

9  Q    Now, at the time that the Debtors filed for bankruptcy,

10 did Circle W have accounts receivable?

11 A    They did.

12 Q    And did they have feed inventories?

13 A    Yes.

14 Q    And did they have medicine inventories?

15 A    They did.

16 Q    And, again, Lone Star had a lien against those?

17 A    Correct.

18 Q    And as part of the cash collateral order, was there an

19 agreement to grant replacement liens?

20 A    Yes.

21 Q    Now, Ms. Roberts, in reading Class 2, do you see any

22 reference to the repayment of Lone Star's secured claims for

23 its accounts receivable?

24 A    I do not.

25 Q    What about for feed inventories?

1   A    No.

2   Q    What about for medicine inventories?

3   A    No.

4   Q    Okay.  Thank you.  Now, Ms. Roberts, as part of this

5   bankruptcy, postpetition, the Debtors liquidated the cattle

6   collateral, correct?

7   A    Yes.

8   Q    And Lone Star received the proceeds from that

9   liquidation?

10  A    That is correct.

11  Q    And that has been applied against the debt that's owed?

12  A    That is correct.

13  Q    And so now Lone Star doesn't have any cattle collateral

14  that we know of?

15  A    There was still some collateral early on that we couldn't

16  identify where the cattle went, but other than our lien was

17  regarding prepetition cattle, to my knowledge, we had sold

18  everything that was made available to us.

19  Q    Okay.  And so what would be remaining as collateral to

20  Lone Star after the liquidation of those cattle would be the

21  real estate that's owned by Bugtussle; is that correct?

22  A    That's correct.

23  Q    And the equipment and farm machinery of Bugtussle?

24  A    Correct.

25  Q    And the accounts receivable of Circle W?

Roberts - Direct                                    71

1    A    Yes.

2    Q    As well as the value of the feed inventories?

3    A    Correct.

4    Q    And then as well as the medicine inventories?

5    A    Correct.

6    Q    And to your knowledge, and I believe it's been stipulated

7    by counsel, but do you believe that there's any equity in any

8    of that collateral to support the $11.8 million claim,

9    roughly?

10   A    Not above the debt amount.

11   Q    Okay.  Now, other than receiving the proceeds from the

12   cattle that were liquidated, has the Debtors in any way

13   offered adequate protection payments to the Bank?

14   A    No, sir.

15   Q    Did, after Lone Star filed this motion for relief from

16   stay, did the Debtors offer adequate protection payments?

17   A    No.

18   Q    So, at this point, other than the receipt of the proceeds

19   from the cattle collateral and then the replacement liens on

20   Circle W, Lone Star has not received any other adequate

21   protection?

22   A    Not that I'm aware of, no.

23   Q    Okay.  And in particular, it hasn't received any other

24   loan payments?

25   A    No.

1            MR. ODELL:  Your Honor, I'll move to admit Exhibit

2     89 as well as Exhibit 84.

3            MR. TARBOX:  No objection.

4            THE COURT:  Exhibits 89 and 84 will be admitted.

5        (Lone Star State Bank's Exhibits 84 and 89 are received

6     into evidence.)

7            MR. ODELL:  And I'll you pass the witness, Your

8     Honor.

9            THE COURT:  Okay.

10            MR. TARBOX:  Your Honor, I believe my -- Max Tarbox.

11     I believe my examination will take at least an hour.  I tell

12     you that for planning purposes.

13            THE COURT:  We will go until -- let's go 'til 12:45.

14            MR. TARBOX:  Okay.

15                          CROSS-EXAMINATION

16     BY MR. ODELL:

17     Q   Ms. Roberts, Max Tarbox.  Would you look at Exhibit 4 in

18     the Debtors' exhibit binder?

19            MR. TARBOX:  And I believe this has already been

20     introduced as -- the same exhibit has been introduced by Lone

21     Star previously, but I'd like the Court to admit the same

22     exhibit at this time as part of the Debtors' exhibits.

23            MR. ODELL:  No objection, Your Honor.

24            THE COURT:  Very well.  Exhibit 4 will be admitted.

25        (Debtors' Exhibit 4 is received into evidence.)

1   BY MR. TARBOX:

2   Q    Okay.  Ms. Roberts, how long have you been with Lone Star

3   Bank again?

4   A    Since 2007.

5   Q    And so are you pretty familiar with this loan that the

6   Bank as with the Waggoner entities?

7   A    Yes, sir.

8   Q    Okay.  And you're familiar with the intercreditors'

9   agreement?

10  A    I am.

11  Q    Okay.  I'm going to try to blow this up, if I can.  And

12  if you'll look at the portion that I highlight.  It appears to

13  me that the term Waggoner refers to the Waggoner Cattle, LLC;

14  is that right?

15  A    It describes other entities below that, but yes, --

16  Q    No, my --

17  A    -- on that first line, is what --

18  Q    My question is that the word Waggoner Cattle, LLC, a

19  limited liability company, it says ("Waggoner").  Is that

20  correct?

21  A    It does say that on that line.

22  Q    Okay.  Well, no, that's what it says.  It refers to

23  Waggoner Cattle, LLC as Waggoner.  Is that right?

24  A    That's what I see.

25  Q    Okay.  Now, again, this is an agreement between Lone Star

1   State Bank of West Texas and Rabo Agrifinance, Inc.  And you

2   see after Lone Star State Bank of West Texas, it has ("Lone

3   Star")?

4   A    Yes.

5   Q    And after Agrifinance, Inc. it has ("RAF")?  Do you see

6   that?

7   A    I do.

8   Q    And so later on in the agreement when it refers to RAF,

9   we know it's referring to Rabo Agrifinance, Inc.; is that

10  correct?

11  A    I assume so.

12  Q    And when it refers to Lone Star, based on this document,

13  we can presume that it refers to Lone Star State Bank of West

14  Texas?

15  A    I think so.

16  Q    Okay.  Let's go down to the bottom of that page, and the

17  very bottom where I'm highlighting it is a definition of

18  Waggener Collateral.  Do you see that?

19  A    I do.

20  Q    Can I read that?  It says, "Waggoner Cattle means the

21  portion of the collateral that is located on the Waggoner Calf

22  Ranch, is related to or arises from its connection with

23  Waggoner operations on the Waggoner Calf Ranch."  Is that

24  correct?

25  A    I believe it says Waggoner Collateral, not Cattle.

1  Q    I'm sorry.  I meant to say Collateral.  And so basically

2  Waggoner Collateral is that portion of the collateral?  Do you

3  see where it says that?

4  A    I do.

5  Q   Okay.  So now we need to find out what collateral means.

6  And I'll go to the second page.  And at the very top, there is

7  the word collateral.  Do you see that?

8  A    I do.

9  Q    Okay.  Collateral means any and all personal property of

10 Waggoner -- and again, we're already determined that Waggoner

11 means Waggoner Cattle, LLC -- which is subject to a perfected

12 security interest or lien in favor of any of one or more of

13 the creditors to secure all or any of the -- portion of the

14 indebtedness.

15     Is that what that says, or did I misstate any words?

16 A    I believe that's what that says.

17 Q    Okay.  So, collateral is property belonging to Waggoner

18 Cattle, LLC.

19     Now, go back up to the previous page.  And it says,

20 Waggoner Collateral means that portion of the collateral --

21 and we've determined that Collateral means collateral of

22 Waggoner Cattle, LLC -- that's located on the Waggoner

23 operations on the Waggoner Calf Ranch.  Is that right?

24 A    I don't read it the same way you do, but that's okay.

25 Q    I'm just reading it word for word.

1    A    I view it as all the entities that were described above.

2    Q    Okay.  But it doesn't say that, does it?

3    A    I -- that's up to determination by the Court.

4    Q    But it doesn't say that, does it?

5    A    That's -- in my opinion, it doesn't say what you're

6    trying to say it says.

7    Q    Okay.  But it doesn't say what you're trying to say,

8    either, does it?

9    A    I've answered the question, Max.

10   Q    Let's go down to the second page again.  And we'll refer

11   to the agreement, I guess, which is at Paragraph B under

12   Section 2.  I'm sorry.  And it says, "Any RAF security

13   interest."  And that RAF is whom?  Or who is RA -- is it Rabo

14   Agricultural Finance?

15   A    I believe so.

16   Q    In or lien or encumbrance on or claim to Waggoner

17   Collateral, including proceeds thereof, shall be junior in

18   priority to any security interest in, lien, encumbrance on

19   claims arising of Lone Star to Waggoner Collateral.

20       And the agreement previously defined Collateral as

21   property belonging to Waggoner.

22   A    I believe we defined Waggoner Collateral as any property

23   at the calf ranch.

24   Q    I'm not defining it as anything.  I'm just reading the

25   agreement that you all prepared.

1        Anyway, we had mentioned previously that Bugtussle was a

2   Delaware corporation.  All right.

3   A    Yes.

4   Q    I think you -- I think you stated that previously.

5   A    To my knowledge, yes.

6   Q    Did Lone Star Bank file a UCC-1 in the state of Delaware?

7   A    Not that I'm aware of.

8   Q    And you're aware that Bugtussle Cattle, LLC is a Delaware

9   company; is that right?

10  A    That's my understanding.

11  Q    And you're aware that Rabo Bank filed a UCC in Delaware?

12  A    Correct.

13  Q    And Lone Star did not?

14  A    That's correct.

15  Q    Okay.  Let's look at Paragraph B again, 2B.  Any Rabo

16  Agriculture Finance security interest in, or lien or

17  encumbrance on the claim of Waggener Collateral, including

18  proceeds thereof or rights relating thereto, shall be junior

19  in priority to the security interest in, lien, encumbrance,

20  claims or rights of Lone Star to the Waggener Collateral.

21       Okay.  Does Lone Star have a lien -- or, did Lone Star

22  file a UCC or does it have a lien on Waggoner's -- excuse me,

23  on Bugtussle collateral?

24  A    We have a lien on real estate and fixtures through the

25  deed of trust.  We also have a security agreement.  But we do

Roberts - Cross                              78

 1  not have a UCC filed in Delaware, to my knowledge.

 2  Q    So did Lone Star perfect its lien on equipment of

 3  Bugtussle?

 4           MR. ODELL:  Objection, Your Honor.  Asks for a legal

 5  conclusion.

 6           MR. TARBOX:  I'll change my question, Your Honor.

 7  BY MR. TARBOX:

 8  Q    Did the Bank file a UCC-1 on the collateral of Bugtussle?

 9  Collateral belonging to Bugtussle?

10  A    We filed in the state of Texas but not in the state of

11  Delaware.

12  Q    Okay.  And so, as your attorney pointed out, you're not

13  in a position to make a legal conclusion as to the effect of

14  that?

15  A    I'd say that's fair.

16  Q    I'd like to have a few questions regarding your

17  testimony, and then I'll have, as we've agreed earlier, I'll

18  have some direct examination for you.

19       We're speaking hypothetically now because you said you

20  don't know if your lien is perfected or not.  Is that correct?

21  A    With what collateral?

22  Q    On equipment belonging to Bugtussle.

23  A    I believe I am perfected.

24  Q    I'm sorry.  Say again?

25  A    I believe I am perfected.

1   Q    You are perfected?

2   A    Via the subordination agreement.

3   Q    And as a banker that's been -- how long you been a

4   banker?

5   A    Since 19...

6   Q    In the banking business?

7   A    Since 1984.

8   Q    Okay.

9   A    Full-time since then.  I started it part-time in 1980.

10  Q    And do you know how to perfect a lien?

11  A    I do.

12  Q    How do you perfect a lien?

13  A    Depends on the collateral.

14  Q    What's that?

15  A    It depends on the collateral.

16  Q    Well, then how do you perfect a lien on equipment?

17  A    Security agreement, UCC.

18  Q    And you said you didn't -- okay.  And you said you filed

19  a UCC in Texas?

20  A    Correct.

21  Q    But you did not file one in Delaware?

22  A    I did not file one in Delaware.

23  Q    Okay.  So you believe you're perfected because you filed

24  one in Texas?

25  A    Because of the subordination agreement is why.

1    Q    Because of the subordination agreement?

2    A    Yes.

3    Q    Okay.  Do you believe you're -- what part of the

4    subordination agreement are you perfected?

5    A    Not in the right state.

6    Q    Okay.  So if you aren't perfected, then you would not

7    have a lien on the equipment, feed, whatever that Bugtussle

8    owned?

9    A    Again, I do think we have a lien because of the

10   subordination agreement, which is obviously going to take the

11   Court's position on.

12   Q    Okay.  Now, did you file a UCC lien -- excuse me, a UCC

13   document on Lone Star's right to have a security interest in

14   causes of action?

15   A    I do not know that.  It was prepared and completed by an

16   attorney, and I don't know whether that was filed or not.

17   Q    Okay.  If it was not filed, would you agree you would not

18   be perfected --

19   A    I don't know.

20   Q    -- on that?

21   A    I honestly don't know what it takes to be perfected on

22   causes of action and if that was required or not.

23   Q    Okay.  On terms afforded to plan treatments or loan

24   treatment for farm equipment, you said five years.  Have you

25   ever made a loan on farm equipment that went for seven years?

Roberts - Cross                            81

1   A    I don't recall one, but it's possible.  Especially in a

2   workout, we might go longer.

3   Q    Okay.  And in a workout, that would be assuming -- a

4   workout would be a desperate situation?  Would it be a special

5   situation where the debtor was needing help from the Bank?

6   A    That's correct.

7   Q    Because his loan wasn't performing properly?

8   A    That's correct.

9   Q    And in that situation, have you ever offered less than

10  prime plus two?

11  A    I don't recall doing that.  We bought a bank that did

12  that, but I don't recall us doing it.

13  Q    Okay.  There was extensive testimony about insurance

14  being reduced, as I recall.

15  A    Yes.

16  Q    Okay.  Now, you realize that the feed yard is only a part

17  of that appraisal?

18  A    I do.

19  Q    So would there be any reason to insure land?

20  A    Typically, no.

21  Q    So if the Debtor insured his total property for $2.4

22  million, and presuming that the number -- that the $2.9

23  million is the correct total value, and we're not presuming

24  that for this hearing, that was a hypothetical presumption,

25  $2.4 million would be sufficient to cover the collateral?

1        MR. ODELL:  Objection, Your Honor.  Assumes facts

2   not within evidence.

3        MR. TARBOX:  I believe the Debtor -- the witness

4   testified to whether the insurance was sufficient or not.

5   BY MR. TARBOX:

6   Q    Do you have any idea --

7        THE COURT:  Just a second.  We did -- I'm going to

8   overrule the objection.  You may ask the question.

9        MR. TARBOX:  Okay.

10  BY MR. TARBOX:

11  Q    Do you have any idea what the value of the personal

12  property belonging to Bugtussle is?

13  A    The personal property?

14  Q    Yes.

15  A    I think, per the appraisal, it was $550,000, if I

16  remember correctly.

17  Q    Okay.  So what else would the insurance need to cover?

18  A    What about the equipment?

19  Q    Okay.  That's what I -- I thought I asked you that.  What

20  is the value of the equipment?  Personal property would

21  include equipment.

22  A    Well, that's a good question.  I've seen an appraisal for

23  $650,000, I've seen the Debtor write it down to $350,000, and

24  in the plan it's at $250,000.  So, --

25  Q    So, but there's nothing that you've seen that would

1  suggest that the property was worth $2.4 million, is there?

2  A    What's the $2.4 million?  I didn't follow you.

3  Q    That's the amount of the insurance.

4  A    I thought it was $2.1 million.

5  Q    I can't recall myself.  But is it either $2.4 or $2.1

6  million?

7  A    I think it's $2.1 million --

8  Q    Okay.

9  A    -- was the amount of the insurance.

10 Q    Is there anything that you're concerned about losing

11 that's worth $2.1 million?

12 A    I would say so, yes.

13 Q    What would that be?

14 A    Well, there's buildings.  There is equipment.  There is

15 structures.

16 Q    Okay.  But the question I had a while ago is what was the

17 value of those items.

18 A    Well, again, I guess part of the discussion today is

19 we're trying to figure that out.

20 Q    Okay.

21 A    So, --

22 Q    You can't say for certain if that $2.1 or $2.4 million is

23 sufficient or not?

24 A    It appears insufficient.

25 Q    Okay.  Now, you said Circle W had feed and medicine on

Roberts - Cross                                    84

1   hand when it filed bankruptcy.

2   A   Correct.

3   Q   And what cattle did it have on hand when it filed

4   bankruptcy?

5   A   Prepetition cattle.

6   Q   And that would be cattle you had a lien on?

7   A   Correct.

8   Q   Were you expecting the Debtor to feed those cattle?

9   A   Yes.

10  Q   With what?

11  A   With the money we loaned him.

12  Q   With -- okay.  And how much money did you loan for feed?

13  A   Total was $106,000 for payroll and feed.  If I remember,

14  --

15  Q   How much for feed?

16  A   -- roughly $70,000 something.

17  Q   And how long do you think that would last?  Per --

18  A   I don't know.

19  Q   How many cattle did you have?

20  A   I think when we were out there it was around 11,000 head,

21  and then later the appraisal showed or the inspection showed

22  maybe 9,500 head.

23  Q   Okay.  What -- I'm sorry.  I didn't understand that.

24  When they filed, you had 11,000 head of cattle?

25  A   I'm saying that whenever we looked at the cattle it

1    appeared to be about 11,000 head, but after the fact the

2    appraisal came in at about 9,500 head.

3    Q    Well, the appraisal was taken long after they filed

4    bankruptcy.

5    A    No.  It was filed -- taken the next morning.

6    Q    Okay.  Nine -- you think there were 9,000 head of cattle?

7    A    9,500 head of cattle.

8    Q    Okay.  And do you have -- do you have any idea how fast

9    9,500 head of cattle can eat?

10   A    I don't.

11   Q    You don't have any idea at all?  But you expected those

12   cattle to be fed; is that correct?

13   A    I did.

14   Q    Okay.  And taken care of?

15   A    Yes.

16   Q    The administrative claim that we -- that Mr. Odell spent

17   a lot of time on, you said that you never agreed to that

18   treatment.  You never advised us of that, did you?

19   A    I have not talked to you about the administrative claims,

20   no.

21   Q    It's something to bring up in this hearing today, but you

22   are aware supposedly that when debtors propose plans, it's

23   almost anticipated that they will need to work things out with

24   creditors to try to resolve problems or differences?

25   A    My understanding --

1  Q   Or understandings?

2  A   My understanding was that we would wait on the plan, and

3  then if the plan was acceptable to us, then we would accept

4  the plan.  And if it wasn't acceptable to us, then we would

5  end up here today.

6  Q   And you -- okay.  But you have -- in other words, you're

7  -- the main reason you're here today is because you don't like

8  the plan?

9  A   Because the plan does not include the things in it that

10 it needs to include --

11 Q   Okay.

12 A   -- to protect the Bank as per the cash collateral order.

13 Q   And I would tell -- I would represent to you that

14 practically every plan I've ever filed, I've had to modify it

15 to satisfy certain creditors' concerns.

16 A   Okay.

17 Q   But you all haven't reached out to us to give us any of

18 your concerns except in the context of this hearing; is that

19 right?

20 A   I don't know if that's true or false.

21 Q   Okay.

22 A   We work with our attorneys.

23 Q   Ms. Roberts, prior to the bankruptcy being filed, and I

24 believe we say the bankruptcy was filed the early part of

25 April 2018.  Okay.  Looking back to December 2017, did you

Roberts - Cross                                    87

1    ever meet with Mr. Waggoner?

2    A    Yes.

3    Q    Did you meet with him at his house?

4    A    Which is his office, but yes.

5    Q    You met with him in -- in the -- I don't know if it's --

6    not in the Dimmitt town, but in the Dimmitt area, at his

7    ranch?

8    A    Yes, sir.

9    Q    And what was the purpose of that meeting?

10   A    To discuss moving forward with the filing of bankruptcy

11   by the Waggoner entities.

12   Q    Okay.  I'm not hearing you very well and I'm presuming

13   the Court's not hearing me very well, so I'll try to speak up.

14            THE COURT:  I can hear both of you fine.  I don't --

15            MR. TARBOX:  Okay.

16   BY MR. TARBOX:

17   Q    State the purpose of the meeting again.

18   A    We met with him to discuss his intentions to move forward

19   with filing bankruptcy by his entities.

20   Q    And what role would you play in that?

21   A    We were just -- the notes were matured and we were asking

22   him what his intentions were.

23   Q    And what was the Bank's intentions?

24   A    To not have a matured note that was in default.

25   Q    No, --

Roberts - Cross                                    88

1  A    To try to -- try to move forward.

2  Q    In regards to the bankruptcy, what was the Bank's

3  position?

4  A    That he should file bankruptcy.

5  Q    Why?

6  A    Because he had more debts than he could afford to pay.

7  Q    Why wouldn't you just foreclose on him?

8  A    We could.

9  Q    Were there any other agendas that the Bank had?

10  A    No, sir.

11  Q    Well, you were there at the meeting.  Was any other

12  agendas expressed?

13  A    We offered to, if he would be willing to file bankruptcy,

14  we offered to set aside part of his debt in the form of a

15  prepackaged bankruptcy plan.

16  Q    That would take care of Lone Star, or were you

17  representing the other creditors as well?

18  A    I didn't approach any other creditors, no.

19  Q    You were only concerned about Lone Star?

20  A    I was working for the Bank, yes.

21  Q    Okay.  What other incentives did you offer the Debtor?

22  A    I believe that he had brought to us some evidence that

23  some borrowing bases had been recalculated, and we told him

24  that anything like that or that that would not be brought up

25  in the bankruptcy, that we would not hold that against him.

1  Q    How long have you been represented by Mullin, Hoard &

2  Brown?

3  A    They handled the forbearance agreement for us in the

4  summer of 2017.   The Amarillo office.

5  Q    Okay.  And what attorney were you dealing with, was the

6  Bank dealing with at the time of your meeting in December?

7  A    I don't think there were any attorneys present.

8  Q    Not at the meeting, but what attorney was the Bank -- was

9  the Debtor -- who -- what attorney was representing the Debtor

10  at the time that you all met with Mr. Waggoner in December of

11  2017?

12  A    If you give me a name, I can probably confirm it.   I

13  don't know him.

14  Q    What about Jeff Carruth?

15  A    Yes.   That sounds right.

16  Q    And who hired Jeff Carruth?

17  A    I assume Quint did.

18  Q    Who recommended that he hire Jeff Carruth?

19  A    I do not know.

20  Q    You do not know?

21  A    No.

22  Q    At the meeting, was it stated who recommended that Jeff

23  Carruth be filed [sic]?

24  A    I couldn't tell you, Max.   I don't know.

25  Q    Did the bank tell Mr. Waggoner that the bank would pay

1  Jeff Carruth's attorney's fees?

2  A    I think as part of a prepackaged bankruptcy plan, yes,

3  that was part of the discussion.

4  Q    That you would fund his attorney -- Mr. Carruth's

5  attorney's fees?

6  A    Whatever attorney was on record at that time.

7  Q    No.  Did you agree to fund Mr. Carruth's attorney's fees?

8  A    As part of a bankruptcy plan.  I believe that was the

9  case.

10  Q    And what was Mr. Carruth supposed to do?  Why would --

11  well, let me ask you this question.  Why would you agree --

12  or, why would you state that you would support funding Mr.

13  Carruth's attorney's fees?

14  A    There was a lot of debt that the borrowers were trying to

15  get through, and there was a difference of opinion about the

16  collateral and whose collateral was what, and we believed the

17  best place to sort all that out was in the bankruptcy court.

18  Q    Okay.  And who referred Mr. Carruth to Mr. Waggoner?

19  A    Again, I told you I don't think I know that.  I thought

20  it was someone Mr. Waggoner had worked with.

21  Q    But it was stated in that meeting who referred --

22         MR. ODELL:  Your Honor, I'm going to object.  To the

23  extent he's referring to a meeting and specific conversations,

24  I think the witness has a right to hear or see those -- a

25  transcript of that meeting.

1          MR. TARBOX:  Okay.  I will do that in just a second.

2     BY MR. TARBOX:

3     Q    Who referred Mr. Carruth -- okay.  Let me ask you this

4     question.  You're saying you don't recall suggesting to Mr.

5     Waggoner that he hire Jeff Carruth?

6     A    I did not, no.

7     Q    No.  Did Mr. Thomas -- anybody at that meeting recommend

8     it?

9     A    I honestly don't remember.  So if you've got something to

10    help my memory, I'm glad to answer it.

11    Q    Okay.

12         MR. TARBOX:  Your Honor, at this time I would like

13    to introduce a taped recording of that meeting.  And I can

14    authenticate it by having the parties identify themselves that

15    participated in that meeting.  And I can do that prior to

16    submitting it as an exhibit, with the Court's permission.

17         THE COURT:  Okay.  But I take it you don't intend to

18    use the witness --

19         MR. TARBOX:  I intend to impeach, impeach the

20    witness with this tape, yes.

21         THE COURT:  Well, I understand that.  But as far as

22    authenticating the recording.

23         MR. TARBOX:  Oh.  Well, the witness -- the witness's

24    testimony -- the witness's comments are very prominent in the

25    tape, yes.

1          MR. ODELL:  Your Honor, at the moment, I'm going to

2     object to relevance.  I'm not quite sure what relevance all of

3     this has to do with the motion for relief from stay.  The

4     issues before the Court are whether or not there's cause and

5     whether or not there's equity in the property and whether or

6     not the Debtors can adequately protect the Bank and whether or

7     not the Debtors can show that there's a reasonable likelihood

8     of a plan coming forward that can be confirmed.

9          The pre- bankruptcy conversations, I'm not sure how those

10    get to these issues and why they're relevant to this hearing.

11         MR. TARBOX:  Your Honor, can I respond to the

12    objection, or --

13         THE COURT:  You may.

14         MR. TARBOX:  I think that this -- the Bank, Lone

15    Star Bank, has from the very -- not from the very beginning,

16    but from 2000 on, 2017 on, has basically set up a plan to

17    force Mr. Waggoner into bankruptcy, and it was mainly due to

18    satisfy their particular needs and at the -- it would have

19    done so at the expense of the other creditors.  I think, if

20    it's not criminal, it's at least unethical.

21         THE COURT:  Well, I assume that the issue on the --

22    we have a recording of this meeting?  Is that what you're

23    telling me?

24         MR. TARBOX:  Yes, Your Honor.

25         THE COURT:  And my question is, is who are you going

1  to use to authenticate that recording?

2          MR. TARBOX:  My understanding of Evidence Rule --

3  Federal Evidence Rule, I believe it's 901, is I can

4  authenticate it by parties identifying their own voices.

5          THE COURT:  And I assume, at least based on where

6  you've gone so far, that you're going to use the tape to

7  establish that perhaps the Bank or a representative of the

8  Bank suggested the Debtors use Mr. Carruth?

9          MR. TARBOX:  No, I'm trying to identify -- I'm

10  trying to establish, Your Honor, that the Bank incentivized,

11  deliberately, Mr. Waggoner to file bankruptcy so that they

12  could basically position themselves to exercise certain

13  lawsuits in this bankruptcy court, but not necessarily to

14  benefit Mr. Waggoner but basically to benefit the Bank.  And

15  they were basically saying that they have cause to lift the

16  stay, and I'm saying they have no basis to assert that there's

17  lack of -- that there is cause, when they themselves

18  orchestrated a bankruptcy, which I think is unethical, because

19  it was basically to benefit themselves.  They were going to

20  pay for the Bank's attorney.  I think I can establish that the

21  Bank basically referred Mr. Carruth to represent Mr. Waggoner.

22  Or, and agreed to pay Mr. Carruth.

23      And I think that puts the Bank in a very poor position to

24  be asserting cause or supporting the -- asserting they have

25  certain rights under a motion to lift stay, when this

1    bankruptcy probably shouldn't have been even filed.

2        And, of course, I can also ask the witness what provoked

3    the bankruptcy, and that's because the Bank, after the Debtor

4    refused to file the Chapter 11, they froze his bank -- they

5    froze his bank accounts.

6            THE COURT:  Well, okay.  I'll allow you to proceed

7    with an attempt to introduce this recording, as I understand

8    it.

9            MR. TARBOX:  Okay.  And I have a few more questions

10   before I do the recording, Your Honor, --

11           THE COURT:  Okay.

12           MR. TARBOX:  -- if you don't mind.

13   BY MR. TARBOX:

14   Q    I asked you early on how long Mullin, Hoard & Brown has

15   been representing you.

16   A    Yes.

17   Q    Okay.  And did you answer that?  You said you had them do

18   a forbearance agreement?

19   A    Correct.

20   Q    Okay.  Who -- you're forgetting who referred or if

21   anybody referred Mr. Carruth?

22   A    I don't recall being involved in the referral with Mr.

23   Carruth.  Again, it was my impression that Mr. Waggoner knew

24   him.

25   Q    Well, you recall being at that meeting, don't you?

1   A   Well, he was already the attorney at the meeting that I

2   think you're talking about.

3   Q   Okay.

4   A   I don't know which meeting you're referring to, but if

5   it's the December meeting at the Waggoner Calf Ranch, I

6   believe Mr. Carruth was already the attorney of record at that

7   point.

8          MR. TARBOX:  Your Honor, I hope this isn't too loud

9   because I have no control over the volume.

10      (Audio recording played, 12:40 p.m.)

11          MR. TARBOX:  Okay.

12  BY MR. TARBOX:

13  Q   Do you recognize your voice?

14  A   Yes, sir.

15  Q   Is that your voice?

16  A   It sounds like me, yes.

17  Q   And the other voice, is that Kirk Thomas?

18  A   I think there was one other voice.  I think it was Kirk.

19  Q   Okay.

20  A   And I also heard Quint.

21  Q   Okay.

22          MR. TARBOX:  Your Honor, I would like to introduce

23  this recording into evidence at this time.

24          MR. ODELL:  Your Honor, I'm going to object to the

25  admission of the recording.  Not only does the Movant need to

1   identify speakers, but they also need to show that this

2   recording is not edited.  And there's been no showing of that.

3   Or even that Ms. Roberts was the one that made this recording.

4          MR. TARBOX:  And I would like counsel to show me

5   where it says that in the Code.  In the Federal Rules.

6          MR. ODELL:  Well, Your Honor, I'll be more than

7   happy to point to Rule of Evidence 901 and don't see anything

8   where it talks about audio recordings.  It does refer to the

9   opinion about a voice, and Ms. Roberts has testified that she

10  does believe that's her voice.

11         MR. TARBOX:  Your Honor, Mrs. Roberts has identified

12  herself, Kirk Thomas, and Quint Waggoner's voice as those

13  being the ones on the tape.

14         THE COURT:  Well, Mr. Tarbox, I'm welcome to -- I'll

15  look at Rule 901, but I don't think you're at the point where

16  you can offer this into evidence.

17         MR. TARBOX:  Okay.  What --

18         THE COURT:  And it's not my job to explain to you

19  what to do.

20         MR. TARBOX:  Well, I -- okay.

21         THE COURT:  So, I'm going to -- to the extent you're

22  requesting that this recording be introduced into evidence and

23  we have an objection lodged, that I'll sustain that objection.

24         MR. TARBOX:  Pass the witness.

25         MR. HENDRICKS:  No questions from Rabo.

1        THE COURT:  Very well.

2                        REDIRECT EXAMINATION

3    BY MR. ODELL:

4    Q    Ms. Roberts, I just have a couple follow-up questions

5    regarding Mr. Tarbox's cross and direct.  Mr. Tarbox

6    questioned you about the Bank wanting the Debtors to care for

7    the cattle that existed as of the petition date in the feed

8    yard, or in the calf ranch, correct?

9    A    Yes.

10   Q    And he asked whether or not the Bank expected for the

11   Debtors to care for those cattle, correct?

12   A    Yes.

13   Q    And I believe your testimony was that you did?

14   A    Yes.

15   Q    Is it not correct that Lone Star actually paid for the

16   feed and care of those cattle?

17   A    Yes, we did.

18   Q    And that, in fact, the Debtors -- or, in particular,

19   Circle W of Dimmitt -- invoiced Lone Star for the feed and

20   care of those cattle?

21   A    Yes.

22   Q    And those bills have been paid?

23   A    They have been paid.

24   Q    Okay.  Now, Mrs. Roberts, he asked you some questions

25   about the Bank having meetings with the Debtors to -- or, in

1  particular, the Debtors' principal -- to discuss the filing of

2  a bankruptcy case.

3  A    Yes.

4  Q    Is that correct?  Did Mr. Waggoner -- well, let me back

5  up and ask you this.  Did the banks file an involuntary

6  bankruptcy case against Mr. Waggoner?

7  A    No, we did not.

8  Q    Did they file an involuntary bankruptcy case against the

9  Debtors?

10  A    No.

11  Q    Did -- when the Bank learned that Mr. Waggoner was no

12  longer -- or, no longer interested in placing either himself

13  or the Debtor entities into bankruptcy, what steps did the

14  Bank take?

15  A    I believe that was in January when we had a meeting to

16  discuss why he didn't think it was a good plan to file

17  bankruptcy and to explain to us why that he thought that Rabo

18  had adequately paid Waggoner Cattle for the cattle and that he

19  was not going to file bankruptcy.  And so we told him we would

20  like to review what he brought to us that day and understand

21  why there wasn't a discrepancy on the collateral at hand.

22  Q    Okay.  And so after this meeting and after review by the

23  Bank, did the Bank take certain actions to enforce its

24  security interests?

25  A    I believe in March of that year we filed a demand letter.

Roberts - Redirect                                    99

1   Q    Okay.

2   A    Or sent a demand letter.

3   Q    Okay.  Did they take other actions, like seeking a

4   receivership?

5   A    We talked about a receivership, but I don't think we

6   actually did anything.

7   Q    And to your knowledge, are those rights that the Bank has

8   based on the security agreements that you have?

9   A    Yes.  Absolutely.

10  Q    As well as the deeds of trust?

11  A    Yes.

12  Q    Okay.  Now, Mr. Waggoner, after -- prior to the

13  bankruptcy case, did the Bank come into possession of the calf

14  ranch?

15  A    Yes.

16  Q    And how did that come about?

17  A    What part of it?

18  Q    How Lone Star came into possession of that.

19  A    When we were in negotiations with the Debtor, we were

20  told that if we didn't accept their offer, that at 5:00

21  o'clock today they're going to abandon the yard.

22  Q    Okay.  And so, based on that communication to the Bank,

23  did the Bank take over to make sure the collateral was

24  protected?

25  A    We did.

1    Q    And, again, the collateral that existed at the feed yard

2    or the calf ranch were live cattle?

3    A    Yes.

4    Q    And they would need immediate attention?

5    A    Yes.

6    Q    And did the Bank scramble to try to get into place that

7    attention?

8    A    We did.

9    Q    When the Debtors filed for bankruptcy, what did the Bank

10   do?

11   A    We relinquished the yard back to the Debtors.

12   Q    Okay.  Did you do that willingly?

13   A    Absolutely.

14   Q    We didn't come to the Court to have a fight about that?

15   A    We did not.

16   Q    Okay.  Now, there was some questioning regarding the

17   payment of lawyers.  Do you recall that?

18   A    Yes.

19   Q    And did the Bank offer to pay Quint's lawyer or did they

20   offer to provide financing to cover the cost?

21   A    I honestly don't remember.

22   Q    Okay.

23   A    I assume it was the latter, but I don't know.

24   Q    Do you know whether or not there's any prohibition for

25   creditors to enter into pre-bankruptcy plans?

1    A    I do not know that.

2    Q    Okay.

3    A    I was told there was not.

4    Q    Okay.

5         MR. ODELL:  No further -- I'll pass the witness.

6         MR. TARBOX:  Your Honor, I just have one question.

7         THE COURT:  All right.

8                         RECROSS-EXAMINATION

9    BY MR. TARBOX:

10   Q    Ms. Roberts, what arrangement did the Bank have regarding

11   the proceeds of Debtors' collateral when the -- when the

12   cattle were sold?

13   A    After the bankruptcy?

14   Q    Before the bankruptcy.

15   A    They were -- the proceeds of the collateral were due to

16   the Bank.

17   Q    Okay.  Did the Bank get the account receivables?

18   A    The money was deposited into the Debtors' accounts at the

19   Bank.

20   Q    Okay.  And post-bankruptcy, did the same thing occur?

21   When the Bank -- when the Debtors sold the Bank's collateral,

22   did the Bank get the money?

23   A    The money was wired to the Bank.

24   Q    Okay.  Thank you.

25        MR. HENDRICKS:  No questions.

1          THE COURT:  Very well.  Let me see.

2                    EXAMINATION BY THE COURT

3          THE COURT:  I have a couple questions, Ms. Roberts.

4    Let me see if I can find them.

5       (Pause.)

6          THE COURT:  The question I have, and this is just

7    clarification based on your answer to a question, and I'm sure

8    I'm taking this a bit out of context, but you referred early

9    on in your -- in the questioning to Waggoner Calf Ranch.  And

10   can you clarify for me what you're referring to when you refer

11   to Waggoner Calf Ranch?

12         THE WITNESS:  Sure.  It's south of Dimmitt.  Their

13   physical location is south of Dimmitt, I think 15 miles.  And

14   it, again, includes some farmland with pivots on it.  It also

15   includes about a 25,000-head capacity feed yard or grow yard.

16   And then equipment and fixtures that go along with that

17   operation.  So the physical aspect of it is all of those

18   entities at one time or another have operated at that

19   location.

20         THE COURT:  Okay.  When I read the pleadings, my

21   recollection is that -- and this is from the pleadings by the

22   Bank -- you talk about the, basically, the four entities.  And

23   it talks about Waggoner Cattle, LLC as the entity that -- I

24   don't know if I'm -- as I recall, purchased the calves.  And

25   then they'll -- I guess what I'm trying to understand is

1    what's the relationship between Waggoner Cattle, LLC and

2    Circle W of Dimmitt, Inc.?  And to make it more confusing, and

3    how does that relate to this idea of the Waggoner Calf Ranch?

4          THE WITNESS:  So, Waggoner Cattle buys the cattle,

5    and some of them are day-olds that they get from the dairies

6    around Dimmitt and some of those are cattle that they're

7    purchasing and bringing in to what are called the calf ranch.

8    So the calf ranch, I think, is collectively that whole area

9    and all the entities combined, where they're just operating

10   the business of growing cattle.

11        Circle W takes the responsibility of feeding the cattle

12   and generating the accounts receivable.  They feed for

13   Waggoner Cattle, which is their own entity, but they also feed

14   for customers.

15         THE COURT:  Okay.  Would it be, then, as you

16   understand it, Bugtussle that owns these physical facilities

17   that you're referring to?

18         THE WITNESS:  Yes, sir.  That is true.

19         THE COURT:  And then the others are operating --

20   okay.  That clarifies it for me.  I was just confused when you

21   were referring to the Waggoner Calf Ranch, if that was

22   something different from what I understood from the pleadings.

23        Counsel can follow up with any questions based on what

24   I've asked, if you have any.

25         MR. ODELL:  No further questions.

1              THE COURT:  I just wanted a clarification.

2              MR. ODELL:  No further questions from Lone Star.

3              MR. TARBOX:  No further questions.

4              THE COURT:  Very well.  You may step down.  Thank

5  you, Ms. Roberts.

6              THE WITNESS:  Thank you.

7         (The witness steps down.)

8              THE COURT:  All right.  How much more do we have, or

9  --

10             MR. ODELL:  Your Honor, at this time we would rest.

11             THE COURT:  Okay.  And Mr. Tarbox, for today,

12  anything?

13             MR. TARBOX:  I'd rest.

14             THE COURT:  Okay.  As I understand it, then, you all

15  -- have you made arrangements concerning the deposition of the

16  appraiser?

17             MR. ODELL:  Your Honor, we didn't know for sure how

18  long this hearing would take, and so we were maybe a little

19  too optimistic, thinking that we would be done in time to have

20  Mr. Bumguardner deposed today.  Based on the fact that I

21  believe Mr. Tarbox is now going to put on his case, I don't

22  know that that's going to be feasible.  I've asked Mr.

23  Bumguardner to give me dates as to when he could be available

24  for a deposition as well as hearings, so that then we could

25  coordinate that with the Court and with opposing counsel.

1            THE COURT:  Okay.  Mr. Tarbox, was there further

2    evidence you intended to put on for today, or were you looking

3    to take this deposition first?

4            MR. TARBOX:  I wanted to examine Mr. Kirk Thomas and

5    possibly --

6            THE COURT:  Okay.  You're going to have to get up

7    close to a microphone.

8            MR. TARBOX:  I'm sorry.  I wanted to examine Mr.

9    Kirk Thomas and possibly Mr. Quint Waggoner.

10           THE COURT:  Okay.  For your side of the case today?

11           MR. TARBOX:  Yes.

12           THE COURT:  Okay.  All right.  That's all I need to

13   know.  We'll take a lunch break, and we will reconvene at 2:00

14   o'clock.

15           MR. TARBOX:  Okay.

16           THE COURT:  Okay.  We'll be in recess.

17           THE CLERK:  All rise.

18       (A luncheon recess ensued from 12:55 p.m. until 2:14

19   p.m.)

20           THE CLERK:  All rise.

21           THE COURT:  You may be seated.

22           MR. TARBOX:  Your Honor, may I make a statement to

23   the Court?

24           THE COURT:  Certainly, Mr. Tarbox.

25           MR. TARBOX:  What I'm proposing is that I call three

1  witnesses.  Two of them will be very short.  And then I

2  anticipate at that time I will rest.  And then we'll schedule

3  the hearing on Mr. Bumguardner at a later time.

4           THE COURT:  Okay.

5           MR. TARBOX:  And I'll work that out between Mr.

6  Odell and myself.

7           THE COURT:  Okay.  That's fine.  I have -- I did a

8  brief review, not to the point where I have reached any

9  conclusion, but concerning the tape recording, or the

10 recording, however it was recorded.  There is a view under the

11 law of a more relaxed standard for authenticating a recording,

12 and Ms. Roberts' testimony satisfies that.

13    There are other aspects about the recording, and I don't

14 know if the parties agree on the other aspects -- the time of

15 the recording, where it happened and so forth, and who did the

16 recording.  But with that in mind, I will allow Mr. Tarbox to

17 recall Ms. Roberts, if need be.  At the next hearing, in fact,

18 if that's necessary.  So, --

19          MR. TARBOX:  I can use the recording with Mr. Kirk

20 Thomas?  That's fine?

21          THE COURT:  Okay.  Well, we'll proceed, then.

22          MR. TARBOX:  Okay.

23          MR. ODELL:  Your Honor, regarding the recording, the

24 only thing that we would ask is that, of course, the entire

25 recording be admitted into evidence, as opposed to snippets

1   picked by the Debtor.

2          MR. TARBOX:  We will do that.  And I'll -- I have

3   the whole recording being transcribed, which, as soon as it's

4   finished, I'll give a copy to Mr. --

5          THE COURT:  Okay.

6          MR. TARBOX:  Okay.  At this time, Your Honor, I need

7   to recall Melisa Roberts to the stand, just for a couple of

8   questions.

9          THE COURT:  Ms. Roberts, you're still under oath,

10  okay?

11         MS. ROBERTS:  Okay.

12       MELISA ROBERTS, DEBTORS' WITNESS, PREVIOUSLY SWORN

13                      DIRECT EXAMINATION

14  BY MR. TARBOX:

15  Q   Ms. Roberts, a while ago you testified as to the Debtors'

16  insurance of collateral.  Do you recall that?

17  A   Yes, sir.

18  Q   And I believe Mr. Odell referred you to certain exhibits

19  that Lincoln Financial Group had put together to show that --

20  the coverage on the property that Mr. -- that Waggoner Cattle

21  owned.  And I would look -- I would refer you, I believe, to

22  --

23      (Counsel confer.)

24         MR. TARBOX:  Just one second, Your Honor.  I got the

25  wrong exhibit.

1   BY MR. TARBOX:

2   Q    Can you turn to Exhibit 90?

3   A    Okay.

4   Q    In the -- Lone Star's exhibits.  Okay.  Would you agree

5   with me that those properties that are insured are basically

6   the buildings, the barns, the hutches or the huts?

7   A    Yes, sir.

8   Q    And the same thing could be said if you look at Exhibit

9   92.  Again, we're talking about metal buildings, barns, tanks.

10  Would you agree that that exhibit displays that kind of

11  collateral?

12  A    Are you talking about 91?

13  Q    92.

14  A    I think 92 is the recap, isn't it?

15  Q    Okay.  Do you get copies of all the insurance that the

16  Debtor purchases for his collateral?  For your collateral?

17  A    I'm not sure.  We try to.  I don't know if I've seen any

18  other policies, though.

19  Q    Okay.  Have you seen any policies that cover insurance

20  coverage on the Debtors' equipment?

21  A    I have not.

22  Q    So you don't know or can't testify that -- as to whether

23  or not the Debtor has his equipment insured?

24  A    No.  Not today, I can't.

25  Q    Okay.  Now, but the -- as far as you saying about the

1    value of the collateral that's being insured, all you're

2    referring to is the fixtures or improvements; is that right?

3    A    The real estate collateral.

4    Q    You aren't prepared to testify about whether the

5    equipment is insured or not?

6    A    That is correct.

7    Q    Okay.

8              MR. TARBOX:  That's all I have, Your Honor.

9              THE COURT:  Do you have any --

10             MR. ODELL:  No, Your Honor.

11             THE COURT:  You may step down, Ms. Roberts.

12             THE WITNESS:  Thank you.

13        (The witness steps down.)

14             MR. TARBOX:  I'd call Mr. Kirk Thomas at this time.

15             THE CLERK:  Mr. Thomas, please raise your right

16   hand.

17             KIRK THOMAS, DEBTORS' WITNESS, SWORN

18                    DIRECT EXAMINATION

19   BY MR. TARBOX:

20   Q    State your position, please.

21   A    I am president and manager of the Lubbock branch with

22   Lone Star State Bank.

23   Q    And how long have you held that position?

24   A    Since the bank started in 2007.

25   Q    And where did you work before then?

1    A    State National Bank in Lubbock.

2    Q    Okay.  So how long have you been in the banking business?

3    A    Started in 1982.

4    Q    Okay.  And you're aware of the loans to the Waggoner

5    Cattle entities?

6    A    Uh-huh.  Somewhat.

7    Q    Somewhat?

8    A    Many of the details, sure.

9    Q    Okay.  And you -- it was testified earlier that the Bank

10   had to go out there and take possession of cattle and so

11   forth.  Do you recall that testimony that Mrs. Roberts made?

12   A    Oh, I don't -- I don't know the -- I don't remember the

13   exact testimony if you're describing we had to take

14   possession.  I think I know the incident you're probably

15   describing.

16   Q    Okay.

17   A    In April?

18   Q    Yeah.  Now, was Mr. Waggoner at the ranch when that

19   happened?

20   A    Let me remember.

21   Q    Were you --

22   A    I don't believe he was.  I don't believe he was.

23   Q    Okay.  Were you there?

24   A    I eventually made it there at the end of the day.

25   Q    Okay.

1    A    Sure.

2    Q    Because I think there was some testimony that Mr.

3    Waggoner tried to prevent the property from being taken by the

4    Bank.

5    A    No, I don't believe so.

6    Q    Okay.

7    A    That wasn't my recollection.

8    Q    Okay.  But so Mr. Waggoner was not there and did not

9    disturb you or interrupt your activities?

10   A    No.

11   Q    Okay.  I have -- was asking Mrs. Roberts about this

12   meeting that was in December.  Do you remember going to a

13   meeting with Mr. Waggoner in December of 2017 at his house or

14   ranch?

15   A    Yes, I do.  I do.

16   Q    Were you there?

17   A    I was.

18   Q    And who else was there?

19   A    Myself, Ms. Roberts, and Mr. Alan Lackey.

20   Q    Okay.  And what was the purpose of that meeting?

21   A    We had gone on for months -- really, the entirety of 2017

22   -- and just were not making any progress in resolving what we

23   deemed to be a problem on.  Differing ideas were proposed.

24   And for several months, the course we struck was to develop a

25   plan where we would try to recover some claims that Quint, Mr.

1  Waggoner, thought he had against, first, Rabo Bank, and then

2  the auditing concern, Moseley & Riddle.

3  Q    Okay.

4  A    And, again, but, months, nothing ever came.  He had first

5  said he would go along, then he wouldn't, and then we just had

6  to call the question.

7  Q    Okay.

8  A    So, --

9  Q    So, --

10 A    -- that was the purpose of that meeting.

11 Q    -- other than calling the question, did you have -- the

12 Bank have any other agenda at that -- to discuss at that

13 meeting?  For example, the Rabo lawsuit?

14 A    The lawsuit?

15 Q    The Bank's belief that they could sue Rabo Agriculture.

16 A    I may not follow your -- that question.

17 Q    Did you all discuss the issue regarding the Bank's

18 ability to sue Rabo Agriculture --

19 A    Okay.  Okay.

20 Q    -- in the bankruptcy court?

21 A    I'm sure we probably did.  I will tell you, I don't

22 remember word for word that entire conversation.  But that

23 probably would, it would have been on our mind.

24 Q    Okay.  Did you discuss that with Mr. Waggoner?

25 A    He was there at the meeting, so if it came up he would

1    have been a party to the conversation.

2    Q    But do you remember discussing it with him?

3    A    Again, I don't remember the exact words and conversation.

4    That was the general subject, I believe.

5    Q    Okay.  Did you ask Mr. Waggoner to hire Jeff Carruth to

6    represent him in the Chapter 11 bankruptcy?

7    A    I didn't.  I didn't.

8    Q    You did not?

9    A    I don't even know who he is, so I did not.

10   Q    Okay.

11   A    I don't think I did.  I've -- yeah.  Don't remember all

12   the details.

13   Q    Okay.  Did you tell Mr. Waggoner that the Bank would

14   figure out a way to fund Mr. Carruth's attorney's fees?

15   A    I don't remember if we discussed it at that meeting.  I

16   would say it was -- I think our -- the general concept we had

17   would be a prepackaged bankruptcy where we would provide

18   debtor-in-possession financing that would cover his attorney

19   fees.

20   Q    Okay.  So the Bank would fund Mr. Carruth's attorney

21   fees, or not?

22   A    Or whoever it would have been.

23   Q    Okay.

24   A    That was the concept.

25   Q    Now, did you also offer to Mr. Waggoner that if he would

1  file Chapter 11 that you all would write down your claim by

2  approximately $4 million?

3  A    I think that we're going to give him credit toward that.

4  I think that's right.

5  Q    Well, that's what I meant by writing down.

6  A    Yeah.  Yeah.  Okay.

7  Q    Okay.

8          MR. TARBOX:  Just one second, Your Honor.

9          THE COURT:  Okay.

10          MR. TARBOX:  Is it working yet?

11          THE CLERK:  Mr. Tarbox, you'll have to turn it on on

12  your iPad.

13          MR. TARBOX:  Oh, okay.  My fault.

14  BY MR. TARBOX:

15  Q    Now, then, you -- it was also testified by Ms. Roberts

16  that you all agreed to not pursue certain objections to his

17  discharge if he were to file bankruptcy.  Is that correct?

18  A    I don't know about the objections.  That's -- that's kind

19  of over my paygrade when you're talking a legal thing like

20  that.

21  Q    Uh-huh.

22  A    I don't know.

23  Q    Okay.

24  A    I don't know.

25  Q    So, and you don't know anything about Mr. Carruth?

1   A    I know the name and I think I remember being at a

2   meeting, maybe he -- he was supposed to attend at a meeting

3   and he didn't make it.  I think he got teleconferenced in.

4   Q    Okay.

5   A    I remember that.

6   Q    But you had nothing to do with Mr. Waggoner hiring Mr.

7   Carruth as his bankruptcy attorney?

8   A    Me?

9   Q    Yes.

10  A    Uh, if --

11  Q    Okay.

12  A    Don't remember that.  Yeah.  It might have been a

13  suggestion.

14  Q    Well, --

15  A    Yeah.  I just, I just don't remember.

16  Q    -- you may have suggested Mr. Carruth?

17  A    We may have.

18  Q    Do you know Mr. Carruth?

19  A    We may have.  I just don't know.  I don't.

20  Q    Who referred Mr. Carruth to you?

21  A    It could have came up from our own counsel.

22  Q    Who's your own counsel?

23  A    Mullin, Hoard & Brown.

24  Q    Okay.  Now, are you aware that Mr. Waggoner met with

25  Mullin, Hoard & Brown attorneys prior to the December

1   meeting?

2   A    Prior to December?  Hmm.

3   Q    Specifically, with David Langston.

4   A    Well, I can't say that I do.

5   Q    But you --

6   A    I don't recall that.

7   Q    But you think that Mullin Hoard may have referred --

8   A    I --

9   Q    -- to you that Mr. Carruth would be a good attorney for

10  --

11  A    I literally do not remember, I just don't, where that

12  name came up from.  I don't know.

13  Q    Okay.

14  A    We also have another attorney, John Lovell.  Maybe it was

15  John.  I just don't remember.

16  Q    Okay.  But Mullin, Hoard & Brown was representing the

17  Bank at that time?

18  A    And -- along with John Lovell.

19  Q    Okay.

20  A    Yes.

21  Q    Listen to this tape here.

22          MR. TARBOX:  Your Honor, may -- I'd like to

23  introduce this recording at this time.

24          THE COURT:  Very well.

25          MR. TARBOX:  I'm going to have three segments here.

1          (Audio recording played, 2:27 p.m.)

2    BY MR. TARBOX:

3    Q    Before we proceed, is that your voice?

4    A    I'm afraid so.

5    Q    Okay.

6    A    It doesn't sound very good.

7    Q    Okay.

8          (Audio recording played, 2:27 p.m. to 2:28 p.m.)

9    BY MR. TARBOX:

10   Q    And why did you say "Yeah" when he said that?

11   A    Don't remember.  I literally don't remember.  I don't

12   know who recommended him.

13   Q    No, I said --

14   A    It could have come from --

15   Q    No, you --

16   A    Yeah.

17   Q    I asked you if you recommended Carruth to Mr. Waggoner.

18   A    Not me personally.  Did our counsel, one of our counsel

19   come up with the name?  Probably.  I just don't recollect it.

20   Not trying to be evasive at all.  I just literally don't

21   remember where that name came from.

22   Q    Okay.

23         (Audio recording played, 2:29 p.m. to 2:32 p.m.)

24   BY MR. TARBOX:

25   Q    Okay.  Two things.  You would not file objections to

 1  dischargeability or discharge, and two, you would discount

 2  your claim by approximately $4 million?

 3  A    I think at that time that's where we thought the

 4  collateral values would have been.

 5  Q    Okay.

 6  A    You know, plus a million dollars.  Yes, sir.

 7  Q    One more, and then we'll be finished.

 8  A    Yes.

 9      (Audio recording played, 2:32 p.m. to 2:33 p.m.)

10  BY MR. TARBOX:

11  Q    Okay.  You said you're going to have to figure out how to

12  fund that.  Why would you be funding that?  You're a creditor.

13  A    Well, because he would have to be represented in

14  bankruptcy.

15  Q    Now, you're aware of prepackaged bankruptcy cases; is

16  that correct?

17  A    I know there's a concept.  Don't know the details, but I

18  do.

19  Q    Because I'm trying to draw the distinction between a

20  prepackaged bankruptcy and you basically trying to coerce him

21  into filing Chapter 11.

22          MR. ODELL:  Objection, Your Honor.  He misconstrues

23  the testimony and the evidence.

24          THE COURT:  Objection overruled.  You may ask the

25  question.

Thomas - Direct                               119

1    BY MR. TARBOX:

2    Q    Were you trying to negotiate a prepackaged bankruptcy

3    plan or were you just simply trying to coerce him into filing

4    Chapter 11?

5    A    It was -- it was -- he gave him two options.  I mean, you

6    heard it.  And so --

7    Q    Did he have any leverage over the Bank?

8    A    Did he -- did Mr. Waggoner have leverage over us?

9    Q    Other than not paying you, I guess.

10    A    Yeah.  Other than that, no.

11    Q    Okay.  Did you have any leverage over Mr. Waggoner?

12    A    No.

13    Q    Did you threaten to foreclose on his property?

14    A    It wasn't a threat.  It was a --

15    Q    Actual --

16    A    Yeah.

17    Q    -- thing you were going to do?

18    A    It wasn't a threat.

19    Q    Unless he agreed to file Chapter 11?

20    A    Correct.

21    Q    Okay.

22    A    That's correct.

23         MR. TARBOX:  No further questions, Your Honor.

24         (Counsel confer.)

25                         CROSS-EXAMINATION

1  BY MR. ODELL:

2  Q    Mr. Thomas, you heard the video or the audio that was

3  just played; is that correct?

4  A    Yes, sir.

5  Q    And you identified your own voice; is that correct?

6  A    Yes, sir.

7  Q    Who else did you hear on that audio?

8  A    Ms. Roberts.

9  Q    Okay.  Was there anybody else that you heard?

10  A    Well, Mr. Waggoner.

11  Q    Okay.  So Mr. Waggoner was the one also, the gentleman

12  speaking?

13  A    Yes.

14  Q    And during that meeting, did he tell the Bank that he was

15  willing to file Chapter 11?

16  A    Yes, he did.

17  Q    Had he been telling you that for a time?

18  A    Yes, he did.

19  Q    Okay.  And did you hear the testimony in -- or the voice

20  in there, the discussions that he hired Mr. Carruth?

21  A    Yes, I did.

22  Q    And that he had paid Mr. Carruth $10,000?

23  A    Yes.  We heard that.

24  Q    Okay.  And that was Mr. Waggoner that said those things,

25  correct?

Thomas - Cross                                    121

1    A    It was.

2    Q    Now, prior to this meeting, which I believe was

3    supposedly in December of 2017 -- does that sound about right?

4    A    Yes, it was.  The very end of the month.

5    Q    How long had been Mr. Waggoner been in default?  Or the

6    Debtors been in default?

7    A    Well, since the prior year.

8    Q    Okay.  So do you recall the testimony of Mrs. Roberts

9    about that the Debtors were in default prepetition?

10   A    Yes, I do.

11   Q    And do you recall the testimony that they were in default

12   prior to entering into the forbearance agreement?

13   A    Yes, I do.

14   Q    And then the Debtors entered into the forbearance

15   agreement with Lone Star; is that correct?

16   A    Correct.

17   Q    Now, did the Debtors perform under the forbearance

18   agreement?

19   A    Not as required.

20   Q    Okay.  Did they go back and default under the forbearance

21   agreement?

22   A    They did.

23   Q    And at the time of this meeting, were they in default at

24   the forbearance agreement?  Or on the forbearance agreement?

25   A    They were, yes.

Thomas - Cross                                    122

1  Q    Okay.  Now, will you turn with me to Exhibit 84?  That's

2  going to be in Volume 7.

3  A    Okay.

4  Q    Will you turn to Page 9 of 35?

5  A    I have it.

6  Q    Now, on the bottom of Page 9 of 35, there is a paragraph

7  that begins on Page 9 and continues to Page 10.  Do you see

8  that paragraph?

9  A    I believe I do.

10 Q    And could you read that for the Court?

11 A    "Waggoner met with LSSB and ANB personnel in early

12 January 2017 and requested that they continue to go with him.

13 He argued" --

14 Q    Okay.  Hold on.  Hold on.

15 A    -- "that the banks" --

16 Q    Sorry to interrupt, but hold on for one moment there.  Do

17 you recall meeting with Mr. Waggoner in around that time?

18 A    Not specifically --

19 Q    Okay.

20 A    -- right now.

21 Q    But do you know or do you have any knowledge as to

22 whether or not he met with Lone Star State Bank personnel as

23 well as Amarillo National Bank?

24 A    We just had continuing meetings.  It would not surprise

25 me.  But I just don't remember this specifically.

Thomas - Cross                                      123

1   Q    Okay.  Would you continue reading, then?

2   A    Okay.  "He argued that the banks will be paid in full, if

3   given time, because his core operation was viable.  Requested

4   an operating budget and agreed to consider his request.  It

5   took five months before the final answer came from the banks

6   that they would in fact move forward."

7   Q    Okay.  So, according to the Debtors' plan and what

8   they're representing to the Court, there was a meeting in

9   January of 2017, correct?

10  A    Yes.

11  Q    And he said that he was going to be able to pay back the

12  Bank in full?

13  A    That's what it says.

14  Q    And that he was waiting on -- he had given the Bank

15  budgets to consider?

16  A    Yes.

17  Q    Now, this would have been prior to the forbearance

18  agreement, correct?

19  A    That's what led up to it, yes.

20  Q    And the Bank eventually agreed to enter into the

21  forbearance agreement with him, correct?

22  A    We did.

23  Q    And to give him an opportunity to make good on his word?

24  A    Correct.

25  Q    And at the time of the forbearance agreement, he was in

1   default, correct?

2   A    That's correct.

3   Q    And at the time before the bankruptcy filing, was he in

4   default again?

5   A    Yes, he was.

6   Q    And was, at the time of this audio recording, him in

7   default again?

8   A    He would have been, yes.

9   Q    Now, Mr. Tarbox asked you certain questions about claims

10  against third parties.  Do you recall him asking you questions

11  regarding claims against Rabo?

12  A    Okay.  Yes.

13  Q    And did Mr. Waggoner first approach the Bank about claims

14  that he believed he had against Rabo?

15  A    Yes.  That's how we came to become aware of that

16  possibility.

17  Q    And do you recall what he said to you were those claims?

18  Or the cause for those claims?

19  A    Well, there were numerous causes, but one of which was

20  that he understood he had made arrangements with them to both

21  refinance our debt plus finance his purchase of a cattle

22  confinement feeding business, which they didn't, didn't

23  accomplish either one.  And then, furthermore, there was a

24  question that came up about how the cattle sales proceeds were

25  shared among the two banks, that those may not have been

Thomas - Cross                                        125

1  apportioned the way they should have.

2  Q    Would you turn with me back to Page 9 of Exhibit 84?

3  A    Okay.

4  Q    And starting in Paragraph -- or, the third full

5  paragraph.  I'm going to go ahead and read that to you.  It

6  says, "In early 2016, Lone Star and Rabo Bank agreed it was

7  best for both banks to consolidate all cattle financing to one

8  lender.  Rabo Bank, being the larger bank, could accommodate

9  the large amount of livestock credit needed to finance

10 Waggoner's operations.  Lone Star would then provide all the

11 fixed asset financing requirements of the operation, including

12 the Great Plains Feed Yard purchase."

13     Is that correct?  Were you going to finance the feed yard

14 purchase?  Was Lone Star going to finance the feed yard --

15 A    We had contemplated it.

16 Q    Okay.

17 A    We had not formally approved it, but neither had we

18 denied it.

19 Q    Okay.

20 A    We had contemplated that.

21 Q    Okay.  So, so far, is that an accurate depiction of what

22 was going on at this time?

23 A    I believe so, yes.

24 Q    Okay.  And then I'm going to continue to the next

25 paragraph.  "A closing date for the feed yard purchase was set

1   for June of 2016.  Was subsequently changed to November, at

2   the request of Rabo Bank."  Does that sound correct?

3   A    Yes.

4   Q    Now, continuing in that paragraph, it says, "It should be

5   noted that from early 2016, the Waggoner Cattle Feed Yard or

6   entities began filling up Great Plains Feed Yard with his

7   cattle in anticipation of a purchase of that feed yard later

8   that year.  This is significant because it was known that some

9   of the cattle being placed in the feed yard would lose money,

10  but the feed profits from the cattle were expected to offset

11  the losses in full or in part."

12       Is that part of the conversations that Mr. Waggoner had

13  with you regarding --

14  A    That's what we had always understood, yes.

15  Q    Okay.  And then, going on to the next paragraph, "Cliff

16  Hanger's line of credit was to be renewed in November, at

17  which time they were expected to consolidate all financing

18  with Rabo Bank, and Lone Star would finance the fixed assets.

19  However, in late November, without prior notice, Rabo Bank

20  informed Waggoner they were not going to finance the Waggoner

21  Cattle entities' operations going forward and were, in fact,

22  going to liquidate his line of credit."  Does that sound

23  familiar?

24  A    Yes, it does.

25  Q    And are those the conversations that Mr. Waggoner had

Thomas - Cross                          127

 1   with you as to what he believed to be causes of action against

 2   Rabo?

 3   A    Yes.

 4   Q    And if you'll continue with me now to the next paragraph,

 5   it says, "The decision by Rabo Bank had a negative effect on

 6   Waggoner's total operation.  The Waggoner Cattle entities lost

 7   a total of $1.8 million, $1.3 million of money from the lost

 8   profits accrued, and the $500,000 of earnest money."  Do you

 9   see that?

10   A    Yes, I do.

11   Q    And were those damages that Mr. Waggoner brought up to

12   the Bank --

13   A    Yes.

14   Q    -- as against Rabo Bank?

15   A    Yes, they did.

16   Q    So, Mr. Waggoner came to the Bank and said he's in this

17   financial problem because Rabo pulled out.  Is that --

18   A    Yes.

19   Q    -- accurate?

20   A    That's how he characterized it.

21   Q    And he believed that he had claims against Rabo Bank?

22   A    He did, yes.

23   Q    Now, in the audio that you heard, did you hear Mr.

24   Waggoner admit that he believed he had -- that there were

25   claims against Rabo Bank?

Thomas - Cross                          128

1    A    Yes.

2    Q    And so were -- was the Bank the one that was the only one

3    pushing for claims against Rabo Bank?

4    A    No, it didn't sound like it.

5    Q    Now, in this meeting that you had, you essentially said

6    there's kind of two roads to go down, correct?

7    A    Yes.

8    Q    One would be the filing of a Chapter 11 bankruptcy?

9    A    That's correct.

10   Q    And the bank was willing to enter into somewhat of a

11   prepackaged bankruptcy plan for that, correct?

12   A    Yes.

13   Q    And that entailed treatment of Lone Star's claim?

14   A    That's correct.

15   Q    Did it also entail how the Debtors might be able to

16   finance the filing of a bankruptcy?

17   A    Yes, it did.

18   Q    Is it your understanding that the Debtor entities would

19   need to be represented in bankruptcy?

20   A    Yes.  Or --

21   Q    And that they were going to need counsel of their own?

22   A    Certainly.

23   Q    And was it the Bank's intention to assist the Debtors in

24   acquiring counsel through the possibility of a debtor-in-

25   possession loan?

1   A    That's correct, yes.

2   Q    Has the Bank ever made any payments to Mr. Carruth?

3   A    No.

4   Q    The Bank didn't pay Mr. Carruth a retainer?

5   A    No.  We didn't engage him.

6   Q    Now, again, the two options that were presented in that

7   audio were filing a bankruptcy case in which Rabo -- or,

8   sorry, in which Lone Star and the Debtors would agree to a

9   prepackaged plan, correct?

10  A    Correct.

11  Q    And then the other option was that Lone Star would

12  proceed forward under its loan documents and state law?

13  A    That's correct.

14  Q    And by this time, the Debtor had essentially been in

15  default for more than a year?

16  A    Over a year, yes.

17  Q    During this time, had the Debtors made monthly payments

18  on the debt?

19  A    Not regularly.

20  Q    What do you mean by not regularly?

21  A    Irregularly.

22  Q    Okay.  Were the only ways that they made payments was

23  mostly through liquidating collateral?

24  A    Primarily, yes.

25  Q    And was part of that collateral an airplane that you all

Thomas - Cross                                    130

1   had a lien against?

2   A    That's correct.

3   Q    Okay.  Now, at some point, Mr. Waggoner decided

4   bankruptcy was not what he was going to do; is that correct?

5   A    It seemed like it, yeah.  For reasons I don't understand.

6   But yes.

7   Q    And do you recall when about that might have occurred?

8   A    Oh, along about March of '18, it seems like.

9   Q    Okay.

10  A    It seems like.

11  Q    And so if Mr. Waggoner decided he wasn't going to choose

12  the bankruptcy route, what was the Bank -- what did the Bank

13  decide to do?

14  A    I think there were some conversations back and forth

15  where they were inquiring about possible settlements, --

16  Q    Okay.

17  A    -- coming up from some third-party financings.  So we

18  went back and forth with some of those ideas, but none of them

19  were satisfactory.

20  Q    During this time, was he -- did he start to begin to make

21  regular payments?

22  A    No, sir.

23  Q    And I believe you just stated that the -- eventually,

24  these discussions went nowhere?

25  A    They did not.

1  Q   And so the Bank next moved to enforce its liens?

2  A   That's correct.

3  Q   And do you recall whether or not the Debtors turned over

4  the property to -- and by property, I mean the calf ranch --

5  to the Bank?

6  A   They actually turned over the cattle, the personal

7  property.  And then we would have probably commenced

8  foreclosure proceedings on the real estate, but we didn't get

9  that far.

10 Q   Well, did they actually say, you're going to need to come

11 and --

12 A   They gave us possession, yes.  We took possession.

13 Q   That you need to come take care of these cattle?

14 A   That's correct.

15 Q   Okay.  And did Lone Star do that in order to protect its

16 collateral?

17 A   We did.

18 Q   Now, the bankruptcy case was filed on April 9th; is that

19 correct?

20 A   That sounds right, yeah.

21 Q   Okay.  And when the bankruptcy case was filed, did Lone

22 Star turn back over possession?

23 A   We did.

24 Q   Okay.

25 A   We did.

Thomas - Cross                              132

1   Q    Now, Mr. Tarbox brought up two so-called concessions that

2   were potentially discussed in this audio.  One was that the

3   Bank would agree to not go after an objection to Mr.

4   Waggoner's discharge?

5   A    That is correct.

6   Q    And that was because Mr. Waggoner was personally liable

7   on this debt as well; is that correct?

8   A    He is, yes.

9   Q    Okay.  And then the other was a mechanism to reduce the

10  total amount of debt that Lone Star would expect to be paid

11  through the plan?

12  A    That's correct.

13  Q    And these were negotiations between the two parties,

14  correct?

15  A    They were, yes.

16  Q    And Mr. Waggoner was represented at the time, correct?

17  A    He would have been, yes.

18  Q    Okay.  And eventually Mr. Waggoner decided he didn't want

19  to do that?

20  A    That's correct.

21  Q    Did we file -- or, did Lone Star State Bank file an

22  involuntary bankruptcy case against him?

23  A    No, we did not.

24  Q    Did they file an involuntary bankruptcy case against the

25  Debtors?

Thomas - Redirect                                133

1    A    Repeat that, please.

2    Q    Did the Bank file an involuntary bankruptcy case against

3    the business debtors?

4    A    No, they did not.  Or we did not.

5          MR. ODELL:  May I have one moment, your honor?

6          THE COURT:  That's fine.

7          (Pause.)

8          MR. ODELL:  We'll pass the witness, Your Honor.

9                      REDIRECT EXAMINATION

10   BY MR. TARBOX:

11   Q    Mr. Thomas, your testimony and responses to Mr. Odell

12   appear to me -- appear to represent that you all were just

13   negotiating a deal?  In fact, you started off by saying, we're

14   going to take your property, and then you said, but we have

15   concessions to give you?

16   A    And I -- I'm not sure what you're asking me.

17   Q    Well, I'm saying, --

18   A    Yeah.

19   Q    -- did you threaten Mr. --

20   A    It wasn't a --

21   Q    -- Waggoner?

22   A    No, it wasn't a threat.  It was -- it was a --

23   Q    Was it a --

24   A    It was a business point.  We had loan documents, he was

25   in default, and we were ready to exercise our remedies, --

1    Q    So, --

2    A    -- like we are with all of our customers.

3    Q    So it as an either/or?  Either he filed the bankruptcy or

4    you're going to take his equipment?

5    A    That's correct.  He had a choice.  That's correct.

6    Q    And you said that the bankruptcy was a device to pursue

7    Rabo?  I can replay that if you want me to.

8    A    No, that's fine.  And what -- do you want me to just --

9    Q    Is that what it was?

10   A    A device?  It was a -- it was a means, I think, sure.

11   Q    Okay.

12   A    I guess -- and, again, I'm not a lawyer.

13   Q    I mean, were you --

14   A    You're asking me to --

15   Q    Were you encouraging him to file bankruptcy because it

16   was to his benefit, or were you encouraging him to file

17   bankruptcy so he could sue Rabo?

18   A    Both.  He had a mountain of debt.

19   Q    You thought --

20   A    And a borrower with that much debt needs the organization

21   of bankruptcy to sort through it.

22   Q    So you thought he -- you were just sort of helping him

23   out, in your mind?

24   A    We thought it was his -- to his benefit.  And I think he

25   did, too, at a point.  We don't understand why he changed his

1   mind.  But that's true.

2   Q    Okay.  But it was to his benefit as long as he took care

3   of Lone Star bank?

4   A    Sure.  Certainly.  Well, you heard about the $4 million

5   concession.

6   Q    Okay.

7   A    That's a big concession.  For our bank, anyway.

8            MR. TARBOX:  No further questions, Your Honor.

9                          RECROSS-EXAMINATION

10  BY MR. ODELL:

11  Q    Mr. Thomas, do you recall in the audio, after you

12  discussed with Mr. Waggoner the two roads, options, whatever

13  you want to call them, do you recall where Mr. Waggoner stated

14  that he understood and he understood it was a business

15  decision?

16  A    Yes, I do now, yeah.

17  Q    Okay.

18           MR. ODELL:  No further questions, Your Honor.

19           MR. TARBOX:  We pass the witness, Your Honor.

20           THE COURT:  Okay.  You may step down.  Thank you.

21      (The witness steps down.)

22           MR. TARBOX:  At this time, the Debtors would call

23  Mr. Gary Phillips.

24            GARY PHILLIPS, DEBTORS' WITNESS, SWORN

25           MR. TARBOX:  That's my trip to Italy.

Phillips - Direct                     136

1            THE WITNESS:  I'm not going to need these exhibits,

2  am I?

3            MR. TARBOX:  Yes.  You're going to need that small

4  one.

5            THE WITNESS:  I'm talking about all those.

6            MR. TARBOX:  I'm ready, Your Honor.

7            THE COURT:  You may proceed.

8                       DIRECT EXAMINATION

9  BY MR. TARBOX:

10  Q    Mr. Phillips, would you state your name, please?

11  A    Gary Phillips.

12  Q    And what is your profession?

13  A    I'm a real estate appraiser.

14  Q    How long have you been a real estate appraiser?

15  A    Thirty-seven or eight years.

16  Q    And what's the main kind of real estate that you

17  appraise?

18  A    Agricultural real estate.

19  Q    And do you represent mostly owners, bankers, or both?

20  A    Everything.  We do a lot of estate work, too.

21  Q    I'm sorry.  What?

22  A    A lot of estate work as well.

23  Q    Okay.  Were you engaged to appraise the property known as

24  the Waggoner Cattle Ranch or premises?

25  A    Yes.

1    Q    Okay.  Let me ask you just a few more questions.  Are you

2    -- have any certifications?

3    A    Yes.  I'm an MAI.

4    Q    And explain what that means.

5    A    I'm a member of the Appraisal Institute.  It's a

6    designation that qualifies me to do almost any type of

7    appraisal work.

8    Q    Okay.  So you're MAI and you've been appraising for 39

9    years?

10   A    Thirty-seven or eight years.

11   Q    Thirty-seven or eight years?

12          MR. TARBOX:  Your Honor, at this time I would ask

13   the Court's permission to allow Mr. Phillips to testify as an

14   expert witness.

15          THE COURT:  I assume no objection?

16          MR. ODELL:  No objection.

17          THE COURT:  Very well.  You may proceed.

18          MR. TARBOX:  Okay.

19   BY MR. TARBOX:

20   Q    Mr. Phillips, would you look at Exhibit 2 that's in front

21   of you in the Debtors' exhibits?

22   A    Exhibit 2?  Can I just use my copy or do I need to look

23   at yours?

24   Q    You can use your copy.

25   A    Okay.

Phillips - Direct                                    138

1          THE COURT:  Let's -- no.  Let's use the exhibits

2   that are -- have been presented to the Court.

3          THE WITNESS:  Okay.

4   BY MR. TARBOX:

5   Q   I'm sorry.  Exhibit 2 of the Debtors' exhibits.  It's the

6   small black binder.  It looks like this.

7   A   Oh.  I got it.

8   Q   Okay.

9          MR. TARBOX:  May I proceed, Your Honor?

10         THE COURT:  You may.

11         MR. TARBOX:  Okay.

12  BY MR. TARBOX:

13  Q   And Mr. Phillips, you were retained by the Debtors'

14  counsel, Debtors' counsel, to do this appraisal.  Is that

15  right?

16  A   That's correct.

17  Q   And describe the property that you were examining or

18  appraising.

19  A   We were appraising 447.4 acres that included both a --

20  what I would call a calf ranch along with some irrigated

21  farmland.

22  Q   Okay.  And what was the amount that you came up with as

23  far as the value of the --

24  A   The total value was $2,900,000.

25  Q   And just for the Court's edification, I would like to

Phillips - Direct                        139

1   show some pictures of the Debtors' calf ranch.  First of all,

2   that is a picture -- that would be a picture of the property.

3   Is that correct?

4   A    That's correct.

5   Q    And the part in yellow?

6   A    Well, the part -- the top left part is what we consider

7   the calf ranch.

8   Q    Okay.

9   A    Which is where all of the corrals, the pens, the hutches,

10  all that are.

11  Q    Okay.  And then to the far left of that calf ranch, would

12  that be where the pens are?

13  A    Yes.  Yes.

14  Q    Okay.  What is that in the middle there?

15  A    That is a -- it's a flat lake.  It's a drainage area.

16  Q    Okay.  But it cannot be used for the Debtors' operations?

17  Or --

18  A    No.

19  Q    Okay.  And then to the right area of that yellow upper

20  left-hand portion, what was that land used for?

21  A    That's what we -- we considered that as excess land.

22  Q    No, I'm talking about inside the yellow.

23  A    Oh, that's where all the hutches are.

24  Q    Calf hutches?

25  A    Yes.

1   Q    Okay.  And that's where the baby calves are put --

2   A    That's where all the baby calves are kept, uh-huh.

3   Q    -- when they're brought into the ranch?  Okay.  And then

4   the portion that's to the right of that and goes all the way

5   down south, called the El Paso Camp Road, is that what we call

6   the excess land?

7   A    Yes.

8   Q    And what does that consist of?

9   A    It consisted of 267 acres with -- or 260 acres with --

10  that had two pivots.  One of them windshield wiped or did not

11  make a full turn, and the other pivot that was there made a

12  full turn.

13  Q    Okay.

14             MR. TARBOX:  And Your Honor, --

15  BY MR. TARBOX:

16  Q    Okay.  Just for the Court's clarification, that is a

17  picture of the calf ranch; is that correct?

18  A    Yes, it is.

19  Q    And the portion that we're looking at in the bottom part

20  of the picture, what is that?

21  A    In the bottom part of the top picture?

22  Q    Yes.  Uh-huh.

23  A    Those are actually corrals.

24  Q    Okay.  And what's that behind the corrals?

25  A    Those are the covered areas for the calves.

1   Q    Okay.  Okay.  I think I'll forego showing the pictures,

2   but basically that -- these pictures, during the appraisal of

3   these, show the calf ranch operations, which would consist of

4   pens, corrals, sheds, and then hutches for the calves?

5   A    Right.

6   Q    Okay.  And also barns and commodity barns, things like

7   that?

8   A    Correct.

9   Q    Okay.  Now, I want you to look at Page 25 of that

10  exhibit.  That --

11  A    Okay.

12  Q    What is that called?  Page 25.

13  A    The appraisal process?

14  Q    Yes.  Tell me the appraisal process that you used in --

15  A    Well, normally when you do an appraisal, there are three

16  approaches to value that you utilize:  the cost approach, the

17  income, and the sales comparison approach.

18       Due to the nature of this property, it is almost

19  impossible to determine an appropriate income if you were to

20  lease the property out, so we didn't feel like that it was

21  applicable, so we did not include that.  So we did -- what

22  we're explain here is how we do the cost and the sales

23  comparison approach.

24  Q    Okay.  So, basically, you have your choice here.

25  According to this statement, you can use the cost approach,

1  income approach, and sales comparison approach.  And you did

2  not use the income approach because there's too many

3  uncertainties about what the future income would be?

4  A   Well, the reason on that is that it -- this tries to

5  separate the business and actually determine what a rental

6  income would be for that property if you were to lease it out.

7  Q   Uh-huh.

8  A   And there's just not data available to determine that.

9  Q   Okay.  I would like you to turn to Page 37.

10  A   Okay.

11  Q   And what does that show?

12  A   These are what we estimated or I estimated as direct and

13  indirect costs on each of the improvements.

14  Q   Okay.  Would that be also called the replacement cost?

15  A   Yeah.  They're -- you can do either replacement or you

16  can do a reproduction cost.  We rarely do reproduction cost

17  because, with a lot of improvements, it's impossible to

18  actually reproduce them.  And so these are replacement costs.

19  Q   Okay.  So, that would mean that if somebody would come in

20  and buy the land and make sure all the equipment was new?

21  A   This is what it would cost to put new --

22  Q   Okay.

23  A   -- new buildings and new hutches and new everything.

24  Q   And then the next page would be Page 38, called Physical

25  Deterioration.  What does that mean?

1  A    Physical deterioration is just depreciation based on age,

2  basically.   And what we did here is we went in to each of the

3  components, each of the improvements, estimated their

4  effective age.   And their effective age is how old they --

5  they -- their -- how much they've been used and how they've

6  been taken care of and all that.   And sometimes the actual age

7  differs from the effective age, depending on the condition of

8  the property.

9  Q    Okay.   But basically that's how much the property would

10  be depreciated if you applied the Debtors' property and then

11  compared it to what it cost for it to be new?

12  A    Physically, yes.

13  Q    Okay.

14  A    Yes.   And this is just physical deterioration only.

15  Q    And how much is that?

16  A    $5 million.   Five million one hundred and --

17  Q    Okay.

18  A    -- twenty-one thousand, roughly.

19  Q    And basically, again, you have the replacement costs and

20  then you figured out the economic life and you add a certain

21  percentage of depreciation, which amounted to a dollar amount?

22  For example, in the first line, livestock sheds would have

23  depreciated $848,148; is that right?

24  A    Correct.

25  Q    Okay.   So the total replacement cost minus the

Phillips - Direct                          144

1  depreciation cost would be a million -- in that particular

2  category of livestock sheds, $1,272,222; is that right?

3  A    The depreciated value, yes.

4  Q    Okay.  And so the depreciated value totals up to $5,120,

5  --

6  A    Correct.

7  Q    -- 606?  Okay.  What is functional obsolescence?

8  A    Functional obsolescence is the loss of value due to its

9  function.  I mean, due to its ability to perform its function.

10 Q    For example, cattle market prices?

11 A    No.  That would be external.

12 Q    Okay.  So tell me about the functional obsolescence.

13 A    Functional obsolescence --

14 Q    Give me an example.

15 A    -- is -- an example is that office building --

16 Q    Uh-huh.

17 A    -- that is there.  They built the shell of the office

18 building and then all it has are the two-by-four studs on the

19 interior of the building.  And as an office building, it's

20 functionally obsolete.

21 Q    Okay.  So, basically, since the office building is

22 functionally obsolete, that would be taking away from its

23 value?

24 A    Exactly.

25 Q    Okay.  External obligation -- obsolescence?

1   A    That's, that's a little more complicated.  And what we

2   did is we looked at the sales from the sales comparison

3   approach to determine -- the range was from -- basically from

4   45, 46 percent to 77 percent, and we used a 50 percent factor

5   for external obsolescence.

6   Q    And this was in line or an average of other -- other feed

7   yard type businesses in that area?

8   A    Yeah.  And that's a very -- that is a very difficult

9   calculation, because you go in there and you basically rebuild

10  the sales and depreciate them, and you determine that based on

11  that depreciation from your sale.

12  Q    Okay.  Now, you consider the functional -- the external

13  obsolescence to be around $2,524,366?

14  A    Correct.

15  Q    Okay.  Now, below that you have a Cost Approach Summary.

16  Would you explain that to the Court?

17  A    That just summarizes our reproduction costs less our --

18  less all of our depreciation.  And we put no curable physical

19  deterioration on it because curable means that you could

20  actually go out there and fix it --

21  Q    Uh-huh.

22  A    -- by that cost.  And on something, on a property like

23  this, very rarely would you have curable physical

24  deterioration.  And then we just, we summarized, we went

25  through each one of them and came up with a rounded value of

1    $2,965,000.

2    Q    Okay.  So, basically, you subtracted depreciation --

3    A    Yeah.

4    Q    -- and physical deterioration and then functional

5    obsolescence, and that gave you what figure?

6    A    Yeah.  And then you add the -- you add the value of the

7    site and the excess land back in, to arrive at the total

8    value.

9    Q    Okay.  And the excess land you have down here is $370,000

10   --

11   A    Correct.

12   Q    -- for the excess land, and then the land underneath the

13   site would be about $146,000?

14   A    That's what we said, yes.

15   Q    And so it's roughly -- the land itself is worth about

16   $500,000?

17   A    $515,000, I believe.  $516,000, actually, yes.

18   Q    Okay.  That's how you came up with the value of the

19   property using the cost approach; is that right?

20   A    That's correct.

21   Q    Okay.  Now, you also did comparables, didn't you?

22   A    Yes, I did.

23   Q    Okay.  And which property -- you used several properties.

24   Which property would you consider to be the best site that

25   will be most comparable to the Debtors'?

1  A    Well, to me, the most comparable was the -- was Sale No.

2  1.  It was located in a very close proximity to the subject.

3  And it sold in 2018.

4  Q    Okay.  So that would be the E6 property?

5  A    Yes.

6  Q    And that's on Page 42?

7  A    Yes, it is.

8  Q    Okay.  Now, the property sold for $4,000,070?  Excuse me.

9  $4,070,000?

10  A    Correct.

11  Q    Okay.  And it had a capacity of 21,150?

12  A    Correct.

13  Q    And under the comparable approach, how do you figure out

14  what the feed yard would be worth?

15  A    Well, what we did is I talked with the people that

16  purchased that.  I did -- basically went in and used sales to

17  determine what the value of that excess land.  And the excess

18  land is the irrigated land around the actual calf ranch itself

19  there.  And we deducted the excess land from the total sales

20  price, the value of the excess land from the total, to come up

21  with a price that was -- would have been utilized for just the

22  calf ranch itself.

23  Q    Okay.  So the -- your interview with the person that

24  purchased the land or that purchased improvements on the land,

25  they valued the property at -- the excess land, the farmland,

Phillips - Direct                          148

1   at $2,000 an acre?

2   A    They told me that, and that is what I had -- I'd already

3   figured that it had to be based on the irrigation water that

4   they told me it had and the -- the sprinklers and all that.

5   That's basically what I thought it was worth as well.

6   Q    Okay.  And so the value of the feed yard, you would

7   figure out the cost of that feed yard divided by the number --

8   A    Head.

9   Q    -- of calves?

10  A    The capacity.  Yes.

11  Q    Would you explain that, please?

12  A    We just divided the sales price of the feed yard itself,

13  --

14  Q    Okay.  And did not include the excess land?

15  A    -- not including the land -- we did it both ways,

16  actually.

17  Q    Uh-huh.

18  A    We did it with the excess land and without the excess

19  land.  And --

20  Q    So it's -- okay.  Let me ask you a question.

21  A    Okay.

22  Q    If some feed yard had, you know, instead of a, whatever,

23  $2 million worth of excess land, or $500,000 of excess land,

24  they had $5 million worth of excess land, --

25  A    Right.

1   Q   -- that wouldn't affect the price of the feed yard, would

2   it?

3   A   Well, that's the reason we extract the excess land, --

4   Q   Uh-huh.

5   A   -- to determine how much they actually paid for the

6   facility itself.

7   Q   Okay.  So when you extract the excess land, you come up

8   with a figure of $91.87?

9   A   Correct.

10  Q   Okay.  And that, again, would be the value of the feed

11  yard divided by the total number of cattle.  Is that right?

12  A   That's correct.

13  Q   And we determined there was 13,150 heads of corral cattle

14  and 21,000 -- excuse me, 8,000 head of hutch cattle, for a

15  total of 21,150 cattle.

16  A   Correct.

17  Q   Is that right?  And you divided that into the value of

18  the feedlot; that gave you the $91.87.  Is that correct?

19  A   That's correct.

20  Q   Okay.  But if you just threw in the excess land, that

21  value would shoot up?

22  A   To $192 --

23  Q   Okay.

24  A   -- per head.

25  Q   But you did not use that to value the feed yard?

Phillips - Direct                               150

1   A    Well, we did, but what we -- we looked at it both ways.

2   Q    Uh-huh.

3   A    If you go -- if you go over here to Page 51, we looked at

4   it both ways.  And as you examine it and as you analyze it, we

5   felt like that it was much more appropriate to use the price

6   per head without the excess land, and then just add the value

7   of the excess land of the subject property back to the value

8   that we come up with.

9   Q    Okay.  And what is the potential capacity of the Waggoner

10  feed yard?

11  A    25,000.  In all honesty, that's probably a little high,

12  but we used that number because that maintained consistency

13  that had been used since they started appraising this thing.

14  Q    Okay.  And so when you multiply that 25,000 by $91.87,

15  what figure did you get?

16  A    $3,125,000.

17  Q    Okay.  And then how did you adjust --

18  A    Well, actually, what that -- what we did is we looked at

19  all three of those sales.

20  Q    Uh-huh.

21  A    And since that one was the closest, we said that -- what

22  I said is that the value should be in the vicinity of $100 per

23  head capacity.

24  Q    Uh-huh.

25  A    So we take that and multiply it times the 25,000 and you

Phillips - Direct                               151

1   come up with $2 million.  That's incorrect right there, by the

2   way.  You come up with $2.5 million.

3   Q   Right.  Which would be 25,000 times $100.

4   A   Right.

5   Q   And then you add on -- I guess you -- okay.  How do you

6   get to that 25 -- $2.5 million to --

7   A   The $2.5 million plus the $370,000 is the $2,870,000.

8   Q   And that would be the excess land?

9   A   The excess land, yes.

10  Q   So basically a person would be purchasing the feed yard

11  based upon its capacity and the cost per head?

12  A   Correct.

13  Q   And --

14  A   And then they'd buy the excess land based on what the

15  land itself is worth.

16  Q   Per acre?  And you determined that would be what?

17  A   $370,000.

18  Q   No.

19  A   The excess land, what we figured was $1,325 per acre.  If

20  you go back earlier in the cost approach, --

21  Q   Okay.

22  A   -- you can see that.

23  Q   Even though -- I mean, that's the figure you came up with

24  even though those were not exact figures as far as your

25  comparables go, but that would be the average?

1    A    Well, not really an average.  When they're -- on a

2    property like this, there's very little data, and so what you

3    try to do is use your experience and use the best information

4    that you have to come up with something that is as similar as

5    possible.

6    Q    Uh-huh.

7    A    And this tract or this property sold at auction, it sold

8    -- they took bids on it different ways and they ended -- but

9    they ended up selling it all together.

10   Q    Okay.  So if you exclude the equipment and only

11   considered the value of the land and the value of the pens and

12   so forth, the feed yard, excluding the equipment and feed and

13   whatever else, --

14   A    Yeah.

15   Q    -- do you anticipate over the next several months that

16   that -- that the value of the feed yard would decrease in

17   value?

18   A    Not with -- it shouldn't unless there's -- unless

19   management is -- there's a problem with management or

20   something like that.

21   Q    Okay.  But if there's no problem with management, do you

22   consider any significant decrease in value?

23   A    Shouldn't be, no.

24   Q    Okay.  Unless there was a tornado or something like that?

25   A    Exactly.

Phillips - Cross                                   153

1    Q    Okay.

2         MR. TARBOX:   That's all the questions I have, Your

3    Honor.

4                         CROSS-EXAMINATION

5    BY MR. ODELL:

6    Q    Mr. Phillips, I believe you testified that you have been

7    an appraiser for how long?

8    A    It depends on -- I can't remember exactly when.  It'll be

9    37 and going on 38 years right now.

10   Q    Okay.  Excellent.  And I believe you said that you're --

11   you primarily appraise agricultural real estate?

12   A    We did -- up until about 20 years ago, I had a decent-

13   sized shop, we had five appraisers and me, and we did

14   everything.

15   Q    Okay.

16   A    And I did most of the big commercial and all.  And then

17   about in the late '90s, I let -- I just sent everyone kind of

18   out on their own and just -- I'm just a one-man show now, and

19   I went back to my -- I grew up on a farm and I farmed until

20   1982, when I got in the appraisal business.

21   Q    Okay.  Would you agree with me that the agricultural

22   industry is pretty expansive?  In other words, you've got

23   farming, ranching, dairy.  Is that correct?

24   A    Very correct, yes.

25   Q    And when you say that you've appraised real estate in the

Phillips - Cross                              154

1   agricultural industry, how many calf ranches have you

2   appraised in your lifetime?

3   A    Two.

4   Q    Two?  How many feed yards have you appraised in your

5   lifetime?

6   A    Probably -- I couldn't tell you for sure.  Probably --

7   probably 15 or 20.

8   Q    Okay.  So is it fair to say that the vast majority of the

9   appraisals that you do relate to farmland?

10  A    A large majority, yes.

11  Q    Okay.  Now, when you said you've done two calf ranches,

12  does this include this calf ranch?

13  A    Yes.

14  Q    Okay.  So one prior to this one?

15  A    Yes.

16  Q    Okay.  Now, as part of your appraisal of the calf ranch,

17  and in particular this calf ranch, did you pull the permit

18  issued by the Texas Commission on Environmental Quality?

19  A    No.  That was provided to me, --

20  Q    Okay.

21  A    -- I believe.  I've got it somewhere, but I don't -- I

22  didn't -- I didn't pull it myself.

23  Q    Okay.  And you said it was provided to you?

24  A    Yes.

25  Q    Would it have been provided by the Debtor?

1   A    Yes.

2   Q    Okay.

3          MR. ODELL:  Your Honor, may I approach the witness

4   --

5          THE COURT:  You may.

6          MR. ODELL:  -- as well as the bench with an exhibit?

7          THE COURT:  That's fine.

8   BY MR. ODELL:

9   Q    Now, Mr. Phillips, does this look like the permit on

10  Bugtussle Cattle by the Texas Commission on Environmental

11  Quality?

12  A    Yes.

13  Q    And would this be the one that you would have reviewed

14  yourself?

15  A    I believe so.

16         MR. ODELL:  Your Honor, I'm going to move to admit

17  Exhibit 98.

18         THE COURT:  Any objection to 98?

19         MR. TARBOX:  Just one second, Your Honor.  (Pause.)

20  No objection, Your Honor.

21         THE COURT:  98 will be admitted.

22     (Lone Star State Bank's Exhibit 98 is received into

23  evidence.)

24  BY MR. ODELL:

25  Q    Now, in order to be permitted by the Texas Commission on

Phillips - Cross                                    156

1  Environmental Quality, the Debtor has to comply with certain

2  drainage requirements, correct?

3  A    Correct.

4  Q    And part of those drainage requirements is the lagoon

5  that you mentioned, and that's expected to catch runoff from

6  the feed yard?

7  A    Correct.

8  Q    Do you happen to know what a land management unit is?

9  A    No.

10 Q    Okay.  Do you -- will you turn with me to Page 5?

11 A    Okay.

12 Q    And do you see there Table 2?

13 A    Uh-huh.

14 Q    And do you note that there's what are called land

15 management units related to this facility?

16 A    Okay.

17 Q    And do you happen to know whether or not, in order to

18 operate this facility as a calf ranch, whether or not the

19 Debtor has to comply with these land management units?

20 A    I would assume that he would.

21 Q    Okay.  And if these land management units comprise of the

22 farmland, as you described it, on the out -- on the right side

23 of the property, just south, kind of southeast of the calf

24 hutches, would then that land be necessary in order to operate

25 this as a calf ranch?

1   A     If it -- if it's required, yes.

2   Q     Okay.  And so if it's required, then would the Debtor

3   actually be able to separate out the farmland from the calf

4   ranch and be able to sell it as a calf ranch?

5   A     Probably not.  But that wouldn't change the value.

6   Q     Well, now, you valued it, correct, based on drawing two

7   different conclusions.  One was here was the value based on

8   the entire property.  And if I'm correct, I believe you said

9   it was $192 and some change when taking into account the

10  entire property.  Is that correct?

11  A     That's correct.

12  Q     And then you said that it's actually just $91 if you look

13  at the land just under the feed yard or the calf ranch,

14  correct?

15  A     Well, that's what that -- that's what the sale that we

16  used the most, that was a value that it -- that was the unit

17  of comparison that it came up with, yes.

18  Q     Did you look at the permit related to the E6 Ranch to

19  determine whether or not what you've called excess land is

20  necessary in order to operate E6 Ranch as a --

21  A     No, but it's a smaller -- it is a smaller facility than

22  this, so there's no way that all of that land would be

23  required.

24  Q     Okay.  But you didn't look at the permit by the TCEQ?

25  A     No.  I did not.

Phillips - Cross                     158

1  Q    Okay.  But you would agree with me that if the TCEQ is

2  saying that you have to have that farmland to operate this

3  calf ranch, it's not really excess land, is it?

4  A    Not necessarily, no.

5  Q    Okay.  And so if it's not really excess land, then

6  wouldn't the value based on taking into account this farmland

7  be the proper value?

8  A    Not -- not if -- if it was not -- you'd have to look at

9  the permit for that as well.  If you're going to look at the

10 permit for this, you'd have to go to that permit for that one

11 as well.

12 Q    Okay.

13 A    And see how much land they were -- that they were

14 required to have.

15 Q    So then -- but if they're required to have even some of

16 this land that you've called excess land, than the value at

17 $100 a head isn't correct?

18 A    It would be -- it would be somewhere slightly higher than

19 that, probably, yeah.

20 Q    It would be different?

21 A    It'd be different, yeah.

22 Q    Okay.  Now, Mr. Phillips, will you turn with me to Page

23 36 of your report?

24 A    Okay.

25 Q    And, actually, before I get there, let's just turn to

1   Page 37.

2   A    Okay.

3   Q    As I understand your testimony, I believe you stated that

4   in looking at Page 37, the data that exists there, that

5   provides a value to the Debtors as to the replacement cost of

6   this facility.  Is that correct?

7   A    Yes.

8   Q    And in order to build this facility again, it would be

9   over $10 million; --

10  A    Correct.

11  Q    -- is that correct?  Now, going back to Page 36, can you

12  explain for the Court, what is the difference between actual

13  age and effective age?

14  A    Effective age is the age of an improvement based on its

15  -- based on its use.  In other words, if you have two houses

16  that are identical and one of them has been taken care of and

17  updated and, you know, maintained properly and the other one

18  has not been, then the effective age of the one that's been

19  taken care of will be much less than the property that has not

20  been taken care of.

21  Q    Okay.  So if I understand you correctly, effective age

22  could be higher or lower than the actual age of the property

23  that you're appraising based on the care and maintenance that

24  is being provided?

25  A    Could be.

Phillips - Cross                                    160

1   Q    Okay.  Now, are you familiar with when these improvements

2   were built on this property?

3   A    Most of them, yes.

4   Q    Okay.

5   A    Yes.

6   Q    Are you familiar that the calf hatches, that roughly

7   6,000 calf hutches were built only as far back as three years

8   ago?

9   A    Yes.

10  Q    Now, when I'm looking at this chart and I'm looking at

11  your calf hutches there on this chart on Page 36, you've got

12  actual age between five to twelve years, correct?

13  A    Correct.

14  Q    But you've got an effective age of nine years.  So how

15  would calf hutches that were just built back three years ago

16  have an effective date of nine years?

17  A    If you examine those, and I looked at all of those, and

18  if you examine those, in my opinion, if you took a forklift

19  out there and picked, 95 percent of them would fall apart.

20  Q    Okay.  And is that because they haven't been maintained?

21  A    Not necessarily.  They're just -- that's just kind of the

22  -- if you look at the way that those are built in general,

23  they're just -- you know, if they're -- if you went in and --

24  you could make some changes to them and make them last longer,

25  but the wooden construction and the way that -- the plywood

1  that they use and everything, it just, you know, it just

2  deteriorates.

3  Q    Okay.  Let's look at your livestock sheds.

4  A    Okay.

5  Q    You've got an actual age range between five to ten years.

6  Why is it a range?  Is that because some of these were built

7  --

8  A    Some are newer than others, yes.

9  Q    Okay.  And some of them were built well within ten years?

10  A    Exactly.

11  Q    But you have an effective age of ten years?

12  A    Correct.

13  Q    Again, if I understood your testimony correctly, property

14  can have an effective age of a higher number than what the

15  actual age is if it hasn't been maintained.  Is that your --

16  wasn't that your testimony?

17  A    Right.  But what you get into -- if you get into -- when

18  you've got cattle equipment, in general, the manure, all of

19  the mud, the things like that, tend to, if you don't take care

20  of that around those, they -- they'll shorten the life of

21  those extensively.  They'll rust.  And you could see rust on a

22  lot of those.

23  Q    Okay.  Is it your testimony that you can't maintain that

24  to prevent it from rusting?

25  A    Oh, you can, but it would be very -- I mean, it's

Phillips - Cross                                162

1   difficult, but you could do it, yeah.

2   Q    Okay.  Now, you've got the office building.  Again,

3   actual age, two years; effective age, five years.  Again, is

4   that because this office building is showing greater age than

5   when it was built due to maintenance?

6   A    It's just, it's pretty much the same that it was when it

7   was built.

8   Q    Okay.  What about the milk barn?

9   A    The milk barn showed extensive wear compared to its age.

10  Q    Okay.  And so that's why it has a higher effective age?

11  A    Exactly.

12  Q    Now, if this property is not being maintained, then

13  wouldn't we anticipate seeing a decrease in value?

14  A    I think that's recognized here.

15  Q    Okay.  So you're recognizing in your report that if you

16  don't maintain this property, you're going to have a decreased

17  value?

18  A    But that's also the nature of these type properties.

19  Q    Okay.  But, again, if they're not maintaining them and

20  you've got effective ages greater than their actual ages,

21  which seems to indicate they're not maintaining them, then the

22  property is not going to maintain its value?

23  A    That's true.  Yeah.

24  Q    Thank you.  Mr. Phillips, I'm going to mark Exhibit 99.

25            MR. ODELL:  Your Honor, may I approach the bench as

1    well as the witness?

2              THE COURT:  That'll be fine.

3    BY MR. ODELL:

4    Q    Now, Mr. Phillips, I believe you testified that it was

5    your opinion that the value of this property will stay about

6    the same, the real estate will not change much, that

7    essentially it's at where it's at.  Is that accurate?

8    A    Well, if what you're getting ready to say is why has land

9    changed, it's because of the irrigation water.

10   Q    Okay.  So, let me ask you this.  Do you recognize Exhibit

11   99?

12   A    I do.  I do.  I do.

13   Q    And is that --

14   A    In fact, --

15   Q    And is that an appraisal report that you did --

16   A    Yes.

17   Q    -- back in 2012?

18   A    Yes, it is.

19   Q    And is this related to the land that has been referred to

20   in your other appraisal as excess land?

21   A    Yes, it is.

22   Q    And when you appraised this back in 2012, what was the

23   value you got for that acreage?

24   A    $632,000.

25   Q    And based on what was the price, do you recall?

1    A    The price per acre?

2    Q    Yes, sir.

3    A    $1,975 an acre.

4    Q    Okay.  Now, some of this land has changed use; is that

5    accurate?

6    A    To some degree, yes.

7    Q    They've built part of the calf hutches onto this land,

8    correct?

9    A    Okay.  Yes.

10   Q    When you appraised it, there was two circles?

11   A    Right.

12   Q    And now there's only one full circle and one three-

13   fourths circle?

14   A    Right.

15   Q    Give or take?  Is that the only reason why you valued the

16   land as less?

17   A    No.  If you'll look, if you'll look in the description in

18   the report, in the exhibit that you just handed out on Page

19   99, --

20   Q    Okay.

21   A    I mean, on Exhibit 99.  If you'll go to Page 5.

22   Q    Okay.

23   A    At the time that we appraised it then, it had 500 gallons

24   a minute of water.

25   Q    Okay.

1   A    Okay?  This time, it has 200 gallons a minute.

2   Q    Okay.  And where -- would you mind pointing myself and

3   the Court to where you're looking at for that?

4   A    On Page 7 of the current appraisal.

5   Q    Okay.  Now, you said how much again?

6   A    I'm sorry.  Three hundred.

7   Q    Three hundred?  Okay.

8   A    Three hundred gallons a minute.  Yes.

9   Q    So what would cause for the amount of water to decrease?

10  A    That's happening all over the country.

11  Q    Okay.  And that has a direct impact on the value of the

12  land?

13  A    Absolutely.

14  Q    And is that continuing to go forward?

15  A    Probably.  There's a point that it will stop, but who --

16  where that is, no one knows.

17  Q    Okay.  So when you say that -- well, and let me just back

18  up.  So, comparing your appraisal done in 2012 compared to

19  your appraisal in 2018, or I guess it was '19, just this past

20  month, the value of this land has decreased roughly 300 --

21  well, $250,000?  Is that, give or take, roughly?

22  A    Well, it's decreased -- we -- you're only valuing 260

23  acres versus 320 acres.

24  Q    Okay.

25  A    So, that.  But you're also -- the -- you're looking at

1   probably $600 an acre decrease.

2   Q    Okay.

3   A    Yeah.

4   Q    So, going to it at a per-acre price, which may be an

5   easier comparable, --

6   A    Yes.

7   Q    -- that you're saying that the value of the land has

8   decreased by about $600 an acre?

9   A    I would think so, yes.

10  Q    Okay.  And that's because of the use of the water?

11  A    Just --

12  Q    The amount --

13  A    Just the amount of water that you can pump from it, yes.

14  Q    Okay.  And that's continuing to occur?  In other words,

15  you would anticipate that there's going to be less water?  So,

16  going back to your opinion that this land isn't losing value,

17  doesn't -- don't these two appraisals indicate otherwise?

18  A    Yes, I mean, obviously, if it continues to decline.  But

19  the -- at this point, if you look at -- if you look at a lot

20  of these wells around the country, the point that this water

21  is now, it won't decline nearly as quickly from here wherever

22  -- however forward that we go as it has from 2012 until now.

23  Q    Okay.  And, again, your appraisal came in at $2.9 million

24  --

25  A    Correct.

1    Q    -- for the entire property.  Is that right?

2    A    Yes.

3    Q    And a replacement value of $10 million for all the

4    fixtures, equipment?  And when we're talking about equipment,

5    when you have equipment down here, what equipment are you

6    referring to?

7    A    The -- I'm talking about fixtures.

8    Q    Okay.

9    A    Fixtures.  Not --

10   Q    Tanks?

11   A    Yes.

12   Q    Milk tanks?

13   A    Yes.  Yes.  Yes, tanks.

14   Q    You're not talking about front-loaders?

15   A    No rolling stock.  No.

16   Q    Rolling stock?  Okay.

17   A    No.

18   Q    Now, you were here for the testimony regarding the

19   insurance, correct?

20   A    Yes.

21   Q    And the current insurance coverage on this land that you

22   appraised.  Is that correct?  Were you here for that

23   testimony?

24   A    Yes, I heard -- yes.

25   Q    And do you recall what the value or the policy limits was

1    on that?

2    A    Two point something million.  I don't recall an exact

3    number.

4    Q    Does $2.1 million sound familiar?  Okay.  According to

5    your appraisal, is the land at a fair value greater than $2.1

6    million?

7    A    Well, that -- I mean, if you take just the improvements,

8    I mean, you only insure the improvements, you don't insure the

9    land.

10   Q    Okay.

11   A    Right?  And so if you take just the improvements and you

12   take like Caliche and some of the things like that that are

13   not really insurable, it's not far off.

14   Q    Okay.

15   A    Now, it may be -- there may be a little difference, but I

16   wouldn't think that it would be --

17   Q    But if -- but if we had a loss of those things, the

18   replacement costs certainly would be greater than --

19   A    Oh, I mean, yes.

20   Q    -- $2.1 million?

21   A    Yes.

22   Q    Okay.  And you weren't -- let me just make clear -- you

23   weren't actually asked to do a insurable value appraisal?

24   A    I don't do those.

25   Q    Okay.

1   A    I won't -- I don't -- I don't do those, period.

2             MR. ODELL:  Your Honor, if I may just have one

3   second?

4        (Pause.)

5             MR. ODELL:  We'll pass the witness, Your Honor.

6                     REDIRECT EXAMINATION

7   BY MR. TARBOX:

8   Q    Mr. Phillips, is it imperative that the feed yard have

9   adjoining excess land?

10  A    For permitting purposes only.  I mean, you know, I mean,

11  --

12  Q    It is imperative that they have to be --

13  A    If they have to to have a permit.  If they have to get

14  their permit.  But other than that, no.

15  Q    Okay.  And so what if -- what is the purpose of the

16  excess land?

17  A    Typically, they grow crops on it.

18  Q    Grow crops?

19  A    Yeah.

20  Q    And --

21  A    To feed.

22  Q    Okay.  And so if somebody was going to buy that feed

23  yard, based on your valuation of the E6 sale, would they --

24  would they apply a different value to the land than they would

25  to the feed yard?

1    A    Yes.

2    Q    Okay.  And that's what your appraisal shows?

3    A    Yes.

4    Q    Are you familiar with the work being done by the High

5    Plains Water Conservation District?

6    A    Uh-huh.

7    Q    And -- you have to say yes or no.

8    A    Yes.

9    Q    Okay.

10   A    Sorry.

11   Q    And what's their main purpose?

12   A    To conserve water.

13   Q    Okay.

14   A    Conserve our Ogalalla Aquifer.

15   Q    And is that where the water is coming from for this

16   ranch?

17   A    Yes.

18   Q    And that would be where the water was coming from for the

19   ranches in this -- for the West Texas area?

20   A    Yes.

21   Q    And it covers Castro County and Lamb County?

22   A    Yes.

23   Q    Okay.  And this High Plains Water Conservation District,

24   is that fairly recently formed or --

25   A    No.  It's been here for a number of years.

1  Q    And what's their objective?

2  A    To conserve our aquifer as long -- to make it here --

3  make it stay here as long as we can.

4  Q    Okay.  And so the work they've done, would you consider

5  that the value of their contributions to the water

6  conservation is probably better now than it was five, ten

7  years ago?

8  A    Yes.

9  Q    Okay.  And water is not depleting as fast as it used to?

10  A    No, it's not.  For one thing, they -- the dairies in that

11  area were pumping -- they were double-cropping and pumping

12  water constantly, and they've eliminated that.  They -- you

13  can only have one crop a year now.

14  Q    Okay.  So essentially the Oga -- Oga --

15  A    Ogalalla, yeah.

16  Q    Ogalalla Aquifer can deplete itself, but it also can

17  replenish itself too, can't it?

18  A    It can, but it's a slow process.

19  Q    Yeah.

20  A    Yes.

21  Q    Okay.  Okay.  But it can also be stabilized, too, can't

22  it?

23  A    And that's what, if you look at the underground, the

24  saturated thickness maps and things that the High Plains

25  Underground Water District has done, there's a certain level

Phillips - Redirect                          172

1   there that most -- most of the time, the table stabilizes

2   itself.

3   Q    Uh-huh.

4   A    Because when a water level -- when a well gets to a

5   certain point, a farmer will quit pumping it.

6   Q    Uh-huh.

7   A    And so, you know, it kind of -- it kind of stabilizes.

8   And a lot of these wells in this area are not far from that.

9   Q    Okay.  Okay.  Are there very many dairy areas near this

10  property?  Have you seen dairy farms near this property?

11  A    Yes.  Not right -- not right there, but in a five-mile

12  radius there probably are.

13  Q    Okay.

14  A    A ten-mile radius.

15  Q    Okay.  Okay.

16          MR. TARBOX:  That's all the questions I have, Your

17  Honor.  I'll pass.

18          THE COURT:  Very well.  Any further questions, Mr.

19  Odell?  Very well.  You may step down, Mr. Phillips.  Thank

20  you.

21      (The witness steps down.)

22          MR. TARBOX:  Your Honor, I have no further

23  witnesses.  I believe that we will be -- I mean, the -- Mr.

24  Bumguardner will testify at a later date.  And then we'll -- I

25  guess we'll do our closing arguments then.

1          THE COURT:  Okay.  I take it, Mr. Odell, you have

2    nothing further for today?

3          MR. ODELL:  Your Honor, may I have a moment?

4          THE COURT:  That's fine.

5       (Pause.)

6          MR. TARBOX:  Mr. -- Your Honor, can our appraiser be

7    excused?  Mr. Phillips?

8          THE COURT:  I think he left, so I guess he's -- I

9    don't think Mr. Odell is planning on calling him, so --

10          MR. ODELL:  I can always throw a curveball, couldn't

11   it, Judge?

12       Your Honor, no, I don't think we're going to be calling

13   anyone else.  In fact, I don't know that we have any need to

14   call Mr. Bumguardner.  I'm happy to make and we will comply

15   with making Mr. Bumguardner available for deposition, but we

16   don't believe that we need to call him.

17       I would also just ask that as -- we believe we can get --

18   move into closing arguments, and I would just ask that the

19   Court take judicial notice of all the monthly operating

20   reports that have been filed by the Debtor.  By the Debtors,

21   in plural.

22       And again, Your Honor, we will agree to make Mr.

23   Bumguardner available for deposition.

24          THE COURT:  Okay.  Well, let me be sure I

25   understand the import of all that.  I guess your point is

1   that you would have nothing further, no further witnesses to

2   call for the stay motion.  And then I guess then the issue is

3   whether -- well, I don't know.  I don't know if Mr. Tarbox

4   feels like he needs to take that deposition before we

5   conclude the hearing on the stay motion, or -- is that the

6   issue?

7            MR. TARBOX:  I guess, if my understanding is

8   correct that the Phillips appraisal is the only -- that the

9   Phillips appraisal is the only appraisal before the Court,

10  then I can certainly agree with Mr. Odell.

11           MR. ODELL:  Your Honor, it's been the only one

12  that's been admitted into evidence.  Again, we don't believe

13  that we would need to call Mr. Bumguardner, and we believe

14  that the evidence is sufficient.  We'll obviously make Mr.

15  Bumguardner available for deposition.

16           MR. TARBOX:  If Mr. Bumguardner's appraisal is not

17  going to be entered into evidence, I don't need to have his

18  deposition.

19           THE COURT:  Okay.  Do you all wish to argue the

20  motion, then?

21           MR. ODELL:  Yes, Your Honor.

22           THE COURT:  Let's take a ten-minute recess and then

23  we'll do that.

24           THE CLERK:  All rise.

25       (A recess ensued from 3:41 p.m. until 4:03 p.m.)

1            THE CLERK:  All rise.

2            THE COURT:  Good afternoon.  Okay.  I believe we're

3    ready for closing.  Mr. Odell?

4            MR. ODELL:  Your Honor, just prior to the recess,

5    when we were discussing furtherance of the hearing, one of the

6    things that I asked the Court to do was take judicial notice

7    of the monthly operating reports for all the Debtors.  And I

8    don't believe that I got any ruling from the Court on that.

9            THE COURT:  Okay.  Any objection to the Court taking

10   judicial notice of the Debtors' monthly operating reports?

11           MR. TARBOX:  No objection to the Court taking

12   judicial notice.

13           THE COURT:  Very well.  The Court will therefore

14   take judicial notice of the monthly operating reports.

15           MR. TARBOX:  I would say, Your Honor, that if we --

16   if the point is to determine feasibility, we would have more

17   testimony.

18           THE COURT:  If -- okay.  I didn't hear all that.  Do

19   you want to repeat that?

20           MR. TARBOX:  I said, if the point of the monthly

21   operating reports is to go to the question of feasibility,

22   then I would need to put on more testimony.

23           THE COURT:  I'm sure that's the point of the monthly

24   operating reports.

25           MR. TARBOX:  Well, then, if that's the point that's

1  going to be addressed in closing argument, I would need to put

2  on evidence as well that we do have a feasible plan.  It was

3  not addressed or asserted in his -- in his presentation or his

4  case.

5        THE COURT:  And it goes, I assume, to the prospects

6  of a plan and their performance during the pendency of the

7  Chapter 11.

8        MR. TARBOX:  Yes, Your Honor.

9        MR. ODELL:  That's correct, Your Honor.

10        THE COURT:  And that's in the pleadings.  I don't

11  know --

12        MR. TARBOX:  I didn't address every point in his

13  pleadings because he didn't bring it up.

14        THE COURT:  Well, I guess, then, the question is do

15  you wish to re-open the evidence and put something on?  Since

16  the Court is -- and it's true, I did not rule on the request

17  for the monthly operating reports.  We got -- I guess that's

18  when we kind of got sidetracked on whether we were done or

19  not.  But --

20        MR. TARBOX:  (faintly)  Well, again, I would request

21  that the Debtors' attorney tell me what the purpose of this --

22        MR. ODELL:  Your Honor, I believe on your recent

23  opinion issued in the *Reagor-Dykes* case, you provided the

24  burdens that are supposed to be met by the various parties.

25  Lone Star's burden in this case is to show either that cause

1  exists or that there's no equity in the collateral.  We have

2  done that.  It's been stipulated to by the parties.

3      It then, as I understand your opinion in *Reagor-Dykes*,

4  becomes incumbent upon the Debtor as the Respondent to put on

5  the evidence that he needs to put on to overcome those

6  burdens, which are that a plan is reasonably likely to be

7  confirmed or that we can be adequately protected.  It's not my

8  burden to put on that evidence, and so I don't believe that I

9  had any obligation under the law to do so.

10      MR. TARBOX:  Your Honor, I have an -- I have the

11  right to question and examine and cross-examine any person

12  that was going to assert that this plan was not feasible.  And

13  Mr. Odell rested his case after having the testimony of Mrs.

14  Roberts, I believe.  And I don't believe it was my burden to

15  disprove something that was not raised.

16      I'm prepared to disprove it right now.  But for him to

17  not raise the issue and then all of a sudden make it a point

18  of his at closing argument, --

19      THE COURT:  No, the order in which -- I'm sitting

20  here looking at my notes.  The representation was made that

21  there was no further witnesses for today by Mr. Tarbox.  Mr.

22  Odell stated nothing further.  And then the request was made

23  to take judicial notice of the monthly operating reports.  So

24  if Mr. Tarbox wishes to put on additional evidence, I'll allow

25  him to do that.

1          MR. ODELL:  Thank you, Your Honor.

2          THE COURT:  So, and just as far as a ruling is

3   concerned, the Court, if I haven't said so, I'll say -- if I

4   haven't said so already, I will take judicial notice of the

5   Debtors' monthly operating reports.  And I guess that's all

6   reports filed since the pendency or during the pendency of

7   this case; is that right, Mr. Odell?

8          MR. ODELL:  That's correct, Your Honor.  We might be

9   moving to get those exhibits admitted anyway.  I do have them

10  as part of my exhibit volume, and if we're going to be going

11  forward with testimony regarding those, then we may be able to

12  get them in.  But yes, Your Honor, they would be all the

13  monthly operating reports that the Debtors have filed --

14         THE COURT:  Okay.

15         MR. ODELL:  -- in these cases.

16         MR. TARBOX:  Your Honor, at this time I'd call Mr.

17  Bart Schilling.

18         THE CLERK:  Please raise your right hand.

19            BART SCHILLING, DEBTORS' WITNESS, SWORN

20         MR. TARBOX:  Your Honor, I would refer the Court and

21  the witness to Exhibit 8 in the Debtors' exhibit folder.

22         THE COURT:  Did you say 8?

23         MR. TARBOX:  8.

24         THE COURT:  Okay.

25                         DIRECT EXAMINATION

1  BY MR. TARBOX:

2  Q    State your name for the record, please.

3  A    My name is Bart Schilling.

4  Q    Mr. Schilling, what is your experience in the financial

5  area?

6  A    I was an ag lender for 20 years, and currently I sell

7  insurance.

8  Q    You -- I'm sorry.  You do what?

9  A    I sell insurance.

10 Q    Okay.

11 A    And do some consulting.

12 Q    Okay.  You sell insurance and do ag consulting?

13 A    Yes, sir.

14 Q    And have you been retained by Mr. Waggoner to provide him

15 consultation regarding his cash flow projections?

16 A    Yes.

17 Q    And the information that you have in your cash flows

18 represent information provided to you by Mr. Waggoner?

19 A    Yes.

20 Q    Okay.  And do you have any independent information

21 available to you that would help you do your cash flows?

22 A    I brought some projected break-evens of current cattle

23 purchases and cattle sales.

24 Q    Okay.  But I'm not asking you to present that.  I'm just

25 saying, do you have access to --

1   A    I do.

2   Q    -- outside information that helps you prepare these cash

3   flows?

4   A    Yes.

5   Q    Okay.

6          MR. TARBOX:  Your Honor, I would ask the Court to --

7   I would ask the Court to admit Exhibit 8 into evidence at this

8   time.

9          MR. ODELL:  Your Honor, I don't want to be technical

10  here, but I don't know that we've proven that Mr. Schilling

11  had anything to do with these cash flows or established any

12  foundation for them.

13         MR. TARBOX:  Okay.  I thought he said that he was

14  hired by Mr. Waggoner to project -- to prepare these cash

15  flows.

16  BY MR. TARBOX:

17  Q    I'll ask you again.  Were you hired by Mr. Waggoner to

18  help prepare cash flows?

19  A    I was.

20  Q    Are you familiar with Mr. Waggoner's business?

21  A    Yes.

22  Q    And do you talk to Mr. Waggoner on a frequent basis?

23  A    Yes.

24  Q    Okay.  And do you feel confident that the information in

25  these cash flows are correct?

1   A    Yes.

2   Q    Or it's hard to say that a projection is correct, but it

3   represents the best projection you have for the operations of

4   Waggoner Cattle ranch?

5   A    That's correct.

6        MR. TARBOX:  I again ask the Court to admit Exhibit

7   8.

8        MR. ODELL:  No objection.

9        THE COURT:  Very well.  Exhibit 8 will be admitted.

10       (Debtors' Exhibit 8 is received into evidence.)

11  BY MR. TARBOX:

12  Q    You did file an exhibit with the plan that the Debtors

13  filed in December; is that correct?

14  A    I'm sorry.  Please ask the question again.

15  Q    You did file a cash flow projection exhibit, or you did

16  prepare cash flows for the -- included in the Debtors' plan

17  that was filed in November of 2018?

18  A    Yes.

19  Q    And what is the major difference between these cash flows

20  and the ones you filed in 2018?

21  A    The revised cash flows?

22  Q    Yes.

23  A    Regarding the Waggoner Cattle entity, the projections on

24  the revised cash flow are prepared based upon current

25  conditions and the current environment in terms of what he's

1  purchasing monthly and what he's selling on a monthly basis

2  and what his current feed bills are.

3  Q    And in fact, the January 2019 column, is that based on

4  actuals or estimated budgets?

5  A    I don't have a copy of the --

6              MR. TARBOX:  May I approach the bench, Your Honor?

7              THE COURT:  You may.

8              THE WITNESS:  Is this it?  Okay.

9  BY MR. TARBOX:

10 Q    Exhibit 8.

11 A    Exhibit 8?

12 Q    Have you found Exhibit 8?

13 A    Yes.

14 Q    Okay.  The first column is January 2019.  Do you see that

15 on the first page of Exhibit 8?

16 A    Yes.

17 Q    Does that represent projections or actuals?

18 A    The month, the Holstein cattle sales are actuals.  Feed

19 bills are actuals.  Overhead and operating are actuals.  So

20 that's the actual operation for Waggoner Cattle for the month

21 of January.

22 Q    And what was the -- what do you show as the total sales

23 for January 2019?

24 A    Five hundred and -- approximately $546,596.

25 Q    And what do you show on the second page as total

1    expenses?

2    A    $441,940.

3    Q    Okay.  And what was the net cash in January?

4    A    $14,468.

5    Q    And the net ending cash -- or, excuse me, the ending cash

6    balance?

7    A    $48,800.

8    Q    Okay.  On the projections for February 2019, you're

9    showing a net cash -- a negative number of $121,000.  Would

10   you explain that?

11   A    It's the projected revenues minus the cattle purchases

12   that are expected minus the feed bills for that particular

13   month.

14   Q    Okay.  And, but explain why that figure is so high, the

15   negative figure is so high, the $121,000.

16   A    If you'll look, there's a set of native cattle purchases

17   for that month that we pay for that would have the cash go to

18   a negative position.

19   Q    So there's a significant cattle purchase in February?

20   A    Yes.

21   Q    Okay.  Now, these are the actual cash amounts; is that

22   correct?

23   A    For February?

24   Q    Well, for the whole 12 months.

25   A    These are the projected cash positions for the 12 months.

1  Q    Okay.  And to your knowledge, you supply information to

2  the accountant that prepares the monthly operating reports?

3  A    That's correct.

4  Q    And does he show -- is he showing cash inflows and

5  outflows or is he showing profitability?

6  A    I don't review the monthly operating reports.

7  Q    Okay.  We're showing that the Debtor sells three types of

8  cattle.  Holstein cattle, Holstein-Angus cross, and native

9  cattle.  And we are showing cattle sales as low as two hundred

10 and -- or, lows around near $300,000 and to about an average

11 of $415,000 on the Holstein cattle.

12      Let me just jump to the bottom.  Cattle sales you think

13 are going to be a little bit over $500,000 a month and as high

14 as $770,000?

15 A    That's the projected range, yes.

16 Q    And do you -- and this is based on your conversations

17 with Mr. Waggoner?

18 A    This is based on the current cattle weights, where he's

19 priced them at for the different classes of cattle, and then

20 kind of what he expects to do for the remainder of the year.

21 Q    Okay.  What do you show as cattle sales for the entire

22 year?

23 A    $7.2 million.

24 Q    Okay.  And do you think that's feasible?

25 A    Yes, I believe it is.

1   Q    Okay.  And where do you derive your expense figures?

2   A    The --

3   Q    Cost of cattle, cost of sales, cost of -- expenses?

4   A    The Holstein calf purchases, the Holstein-Angus cross

5   calf purchases, and then the native steers:  The headcounts

6   and the price per head for the Holstein and the Holstein-Angus

7   cross are based upon what he has done in January and what he's

8   done in the last few months.  The native steers are based on

9   what he projects to do throughout 2019.  The purchases for the

10  native cattle are based upon what his purchases on an average

11  basis for January and February.

12  Q    Now, Mr. Waggoner or the Waggoner Cattle entities had a

13  period during last year where they did not meet their

14  projections; is that right?

15  A    Be more specific, I guess, or direct me to a --

16  Q    Okay.  Well, we projected a certain amount of cattle

17  sales and we did not reach that level during the last year.

18  A    On the -- on the first set of projections?

19  Q    Yes.

20  A    I would have to review those, but that's probably

21  accurate.

22  Q    Okay.  So what would be some other reasons why last year

23  was not as -- what we had projected?

24  A    Well, initially, when the first set of projections were

25  put together, it was kind of based upon expected marketings.

Schilling - Direct                          186

1   You know, a couple things happened with the market and the

2   cattle specifically.  When Mr. Waggoner went into bankruptcy,

3   he found it difficult to find guys that would really purchase

4   his cattle, and purchase them at market prices.  So the

5   marketings were delayed compared to what one might normally

6   expect.

7   Q    Okay.  So just prior to Mr. Waggoner filing bankruptcy,

8   Lone Star froze his bank account; is that correct?

9   A    That's correct.

10  Q    And so he started out this bankruptcy without any cash?

11  A    Yes.  They froze his bank account so he basically had no

12  liquidity.

13  Q    Okay.  Did the filing of the bankruptcy and the fact that

14  he had no liquidity affect his credibility with cattle sellers

15  and cattle purchasers?

16  A    Yes.  They were more difficult to work with.

17  Q    Okay.  Do you feel that going -- do you feel like Mr.

18  Waggoner will be successful in selling the proposed budgeted

19  cattle for the next 24 months?

20  A    Yes.  He's put his Holstein cattle on the Overland

21  Livestock Auction, and I guess he's gotten regular bids and

22  been able to sell cattle for $1.10 recently, which is about

23  the going rate for cattle in this area for these Holstein

24  cattle.  So it appears that the hesitance for buyers for

25  purchase his cattle because he's in bankruptcy has subsided.

1  Q    Okay.  For example, was he able -- was he -- was it

2  difficult for him to acquire feed after he filed bankruptcy?

3  A    Yes.  He had to prepay feed and he still has to prepay

4  his feed.

5  Q    Okay.

6  A    Because he doesn't get terms with his -- with most of his

7  vendors.

8  Q    So he can't buy feed unless he pays for it in advance?

9  A    That's correct.

10 Q    And the same thing for medicine?

11 A    Yes.

12 Q    Okay.  Now, has that problem alleviated itself over the

13 last eight, nine months?

14 A    Well, it's getting better.  He's been able to cash flow

15 his operation a little better and it will continue to build as

16 time moves on, as, you know, as -- as more cattle continue to

17 sell on a more regular basis, you know, his cash flow, his

18 cash position will improve, and it is expected to improve.

19 His liquidity should improve as well.

20 Q    Okay.  Explain the process of Mr. Waggoner's business.

21 A    There's three entities.  Waggoner Cattle.  That entity

22 owns the livestock that are fed.  And Circle W is the entity

23 that feeds and cares for the cattle.  And Bugtussle is the

24 entity that owns the feed yard facility and equipment.

25 Q    Okay.  So, fourth from the bottom, it says total feed

Schilling - Direct                           188

1  bill expenses.  The first one is $409,000.  The next one,

2  $307,000.  Do you see that?

3  A    Yes.

4  Q    Is that revenue that goes to Circle W?

5  A    That is correct.

6  Q    Okay.  And flip two pages over.  Excuse me.  Four pages

7  over.  And that's the Circle W monthly cash flow budget?

8  A    That's correct.

9  Q    And again, the -- most of the income comes through

10  purchases made by Waggoner Cattle, Inc., and that would be the

11  second row.  Is that right?

12  A    Yeah.  Are you talking about the revenue?

13  Q    Yes.

14  A    Yes.  The majority of the revenue for Circle W is from

15  feed charged to Waggoner Cattle.  There are some third-party

16  customers as well.

17  Q    Okay.  Based on your experience as an agricultural

18  consultant and your experience in working with Mr. Waggoner on

19  his cash flow projections, do you feel like this plan is

20  feasible?

21  A    I do.

22  Q    And as you heard earlier testimony, there have been

23  people that have testified before -- or a person who has

24  testified before this Court that they're willing to back Mr.

25  Waggoner's operations financially?

1    A    That's correct.

2    Q    Okay.

3         MR. TARBOX:   Pass the witness.

4                   CROSS-EXAMINATION

5    BY MR. ODELL:

6    Q    Mr. Schilling, can you state for the Court again what it

7    is that you do?

8    A    I sell insurance and I do some consulting.

9    Q    Okay.  And is that consulting related to a particular

10   industry?

11   A    Agriculture.

12   Q    And how long have you been doing that consulting?

13   A    It will be two years in June.

14   Q    Okay.  So about a year and three fourths?

15   A    As of today, that -- as of today, yes.

16   Q    Okay.  Now, are you an employee of the Debtors?

17   A    I am not.

18   Q    So you're an outside consultant?

19   A    Yes.

20   Q    How do you get paid?

21   A    I send an invoice for the work performed monthly.

22   Q    Okay.  And have you been paid in this case?

23   A    In this case or for the invoices submitted?

24   Q    For the invoices you're submitting.

25   A    Yes, I have.

1    Q    Have you submitted invoices postpetition?

2    A    Yes, I have.

3    Q    Have you been approved by the Court as a professional of

4    the estate?

5    A    Not to my knowledge.

6    Q    Okay.  But yet you're getting paid to consult with the

7    Debtor on this reorganization?

8    A    I get paid to perform work for him.

9    Q    And is that work part and parcel preparing cash flows to

10   help the Debtor reorganize?

11   A    At his request, yes.

12   Q    Okay.  Now, Mr. Schilling, I believe you testified that

13   the Exhibit 8 is a revised budget or cash flow plan?

14   A    That's correct.

15   Q    And these are cash flows that you put together?

16   A    That's correct.

17   Q    And can you tell me where on these cash flows are plan

18   payments?

19   A    I did not include them on the --

20   Q    Okay.

21   A    -- cash flows.

22   Q    Do you know or have any idea as to what the proposed plan

23   is for this Debtor?

24   A    In its entirety, no.

25   Q    Do you know anything about what type of plan payments the

1  Debtor will have to make?

2  A   I know that their proposal -- I think the revised

3  proposal, payments should start in June, but I don't have any

4  specifics on the amount.

5  Q   Okay.  And, again, there is no proposed plan payments in

6  these cash flows?

7  A   I was not asked to include them on this cash flow.

8  Q   So, sitting here and looking at your cash flows today, we

9  have no idea whether or not these cash flows would support a

10 plan?

11 A   They could --

12 Q   Is that mainly because we don't have a plan?

13 A   I believe that there was an initial plan submitted and

14 that they're -- a revised plan is being worked on.

15 Q   Okay.  But is that plan before this Court?

16 A   I do not know.

17 Q   Do you know if it's even been filed?

18 A   The second plan?

19 Q   That's correct.

20 A   I do not know that.

21 Q   Okay.  Mr. Schilling, there's several volumes of exhibits

22 there.  I'm going to be directing you to Exhibit or Volume 8.

23 And there should be a cover sheet on each one of the bound

24 copies.

25     In particular, we're going to be looking at Exhibit 85.

Schilling - Cross                                   192

1   Are you there, Mr. Schilling?

2   A    Exhibit 85?

3   Q    Yes.

4   A    Yes.

5   Q    Okay.  Now, I believe you testified that you didn't

6   actually work on the -- or didn't create or prepare the

7   monthly operating reports.  Is that correct?

8   A    That's correct.

9   Q    Okay.  But do you provide the information to Mr. Hayes,

10  who -- to prepare the monthly operating reports?

11  A    I provide financial information for him, and then he

12  prepares the statements.

13  Q    Now, will you turn with me, and it's going to be up at

14  the top, Page 6 of 8 in that exhibit?  The exhibit is

15  horizontal or landscape, so it'll be on the right-hand side of

16  the page.  Do you see that schedule there?

17  A    Yes, I do.

18  Q    And do you recognize what that schedule entails?

19  A    It's a monthly operating report, accrual basis.

20  Q    Okay.

21  A    Bank reconciliations.

22  Q    Okay.  And are those the bank accounts of Waggoner

23  Cattle, LLC?

24  A    They are.

25  Q    Now, when I look at your cash flow here and I look at

1  month-end cash ending balance of $48,800 for January -- and I

2  apologize for jumping back and forth, but this would be

3  Exhibit 8 of the Debtors.  Do you see that there?

4  A    Yes.

5  Q    And, again, did I correctly state the ending cash balance

6  according to your revised cash flow?

7  A    The projected, yes.

8  Q    Now, I believe you testified that that's not actually

9  projected for the month of January.

10  A    No, I said that the revenues were actual, the cattle

11  purchases were actual, and the feed bill was actual.  The

12  operating expenses were actual.

13  Q    Okay.  So the cash balance, then, at the end of the

14  month, you don't know whether that's actual or not?

15  A    That's a -- that's a formula.  That's a projected number.

16  Q    Oh, a projected number?  And what do you -- can you

17  explain to me and the Court what you mean by projected number?

18  A    It's a formula.  You take the beginning cash balance, add

19  in the revenues, deduct the cattle purchases, the feed bills,

20  any other expenses, come up with a total expense number.

21  That's deducted from the cattle sales.  And then the projected

22  ending net cash, and that's added to the cash balance.

23  Q    So let me ask you this.  Where did the beginning cash

24  number come from?

25  A    It came off of the bank statement, the beginning balance

1    for January.

2    Q    Okay.  Now, so if that was the beginning cash balance,

3    and you said the other numbers were actuals, would we not

4    expect, then, at the end of January that the Debtor would have

5    $48,800?

6    A    Again, that's a project -- that's a mathematical formula.

7    So the feed bill was charged.  If the feed bill was not paid

8    in full, there would be an accounts payable there, so it may

9    not reflect the cash balance.  Or if some of the cattle

10   purchases, if there's still a payable or a note, they haven't

11   been paid yet, you know, but those are the charges incurred

12   that month for those cattle purchases and feed bills.

13   Q    So, in other words, these numbers here for cattle

14   purchases, cattle feeding costs, cattle sales, are those

15   actual cash-in and cash-out numbers for the month of January?

16   A    Not necessarily.

17   Q    Okay.  Thank you.  Now, when I look at the end of

18   January, it says -- shows the $48,800.  When I look at the

19   beginning of February, I've got a cash balance of $48,800.  Is

20   that accurate?

21   A    That's what it shows.  Yes, sir.

22   Q    Okay.  So now can you look with me at Exhibit 85 and

23   again back to Page 6 of 8?

24   A    Which page?

25   Q    Page 6  of 8.  Again, it's a horizontal page.

1   A    Okay.

2           MR. TARBOX:   What exhibit?

3           MR. ODELL:   Exhibit 85.  Or --

4   BY MR. ODELL:

5   Q    And I believe you've said that this is a bank

6   reconciliation?

7   A    That's what it says on there.

8   Q    Okay.

9   A    I didn't say that.

10  Q    Okay.  That's what this is, correct?

11  A    That's what it says, yes.

12  Q    Okay.  Do you have any reason to dispute that this is a

13  bank reconciliation?

14  A    No.  That's what it says on there.

15  Q    Do you have any reason to dispute the numbers that are on

16  this?

17  A    I did not prepare the numbers so I couldn't say that

18  they're right or wrong.

19  Q    Does this show that the Debtors' debtor-in-possession

20  bank account at Bank of Panhandle actually has a negative cash

21  balance on the last day of the December 31st?

22  A    It's the month-end balance per books.

23  Q    Okay.  Well, what about the month-end balance per bank

24  statement on Line 1?

25  A    It shows a negative.

1  Q    Okay.  So this report shows that on December 31, 2018,

2  the day before January 1, 2019, the Debtors have a negative

3  $36,514 in their debtor-in-possession account?

4  A    I don't know if that's what it says or -- I mean, that's

5  what this report says.  I don't know if that's what -- was

6  actually the balance.

7  Q    Okay.  Now, you said that the Debtor raises three

8  different types of calves or cattle.  Is that correct?

9  A    That's correct.

10 Q    And what are those again?

11 A    Holstein, a Holstein-Angus cross, and a native calf.

12 Q    What's the difference in age whenever the Debtors

13 purchase the Holstein cattle, between -- compared with the

14 native cattle?

15 A    The Holstein cattle are day-olds.  In other words, they

16 were born within a day or two and then they are delivered to

17 Mr. Waggoner's facility.  The native cattle are generally

18 three, four, six months old.

19 Q    Okay.  They're relatively larger than the dairy calves

20 that come to the calf ranch?

21 A    That's correct.

22 Q    Do they require different feed rations?

23 A    They do.

24 Q    And between the two, which tends to be the more expensive

25 cattle to feed?

1  A    It just depends upon how you're feeding them and how

2  heavy you're growing the cattle.  It varies.

3  Q    Okay.  Will you turn with me in Volume 7 to Exhibit 84?

4  And in particular, we're going to go to the back of that

5  exhibit to what is attached to the Chapter 11 plan as Exhibit

6  B.  Are you there?

7  A    I'm there.

8  Q    Now, I believe it was last week I took your deposition.

9  Is that correct?

10 A    That's correct.

11 Q    And if I recall your deposition testimony correctly,

12 Pages 2 of 11 through 5 of 11 were -- was a spreadsheet that

13 you didn't create?

14 A    I did not create it.  That's correct.

15 Q    Okay.  But I do believe that your testimony -- that Pages

16 6 of 11 through 11 of 11 were in fact cash flows that you

17 created?

18 A    That's correct.

19 Q    Now, Mr. Schilling, if I'm looking at Page 6 of 11, and

20 in particular down where it has designated feed bills, I show

21 a section in this cash flow that you created for the original

22 plan for feeding native steers.  Is that correct?

23 A    That's correct.

24 Q    And according to this cash flow, the ADC -- and could you

25 tell the Court what ADC stands for?

1   A    Average Daily Cost.

2   Q    Okay.  So, according to this cash flow, the Average Daily

3   Cost or ADC of native steers is $2.34 per head per day.  Is

4   that correct?

5   A    That's correct.

6   Q    And then if I look up, for Holsteins and Angus cross, the

7   ADC for either one of those types or breeds of cattle is just

8   $1.80 --

9   A    That's --

10  Q    -- per head per day.  Is that correct?

11  A    That's what it shows, yes.

12  Q    Now, if I look over here at your Exhibit 8, there's no

13  longer any cost associated with feeding native steers.  Is

14  there a reason why?

15  A    Because those cattle are turned out onto wheat pasture.

16  They're not being fed at the calf ranch a monthly ration.

17  They're turned out and grazed.

18  Q    Will they be turned out and grazed for all of 2019 and

19  2020?

20  A    That's what the plan shows, that as those cattle are

21  grazed, they reach 400 pounds, 450 pounds, then they'll be

22  sold and replaced with another set and turned out and grazing.

23  Q    Okay.  And where do these cattle graze at?

24  A    At Mr. Waggoner's facility on the adjoining pastures.

25  Q    Okay.  And that's on the farmland that exists or the crop

1    circles that are there?

2    A    Yes, sir.

3    Q    Okay.  Does it not cost Mr. Waggoner or one of the Debtor

4    entities to grow crops?

5    A    There is a cost associated with that.

6    Q    Okay.  And where is that located?

7    A    Circle W has the expanse for growing crops.

8    Q    Does Circle W charge Waggoner Cattle for grazing its

9    cattle on the Circle W crops?

10   A    That's a -- that's a charge that you could put in.  So,

11   Circle W could bill out Waggoner Cattle for the cost of

12   feeding cattle, which would increase Circle W's revenues,

13   increase their profits at the bottom line.  So you could

14   assign a charge there.  In this case, I did not do that.

15   Q    These are separate entities, correct?

16   A    They are.

17   Q    Okay.  So, in other words, if I understand you correctly,

18   you did not -- Circle W is not charging Waggoner Cattle for

19   the grazing of the cattle on crops grown by Circle W?

20   A    For this particular set of projections, that charge for

21   grazing was not included.

22   Q    Okay.  Now, Mr. Schilling, if I understand correctly,

23   these revised cash flows are to be cash basis; is that

24   correct?

25   A    I'm working on getting to a cash basis.  So I can't tell

1  you that every line item is exactly cash, but that's -- as we

2  continue to work on these and get them in a format that the

3  Court prefers, the attempt will be to get them all on a cash

4  basis.

5  Q    So these aren't complete, then?

6  A    No, sir.

7  Q    Okay.  Would you turn with me to Exhibit Volume 5?  We're

8  going to be looking at Exhibit 42 to start off with.  Now, are

9  you aware that the Debtor has to file monthly operating

10  reports with the bank -- or, with the Court every month?

11  A    I am.

12  Q    And do you happen to know when that obligation is due

13  every month?

14  A    I believe the 20th.

15  Q    Okay.  And do you know whether or not that's due for the

16  month preceding on the 20th?  In other --

17  A    I believe it's for the preceding month.

18  Q    Okay.  In other words, in January, on January 20th, the

19  Debtor should have filed the December monthly operating

20  report, correct?

21  A    I believe that's correct.

22  Q    And then for January month, the Debtor should have filed

23  on February 20th, correct?

24  A    That's correct.

25  Q    Okay.  Do you control at all when those operating reports

Schilling - Cross                                      201

1    are filed?

2    A    I do not.

3    Q    You just have the responsibility of providing certain

4    financial information to Mr. Hayes?

5    A    That's correct.

6    Q    Do you provide that as well to Mr. Waggoner?

7    A    Could you be more specific?

8    Q    Well, do you -- when you send the information to Mr.

9    Hayes, are you sending the same reports to Mr. Waggoner?

10   A    I don't know if I sent him a separate set.  He has access

11   to the books, so I can't tell you if I sent a separate set to

12   him.

13   Q    Okay.  And how are the Debtors' books and records kept as

14   far as the accounting goes?

15   A    Could you be more specific?

16   Q    What software system does the Debtor use?

17   A    QuickBooks.

18   Q    QuickBooks?  Okay.  And are you in charge of entering the

19   data in the QuickBooks?

20   A    I am not in charge of it, no.

21   Q    Okay.  Do you assist in that regard?

22   A    I do.

23   Q    And in what ways do you assist the Debtors in putting in

24   information into QuickBooks?

25   A    I will assist in going through the -- reconciling the

1  checking accounts back to the books.  If there are some items

2  that aren't included, I'll, you know, add those.  Expenses for

3  the month.  I will oversee his -- there's a prepaid feed

4  account, so I'll reconcile the feed expense for the month back

5  to the invoices that were submitted.  Just -- just things like

6  that nature.

7  Q    Okay.  Now, will you turn with me in Exhibit 42 to Page 3

8  of 8 at the top?  Do you see that page?

9  A    Yes.

10  Q    And what is that?

11  A    That is a monthly operating report for Waggoner Cattle.

12  Q    Okay.  And is this the income statement for the month of

13  April?

14  A    It is.

15  Q    Now, this provides that it's kept on an accrual basis.

16  What is -- first off, Mr. Schilling, what is your educational

17  background?

18  A    I have a degree from Abilene Christian University.

19  Q    In what?

20  A    In -- it is a business administration with an emphasis in

21  finance.

22  Q    Okay.  And are you familiar with financial statements?

23  A    I am.

24  Q    Could you explain to me what the difference is between an

25  income statement and -- or, an income statement on an accrual

1    basis compared to a cash basis?

2    A    I can.

3    Q    Okay.  And what would that be?

4    A    An income statement prepared on an accrual basis,

5    revenues, expenses are charged to that particular account for

6    that month as they happen, not necessarily when those checks

7    are paid for those items.

8    Q    Okay.  And then what about on a cash basis?

9    A    On a cash basis, you would recognize a revenue maybe when

10   you got a check or an expense when you actually paid the item.

11   Q    Okay.  And this says that this is an accrual basis income

12   statement, correct?

13   A    That's correct.

14   Q    When does the Debtor recognize its gross revenues?

15   A    Which --

16   Q    Do you know?

17   A    Which Debtor?

18   Q    Sorry.  Waggoner Cattle.

19   A    Revenues for Waggoner Cattle are recognized when a

20   particular lot of cattle have closed out.  And that means when

21   all of the cattle in that lot have been sold.

22   Q    Okay.

23   A    That's when they'll -- the income and expenses for those

24   cattle will be recognized.

25   Q    Okay.  Now, would the Debtor still recognize in any of

1    its financial statements the cash inflows from the sale of

2    cattle?

3    A    Could you ask the question again?

4    Q    Yeah.  Let me see if I can restate it for you.  If I

5    understood what your testimony was just then about gross

6    revenues, the Debtor recognizes gross revenues whenever it

7    closes out a particular lot of cattle.  Is that correct?

8    A    That's correct.

9    Q    And now, if -- well, let me ask you this.  Does the

10   Debtor always sell a full lot of cattle every time it sells

11   cattle?

12   A    Out of one particular lot?

13   Q    Correct.

14   A    No.

15   Q    So if cattle come in and are lotted under Lot #1, when

16   the Debtor sells -- when Waggoner Cattle cells cattle under

17   Lot #1, does it sell all of Lot #1 at one time?

18   A    Not necessarily.

19   Q    Does it sell at varying times?

20   A    Yes.

21   Q    But if I understand correctly, not until all of Lot 1 is

22   sold does the Debtor recognize -- does Waggoner Cattle

23   recognize gross income?

24   A    That's correct.

25   Q    Okay.  And that would be on the accrual basis side of

1  that, correct?

2  A    That's correct.

3  Q    What about if the Debtor sells cattle during the month or

4  any period of time in the year but has not yet closed out that

5  lot?  Does the Debtor recognize the cash that comes in?

6  A    Recognize it--?

7  Q    As money received.

8  A    It recognizes the cash received as an increase in cash

9  and deferred revenue on the liability side.

10  Q    Okay.

11  A    It does not recognize it on the income statement.

12  Q    Okay.  Now, would that show up on any other financial or

13  operating reports of the Debtor?

14  A    It would be on the balance sheet.

15  Q    Okay.  Would it be on the cash flow statement?

16  A    I don't prepare the cash flow statements.  I don't know.

17  Q    You don't know?  Okay.  Looking at the April revenues on

18  Page 3 of 8, on the cattle that were sold and -- or the cattle

19  that were recognized as sold in April on this income

20  statement, did they lose money?

21  A    They did.

22  Q    The Debtor had a negative net income?

23  A    Yes.  I believe these were prepetition cattle from the

24  feed yard that were recognized.

25  Q    Okay.  Now, turning to the next page of this report, do

1   you see that?

2   A    Yes.

3   Q    Now, is this a cash-in or cash -- cash flow type

4   statement?

5   A    This is a cash receipts and disbursements.

6   Q    Okay.  Do you know whether or not this report is trying

7   to recognize what cash came in and what cash went out?

8   A    I did not prepare this report.

9   Q    So you don't know exactly what this report tells us?

10  A    It just says it's a cash receipts and disbursements.

11  Q    Okay.  Do you see there that at the end of the month the

12  Debtor shows to have cash of only $394, according to this

13  report?

14  A    That's what the report says.

15  Q    Okay.  Now, will you turn with me to Page 6 of 8 of this

16  report?  And do you see there, both in Line 1 of the first

17  chart and in Line 5 of the first chart, what it shows to be

18  the ending cash balance in the Debtors' bank -- in Waggoner

19  Cattle's bank accounts for the month of April?

20  A    On Line 1?

21  Q    Yes.  On Line 1, under the column Total.

22  A    $394.

23  Q    And does that match up with the cash -- end of cash on

24  Page 4 of 8?

25  A    Those two numbers are the same.

1   Q   Okay.  So those two match, correct?

2   A   They do.

3   Q   Okay.  Will you turn with me to Exhibit 43?  And will you

4   turn with me to Page 3?  Sorry.  3 of 8 at the top.  And,

5   again, this is the monthly operating report for Waggoner

6   Cattle and the income statement, correct?

7   A   Yes, it is.

8   Q   And in this month, the Debtors recognized another net

9   loss, correct?

10  A   That's correct.

11  Q   Now, will you turn with me to Page 4 of 8?  And do you

12  see there where it has beginning cash -- or, cash beginning of

13  month?  And it says $394?

14  A   Yes.  On Line 1?

15  Q   Yes.  And then there -- do you show any calf sales?  Or,

16  are there any calf sales on this report?

17  A   No, there are not.

18  Q   And then do you see on Line 6, Loan & Advances, --

19  A   I do.

20  Q   -- $1,221,000?  Do you see that?

21  A   I do.

22  Q   Okay.  And do you know what that relates to?

23  A   I would have to look, so I don't know specifically, but

24  it's probably the S&R debtor-in-possession financing.

25  Q   Would you --

Schilling - Cross                                              208

1    A    A draw.

2    Q    Would you look just down there at the bottom of that

3    line?  Or just under that chart?  There is a Number 6 with

4    loan advances.  And it's got two items there.

5    A    Okay.

6    Q    A million of that is related to the cattle line with S&R

7    Cattle.  Is that correct?

8    A    That's correct.

9    Q    And the other is related to feed and care of Lone Star

10   State Bank?

11   A    That's correct.

12   Q    Do you have any idea what that represents?

13   A    Which month is this?

14   Q    This would be the month of May.

15   A    Month of May?  At the time, I was intending to show an

16   accounts payable on the feed and care that Lone Star was

17   providing.  And so for the amount of feed that they paid for,

18   I set up an accounts payable.

19   Q    Okay.  And at the end of the month, this shows that the

20   Debtor had a little over $551,000, correct?

21   A    That's what it says at the bottom, yes.

22   Q    Would you agree with me that that was not based on --

23   that cash amount was not based on the sale of cattle?

24   A    That's correct.

25   Q    Okay.  Now, will you turn with me to Exhibit 44?  And,

1   again, Page 3 of 8.  In the month of June, the Debtors show a

2   net profit.  Is that right?

3   A    That's correct.

4   Q    About $16,000?

5   A    That's correct.

6   Q    Now, will you turn with me to Page 4?  And, again, up at

7   the top we've got beginning cash of 551, or $551,000.  We've

8   got no cash sales.  Is that correct?

9   A    It does not show any.

10  Q    Okay.  And then in Line 6 we've got another $500,000

11  under Loan & Advances.  Is that correct?

12  A    That's correct.

13  Q    And was that drawn on the line, the cattle line with S&R

14  Cattle?

15  A    It was.

16  Q    And total purchases for the Debtor or total operating

17  disbursements were just under a million dollars, at $924,000?

18  A    That's correct.

19  Q    And that resulted in a negative cash flow of about

20  $424,000?

21  A    That's correct.

22  Q    Okay.  But again, the cash increase that the Debtor saw

23  in the month was not on account of selling cattle?

24  A    That's correct.

25  Q    Okay.  Will you turn with me to Exhibit 45?  And, again,

1    will you turn with me to Page 3 of 8?  And do you see there

2    for the month of July the Debtors lost -- had a net loss of

3    another $31,000?

4    A    Yes.

5    Q    So, from April until July, the Debtors have had a net

6    loss of more than $150,000; is that accurate?

7    A    Including prepetition cattle?  That's correct.

8    Q    Well, these are the Debtors' books and records, right?

9    A    And it includes the prepetition cattle sales, yes.

10   Q    Okay.

11   A    So it would include -- so that's what it shows on there.

12   Q    Okay.  But it shows them having a net loss?

13   A    Yes.

14   Q    Okay.  Now, will you go with me to Page 4 of 8?  And,

15   again, now we're showing beginning cash of $126,000.  We do

16   have some cash sales.  Is that correct?

17   A    That's correct.

18   Q    Now, would that be cash sales of cattle that the lot

19   didn't get cleared out?

20   A    I believe it would be the closing out of a particular

21   lot.

22   Q    Well, will you turn with me back to Page 3?  Did the

23   Debtors recognize any gross revenues in the month of July?

24   A    No.

25   Q    So if I understood your testimony correctly, the only

1    time that the Debtors would recognize gross revenue in a month

2    would be whenever they closed out a lot, correct?

3    A    On an accrual basis, that's correct.

4    Q    Are these statements not kept on an accrual basis?

5    A    I did not prepare these statements.

6    Q    Does the statement on Page -- up at the top right-hand

7    corner of Page 3 not say Accrual Basis?

8    A    It says Accrual Basis.

9    Q    Okay.  Now, can you look with me at what the ending cash

10   balance for the Debtor was on Page 4 of 8 for the month of

11   July?

12   A    It says minus $123,165.

13   Q    Okay.  Now, will you turn with me to Page 6 of 8?  And,

14   again, for Line 1, Balance Per Bank Statement, as well as

15   Month-End Balance Per Books, does the Debtor show on this

16   report that the total cash on the bank statement as well as

17   per the Debtor's books, the Debtor being Waggoner Cattle, that

18   the total cash was negative $123,165?

19   A    That's what this report says.

20   Q    Okay.  Now, do you have any reason to dispute these

21   reports?

22   A    Mr. Waggoner's checking account balances have not been

23   negative, so --

24   Q    So you're saying the --

25   A    And I didn't prepare -- I didn't prepare --

1   Q    -- reports are inaccurate?

2   A    I did not prepare these reports, so I can't tell you how

3   he arrived at that number.  What I can tell you is that his

4   bank balance statements have not been negative.

5   Q    So the reports are incorrect?

6   A    His bank balance statements have not been negative.  I

7   did not prepare these reports so I cannot tell you how he

8   prepared them, whether or not that they're correct or

9   incorrect.

10  Q    So Mr. Waggoner is submitting false information to the

11  Court?

12  A    I did not say that.

13  Q    Now, will you turn with me again to Page or Exhibit 46?

14  Page 3 of 8?  Do you see what the net loss was for the month

15  of August?

16  A    It shows a loss of $57,533.

17  Q    Okay.  Now, will you turn with me to Page 4 of 8?  And

18  on this month, the Debtor had more calf sales; is that

19  correct?

20  A    That's -- yeah.  It looks like he's recognizing the

21  receipt of cash as cattle are sold.

22  Q    Okay.  And --

23  A    Not the closeout of a lot for a particular month.

24  Q    Okay.  So there's no recognition of any revenue because

25  the lot hasn't closed out?

1    A    On the accrual side, correct.

2    Q    Okay.  Now, will you turn with me to Page 2 of 8?  And

3    will you look at Line 22?  First off, do you see that this is

4    what's called a balance sheet?

5    A    Yes.

6    Q    And do you see Line 22 there?

7    A    I do.

8    Q    And what is the balance sheet balance of that account as

9    of August 31st?

10   A    $2.2 million.

11   Q    Now, will you look at Line 22 down below where it has

12   defined Other Attached List?  Do you see that?

13   A    I do.

14   Q    And so what does the $2.2 million relate to?

15   A    It's the S&R Cattle line.

16   Q    Okay. Now, by August 31st, the Debtor had already drawn

17   all the amount that was available on the Debtor's debtor-in-

18   possession line, correct?

19   A    That's correct.

20   Q    Do you see Line 17 on that same page, --

21   A    Yes.

22   Q    -- Page 2?  And what does it say that line represents?

23   A    Accounts payable.

24   Q    Now, what would be the accounts payable for the Debtor,

25   for Waggoner Cattle?

1  A    It would be cattle purchases accounts payable, and

2  possibly accounts payable related to feed.

3  Q    Okay.  And who would be owed on that account payable for

4  feed?

5  A    Circle W.

6  Q    Okay.  Does these -- do you know whether or not these

7  accounts payable take into account the feed that is being paid

8  by Lone Star?

9  A    Could you ask that question again?

10 Q    Yes.  Do you -- are you aware that Lone Star Cattle was

11 being billed for the care and feed of the cattle that existed

12 prepetition?

13 A    Yes.

14 Q    And that they were being invoiced by Circle W?

15 A    That's correct.

16 Q    Do you know whether or not Waggoner Cattle in any way was

17 showing on its books and records the feed costs associated

18 with the feed and care of the cattle that Lone Star was paying

19 those costs for?

20 A    I don't believe that it was being recognized, no.

21 Q    In fact, if you turn back to Page -- or, if you turn to

22 Page 4 and look at what is down there as Loan & Advances, that

23 first input of $221,767 has not changed, has it?

24 A    No, it has not.

25 Q    Okay.  And I believe you said that that was an attempt by

1  you to somehow account for what Lone Star was paying for the

2  feed and care of the cattle that were prepetition cattle and

3  in the yard -- in the calf ranch?

4  A    Yes.

5  Q    Okay.  Now, so the Debtor is, at this point, at the end

6  of August, the Debtor has already maxed out its line of credit

7  with S&R Cattle and incurred $835,000 worth of payables.  Is

8  that correct?

9  A    That's the payables it shows, yes.

10  Q    Okay.  I believe you mentioned that this bankruptcy has

11  caused for the Debtor -- Waggoner Cattle, I presume -- to be

12  on a cash basis only.  Is that correct?

13  A    Say that again?

14  Q    I believe your testimony -- or, let me ask you this.  Did

15  the bankruptcy cause for the Debtor to have to pay all of its

16  vendors on -- by cash?

17  A    Most of his vendors, they pay -- they're not given terms.

18  In other words, they don't get -- they don't have to -- they

19  don't get 30-day terms on feed charges.

20  Q    So the Debtor has to pay cash whenever he buys feed?

21  A    Yes.  Or pre -- or put a prepaid amount in.

22  Q    Okay.  And so if the Debtor is putting in a prepaid

23  amount, would that not show up on the balance sheet?

24  A    On Circle W, it would.

25  Q    On Circle W, it would?  Okay.

1  A    Yes.

2  Q    So Waggoner Cattle isn't purchasing feed, correct?

3  A    That's correct.

4  Q    So what would be the accounts payable for Waggoner

5  Cattle?

6  A    For Waggoner Cattle, it would consist of accounts payable

7  for cattle purchases, accounts purchases for feed billing from

8  Circle W.  They may include accounts payable from any

9  prepetition accounts that were outstanding at the time.

10  Q    Okay.  So is this correct, that Circle W does not expect

11  to be paid cash for its feed bills and it has terms with the

12  Debtor, with Waggoner Cattle?

13  A    That's -- I can't answer that question.

14  Q    You don't know?

15  A    I don't know.

16  Q    Okay.  What about the Debtors' -- what about Waggoner

17  Cattle's vendors for calves, for dairy calves?  Are they on

18  cash terms?

19  A    I don't know --

20  Q    Okay.

21  A    -- what the terms are there.

22  Q    Okay.  But you're -- but Waggoner Cattle is showing

23  payables for cattle purchases?

24  A    Again, I'm -- you asked me what I assumed it was.  I'm

25  speculating as to what these payables were.

Schilling - Cross                                      217

1    Q    So you don't know whether those payables --

2    A    I --

3    Q    That's correct?

4    A    I have not looked --

5    Q    Okay.

6    A    -- at the specific payables for this period that you --

7    that you're referencing.

8    Q    Okay.  Now, at the end of the month, there was $159,000

9    -- I'm looking at Page 4 of that report.  There was $159,000.

10   Is that correct?

11   A    That's what it shows.

12   Q    Okay.  And based on the cash flows that existed or that

13   exist for July and August, that's roughly just a positive cash

14   flow of about $32,000 for Waggoner Cattle for those two

15   months?  Is that correct?

16   A    Show me how you got to that conclusion.

17   Q    Well, if you'll look at July, the columns for July and

18   August, and then there's a column for Second Quarter, and if I

19   take the negative cash flow that occurred in July and take the

20   positive cash flow from the month of August, --

21   A    Okay.  So you're looking at Line 32, right?

22   Q    Yes, I am.

23   A    The right-hand side?  Yeah, it shows a $32,952 balance.

24   Q    Now, will you turn with me to Page -- or, sorry, to

25   Exhibit 47?  And would you look with me at Page 3?  Here it

Schilling - Cross                                    218

1 | shows that the Debtor had a net loss of $1.8 million.

2 | Correct?

3 | A    That's what this report shows, yes.

4 | Q    Okay.  Now, will you turn with me to Page 4?  And do you

5 | see there on Line 32 that it shows that the Debtor, for the

6 | month of September, had a negative cash flow of $156,000?

7 | A    That's what that number says, yes.

8 | Q    And that for the full second quarter, the Debtor shows a

9 | negative cash flow of $123,000?

10 | A    That's what that number reports.

11 | Q    Okay.  And during this time, at least July and August,

12 | the Debtor did draw on the line of credit and was able to have

13 | a source of cash, correct?

14 | A    Repeat the question, please.

15 | Q    In the months of -- we looked at the Exhibit 46, which

16 | was the August monthly operating report, and at the -- by the

17 | end of August, the Debtor had drawn completely on the line of

18 | credit.  Is that correct?

19 | A    For S&R Cattle?

20 | Q    For S&R Cattle.

21 | A    That's correct.

22 | Q    And so up until the Debtor had drawn on the line of

23 | credit, the Debtor had available to it advances under that

24 | line of credit, correct?

25 | A    That's correct.

Schilling - Cross                                    219

1    Q    And so some of the cash-positive flow that the Debtor had

2    relates to borrowings?

3    A    Some of it, yes.

4    Q    Okay.  For the months of -- for the month of July and

5    August, do you see Line 6 there?

6    A    Yes.

7    Q    So, in July, the Debtor received $432,709; is that

8    correct?

9    A    That's correct.

10   Q    And then for the month of August the Debtor received

11   $267,291?

12   A    That's correct.

13   Q    Okay.  Now, for the month of September, there is in that

14   same Line 6, Loans & Advances, in a negative number of roughly

15   $2 million.  Do you see that?

16   A    Yes.

17   Q    Do you know what that relates to?

18   A    That was -- I would have to look.  I believe that was the

19   paydown on the borrower's loans at Lone Star from the sale of

20   prepetition cattle.

21   Q    Okay.  Now, going back to Page 3 of 8, there's a line

22   item under Cost of Goods Sold for Material for the month of

23   September, and it shows $5,218,000.  Is that --

24   A    That's correct.

25   Q    -- roughly the correct number?

1    A    Yes.

2    Q    Now, how does the Debtor account for -- or, what makes up

3    the Debtors' Cost of Goods Sold?

4    A    It's the cost of livestock plus accrued feed charges.

5    Q    So, prepetition, when the Debtor was operating outside of

6    bankruptcy, the Debtor would purchase cattle, and that cattle

7    would be placed into an inventory account, correct?

8    A    That's correct.

9    Q    When those cattle were being fed and the Debtor Waggoner

10   Cattle was receiving feed bills, an accounts payable was

11   noted.  Is that accurate?

12   A    On which entity?

13   Q    For Waggoner Cattle.

14   A    Or, ask --

15   Q    For Waggoner Cattle.

16   A    Ask me the question again.  I'm sorry.

17   Q    Okay.  That's fine.  So, let me back up and just make

18   sure.  When Waggoner Cattle goes out and purchases cattle, the

19   Debtor puts the amount of the cattle purchased into the

20   inventory account.  Is that accurate?

21   A    That's correct.

22   Q    When Waggoner Cattle receives a feed bill from Circle W,

23   does Waggoner Cattle book that feed bill into the inventory

24   account?

25   A    It books it, you know, it's inventory and a corresponding

1    accounts payable at the same day.

2    Q    Okay.  And, of course, the accounts payable is what it

3    will eventually pay down the road, correct?

4    A    That's correct.

5    Q    At some point in time?  Now, once postpetition, is the

6    Debtor doing the same thing?

7    A    Yes, they are.

8    Q    So anytime --

9    A    With a separate -- with a separate inventory number for

10   postpetition cattle.

11   Q    Okay.  So if I understand you correctly, whenever the

12   bankruptcy case happened, you all, or maybe you yourself,

13   created two separate inventory accounts.  Is that accurate?

14   A    There was already an existing inventory account for the

15   cattle that were prepetition.  So a new inventory account was

16   set up for postpetition cattle purchases.

17   Q    Okay.  And whenever you've -- whenever Waggoner Cattle

18   has purchased cattle postpetition, again, that purchase price

19   goes into the inventory account that was created for

20   postpetition cattle?

21   A    That's correct.

22   Q    When Waggoner Cattle receives a fee bill from Circle W

23   postpetition, does Waggoner Cattle put the feed bill cost into

24   the postpetition cattle account?

25   A    That's correct.

1  Q    Okay.  So do you know why, on Line 4, the Debtor shows a

2  cost of goods sold for -- well, let me back up.  Line 1, we've

3  got $3.3 million in gross revenues.  Is that correct?

4  A    That's correct.

5  Q    And do you know what that relates to?

6  A    That is prepetition cattle sales and some postpetition

7  cattle sales for that particular month.

8  Q    Okay.  And so when you say the prepetition cattle sales,

9  you're referring to the cattle that Lone Star Cattle was

10  feeding and caring for by paying Circle W.  Is that correct?

11  A    Yes.

12  Q    That were eventually sold.  Now, not all the cattle were

13  sold in September.  Is that accurate?

14  A    That's correct.

15  Q    They have been sold over a period of time?

16  A    That's correct.

17  Q    Okay.  But it was determined to recognize the income in

18  October?

19  A    Yes.  Up to that point, we had not been getting receipts

20  or copies of monthly sales, and so I couldn't determine each

21  month how many head of cattle sold in what amount and how it

22  was applied to the debts.  And so rather than trying to do it

23  piecemeal, I said, let's just wait until we get all the

24  prepetition cattle sold to recognize the income and then wipe

25  the inventory off the books at that point in time by expensing

1   it through cost of goods sold.

2   Q    Okay.  So now, talking about the cost of goods sold, the

3   $5.2 million, do you know what that -- what that is comprised

4   of?

5   A    That is an amount of some postpetition cattle costs, but

6   most of it are the -- is the inventory amount for prepetition

7   cattles on the borrower's balance sheet.

8   Q    Okay.  So is it fair to say, then, that the cattle that

9   were sold that were prepetition cattle lost money?

10  A    I can't tell you if they did or didn't because I don't

11  know if the inventory amount that's on there included prior

12  cattle auctions that were never cleaned up.

13  Q    So, potentially, the $5.2 million could have included

14  cattle losses that were never recognized by the Debtor?

15  A    Again, that was the balance of that inventory amount.  So

16  it could have -- I don't know what it, you know, how it could

17  have been comprised of, but that was the amount of the

18  inventory stated at that time.  Since those -- since that

19  inventory is no longer there, it needs to be expensed, so I

20  expensed it through cost of goods sold.

21  Q    Let me see if I can ask you it this way.  Did you ever

22  compare the lots that sold -- well, let me back up and ask

23  this.  I believe you testified that when the bankruptcy case

24  happened there was already an inventory account.  Is that --

25  A    That is correct.

1  Q    And there was already -- there were already amounts in

2  the inventory account representing cattle purchased and feed

3  costs paid?

4  A    Yes.

5  Q    Or maybe not paid, but accrued?

6  A    Correct.

7  Q    Okay.  And those associated with what Waggoner Cattle has

8  said is the prepetition cattle?

9  A    It's the amount of inventory on the borrower's books from

10 the time he began his books and started creating that

11 inventory until that particular date when they were, you know,

12 expunged off the books.

13 Q    Okay.  And so when this transaction occurred, this

14 accounting transaction occurred where you said, okay, we need

15 to recognize the prepetition cattle sales, and that's where we

16 got $3.3 -- roughly $3.3 million, and we need to recognize

17 that, we need to clear the books of all inventory that -- or,

18 all amounts in the inventory account associated with

19 prepetition cattle?

20 A    That's correct.

21 Q    And if I understand you correctly, you haven't confirmed

22 that all of that amount that was cleaned off the books, so to

23 speak, is one hundred percent related to the prepetition

24 cattle that were sold postpetition in the amount of roughly

25 $3.3 million?

1    A    Could you ask that question again?

2    Q    I certainly can.  If I understand you correctly, when the

3    books were cleaned off and the inventory amount was cleared

4    out, did you do a reconciliation to confirm that the $5.2

5    million, roughly, an amount that needed to be cleaned out of

6    the inventory account, related solely to the cattle that were

7    sold that were Lone Star's prepetition collateral for the

8    amount of roughly $3.3 million?

9    A    Could you break the question up?  You've got -- it's a

10   long question.

11   Q    Okay.  I'll try my best to do this.  I know we're getting

12   towards the end of the day.

13   A    It's getting late and --

14        THE COURT:  We did tell them to turn the air on in

15   here, but it didn't work, I guess.

16   BY MR. ODELL:

17   Q    Debtors sold the cattle that was the prepetition

18   collateral of Lone Star State Bank; is that correct?

19   A    That's correct.

20   Q    Okay.

21   A    And that amount was provided to me by the Bank.

22   Q    And that amount was roughly $3.3 million?

23   A    That's correct.

24   Q    Okay.  Does the Material amount on this report under Cost

25   of Goods Sold relate solely, the $5.2 million, relate solely

1  to those $3.3 million worth of cattle sold?

2  A    As I said, part of that material cost includes some

3  postpetition cattle that were sold.

4  Q    Okay.  But does the prepetition amount relate solely to

5  the prepetition cattle that were sold?

6  A    The prepetition value was taken off of Inventory Line

7  Item 1300, which is the -- which is the -- whatever that value

8  was on that date that we expensed it then.  So that value was

9  -- that inventory value for Line 1300 Inventory, which include

10 all the borrower's prepetition cattle, that amount was

11 expensed through cost of goods sold.

12 Q    Would it have included prepetition cattle that had

13 already been sold?  Could it have done that?

14 A    Going back ten years?  Twenty years?  I mean, --

15 Q    Well, I don't know how many years, but --

16 A    I mean, I can't -- again, I didn't -- I didn't try and

17 match up every inventory to see if those cattle generated a

18 profit or generated a loss.

19 Q    Okay.

20 A    My job at that point in time is to remove that inventory

21 value from the balance sheet, and I expensed it through cost

22 of goods sold.

23 Q    Okay.  So if I understood that correctly, you did not

24 reconcile the lots that were sold related to Lone Star with

25 the cost of goods sold that were written off the books?

1    A    No, I did not.

2    Q    So, potentially, that inventory account could have had

3    built into it amounts that were not previously closed out,

4    even though revenue was recognized?

5    A    Ask the question again.

6    Q    The $5.2 million could have previously -- could have in

7    it, built into it, amounts that were not previously recognized

8    when cattle were sold?

9    A    Again, I -- I can't tell you -- I did not -- I didn't

10   reconcile every inventory prepetition as it sold out to only

11   expense those particular costs.  It was a lump sum elimination

12   of an inventory line item through the cost of goods sold.

13   Q    Okay.  Now, had there not been an agreement reached

14   between Lone Star and Waggoner Cattle at the beginning of the

15   case to where Lone Star paid Circle W for the feeding and care

16   of the prepetition cattle and Waggoner Cattle would have been

17   billed for those prepetition cattle, would that amount show up

18   in that material or the inventory account?

19   A    Yes, it probably would have.

20   Q    And do you know whether or not the feeding expenses paid

21   by Waggoner Cattle -- or, sorry, by Lone Star -- to Circle W

22   ended up in the Material account?

23   A    Again, and --

24   Q    Or the Costs of Good Sold account?

25   A    You know, initially, there's that $220,000.  There's a

Schilling - Cross                          228

1  line item in inventory for that amount.  After that one month,

2  I did not do it going forward.

3  Q    Okay.  So, other than the $221,000, you didn't --

4  Waggoner Cattle never recognized the amount that was for the

5  fee and care of those cattle on its books and records?

6  A    That's correct.

7  Q    And that was because Lone Star was paying for that feed

8  and care?

9  A    That's correct.

10 Q    Now, again, going back to my question, though, if

11 Waggoner Cattle hadn't remained feeding and caring for those

12 cattle, and booking that cost to inventory, would we not see,

13 when those cattle sold, a corresponding increase in the

14 material or the cost of goods sold number that's $5.2 million?

15 A    Not necessarily.

16 Q    And why is that?

17 A    Well, because if those cattle, when they were sold, the

18 only -- the expenses that were paid against that lot would

19 have been recognized through the cost of goods sold at that

20 point in time.

21 Q    Okay.  But we know that the cattle sold.  Correct?

22 A    That's correct.

23 Q    We know that the cattle were fed.

24 A    That's correct.

25 Q    We know that Lone Star paid the feed bill.

1   A    Correct.

2   Q    We know that Waggoner Cattle didn't put the -- didn't

3   book that in their inventory account.

4   A    That's correct.

5   Q    So, had Waggoner Cattle paid the feed bills or even

6   received the feed bills, that would have been booked into the

7   inventory account, correct?

8   A    Correct.

9   Q    And so when those cattle sold, like it did when Lone Star

10  -- when they were sold and Lone Star received the proceeds,

11  then, when they were sold by Waggoner Cattle, there would be

12  feed costs associated with them that would be in inventory?

13  A    Yes.

14  Q    And those feed costs don't show up in this $5.2 million

15  number because Waggoner Cattle didn't pay them; Lone Star

16  did?

17  A    That's correct.

18  Q    So if that would have been the opposite and Waggoner

19  would have paid for them, or been receiving the bills, the

20  feed costs would have been roughly another million dollars or

21  more?  Or the cost of goods sold would have been another

22  roughly million dollars or more?

23  A    Well, yeah, if I was going to expense off the entire

24  inventory at that point in time.  But, again, if you're

25  assuming that Lone -- that Waggoner Cattle were to continue

1   paying those feed bills on their own, that means the operation

2   would have continued on so we wouldn't be in bankruptcy, and

3   so you would you have recognized those cattle as they sold

4   with a cost assigned to them as they sold.  So there may not

5   have been a lump sum removal out of the inventory line item

6   through cost of goods sold.

7   Q    Okay.  But at least you'll agree with me that there is no

8   recognition of a feed cost for those cattle?

9   A    There is not.

10  Q    And that would typically be in the cost of goods sold?

11  A    Yes.

12  Q    And so if I did add that up and added it into here,

13  roughly, we would be looking at a negative $2.8 million loss?

14  A    That's assuming that you would have expunged that entire

15  inventory line item, which may not have occurred.

16  Q    Okay.  Now, Mr. Schilling, let's turn to Exhibit 48.

17             THE COURT:  Before we do that, we're about to run

18  out of time here.  And I take it we're going to need more time

19  after this witness?

20             MR. ODELL:  It would appear so, Your Honor.

21             THE COURT:  We can continue on tomorrow.  That's the

22  only time I can do it this week.

23             MR. ODELL:  That's not a problem for Lone Star, Your

24  Honor.

25             MR. TARBOX:  The problem that we have is that Mr.

1  Waggoner has to take care of cattle tomorrow morning.   If Mr.

2  Waggoner can be excused -- oh.

3          THE COURT:   Yes.   You need to talk into a

4  microphone, Mr. Tarbox.

5       (Pause.)

6          MR. TARBOX:   The problem we're having is that the

7  cattle need to be treated tomorrow morning.   How many cattle

8  do we have?

9          MR. WAGGONER:   About 8,800 head.

10          MR. TARBOX:   About 8,800 of head, which requires Mr.

11  Waggoner's attention.   And we don't mind going forward

12  tomorrow, but I would ask the Court if we could go forward

13  without Mr. Waggoner being present.

14          THE COURT:   Well, that's really up to you.   I'm not

15  going to require that he be present in the courtroom.   I don't

16  know if -- any expectation of calling Mr. Waggoner or do you

17  want to have him here at a time when he -- I take it you don't

18  intend to call Mr. Waggoner?

19          MR. TARBOX:   Well, I don't intend to call him

20  unless Mr. Odell brings up anything that requires me to call

21  him.

22          THE COURT:   Well, we specially set this thing on

23  this date, and we've gone this far.   We will resume court at

24  9:00 o'clock tomorrow morning.

25       Okay.   We'll be adjourned.

1          THE CLERK:  All rise.

2       (Proceedings concluded at 5:30 p.m.)

3                      --oOo--

19                      CERTIFICATE

20     I certify that the foregoing is a correct transcript from
the digital sound recording of the proceedings in the above-
21 entitled matter.

22   **/s/ Kathy Rehling**                    **04/09/2019**

23 _____        _____
Kathy Rehling, CETD-444                    Date
24 Certified Electronic Court Transcriber

1                                    INDEX

2    PROCEEDINGS                                                      3

3    OPENING STATEMENTS
4    - By Mr. Odell                                                   4
     - By Mr. Tarbox                                                  7

5    WITNESSES

6    Debtors' Witnesses

7    Laurens Schilderink
8    - Direct Examination by Mr. Tarbox                              11
     - Cross-Examination by Mr. Odell                                17
9    - Redirect Examination by Mr. Tarbox                            23

10   Melisa Roberts
     - Direct Examination by Mr. Tarbox                             107
11

12   Kirk Thomas
     - Direct Examination by Mr. Tarbox                             109
13   - Cross-Examination by Mr. Odell                               120
     - Redirect Examination by Mr. Tarbox                           133
14   - Recross-Examination by Mr. Odell                             135

15   Gary Phillips
     - Direct Examination by Mr. Tarbox                             136
16   - Cross-Examination by Mr. Odell                               153
     - Redirect Examination by Mr. Tarbox                           169
17

18   Bart Schilling
     - Direct Examination by Mr. Tarbox                             179
19   - Cross-Examination by Mr. Odell                               189

20   Lone Star State Bank's Witnesses

21   Melisa Roberts
     - Direct Examination by Mr. Odell                               26
22   - Cross-Examination by Mr. Tarbox                               72
     - Redirect Examination by Mr. Odell                             97
23   - Recross-Examination by Mr. Tarbox                            101
     - Examination by the Court                                     102
24

25

1

INDEX
Page 2

2

EXHIBITS

3

| Debtors' Exhibits | | Identified | Received |
|---|---|---|---|
| 1 | Loan Agreement | 14 | 24 |
| 2 | Appraisal Report | 22 | -- |
| 4 | Exhibit | 72 | 72 |
| 8 | Revised Cash Flow Projections | 180 | 181 |
| -- | Audio Recording | 95 | Denied-96 |
| | | | Allowed-106 |

| Lone Star State Bank's Exhibits | | Identified | Received |
|---|---|---|---|
| 1 | Commercial Credit and Forbearance Agreement | 41 | 44 |
| 2-20 | Loan Documents | 43 | 44 |
| 24 | Ratification and Amendment to Collateral Assignments | 46 | 47 |
| 25 | Assignment of Life Insurance Policy | 47 | 47 |
| 26 | Assignment of Life Insurance Policy | 47 | 47 |
| 27 | UCC Financing Statements | 33 | 48 |
| 28 | Intercreditor Agreement | 29 | 36 |
| 46 | August Monthly Operating Report | 212 | -- |
| 47 | Report | 217 | -- |
| 84 | Plan of Reorganization | 60 | 72 |
| 89 | Payroll and Fee Expenses | 58 | 72 |
| 90 | Insurance Policy | 52 | 55 |
| 91 | Insurance Policy | 53 | 55 |
| 92 | Life Insurance Policy Comparison | 54 | 55 |
| 97 | Proof of Claim | 63 | 65 |
| 98 | TCEQ Permit | 155 | 155 |
| 99 | Appraisal Report | 163 | -- |

| *Judicial Notice to be Taken of Monthly Operating Reports* | 175/178 |
|---|---|

RULINGS

Motion for Relief from Stay filed by Creditor Lone Star
State Bank of West Texas (#204) - *Continued to 02/26/2019*

END OF PROCEEDINGS                                        232

INDEX                                                233-234