RINEY & MAYFIELD
Thomas C. Riney, SBN: 16935100
W. Heath Henricks, SBN: 240556451
320 South Polk Street, Suite 600
Amarillo, Texas 79101
Telephone: (806) 468-3200
Facsimile: (806) 376-4509
Email: triney@rineymayfield.com
Email: hhendricks@rineymayfield.com

        -and-

Michael R. Johnson (*Pro Hac Vice*)
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: mjohnson@rqn.com

*Attorneys for Creditor Rabo AgriFinance LLC*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| IN RE:<br><br>WAGGONER CATTLE, LLC, ET AL<br><br>    Debtors. | **Chapter 11**<br><br>**CASE NO. 18-20126-11-rlj**<br>**Jointly Administered** |
| IN RE:<br><br>MICHAEL QUINT WAGGONER<br><br>    *Debtor.* | **Chapter 11**<br><br>**CASE NO. 18-20125-11-rlj** |

## OBJECTION OF RABO AGRIFINANCE LLC TO CONFIRMATION OF THE DEBTORS' JOINT REVISED FIRST AMENDED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION

TO THE HONORABLE UNITED STATES BANKRUPTCY COURT:

Rabo AgriFinance LLC, f/k/a Rabo Agrifinance, Inc. ("**Rabo**")[1], through counsel,

respectfully submits this *Objection of Rabo AgriFinance LLC to Confirmation of the Debtors'*

*Joint Revised First Amended Combined Disclosure Statement and Plan of Reorganization* (the

"**Objection**").  By this Objection, Rabo objects to the *Debtors' Revised First Amended*

*Combined Disclosure Statement and Plan of Reorganization* (the "**Plan**") that was filed on April

23, 2019, in both the individual Chapter 11 case filed by Michael Quint Waggoner ("**Quint**

**Waggoner**"), In re Michael Quint Waggoner, Case No. 18-20125-11-rlj) [Dkt. 95][2], and also in

the jointly administered Chapter 11 cases of Quint Waggoner's business entities, under the lead

case of In re Waggoner Cattle, LLC,[3] (jointly administered under Case No. 18-20126-11-rlj)

[Dkt. 266][4].

---

[1] On Page 8 of the Plan, the Debtors correctly identify the Rabo creditor entity as "Rabo
AgriFinance LLC, f/k/a Rabo Agrifinance, Inc.," but the Debtors afterwards use the defined term
"Rabo Bank" to refer to Rabo.  The defined term "Rabo Bank" could cause some confusion
among other parties in interest because there is a separate entity, Rabo Bank, N.A., which is an
affiliate of Rabo.  Rabo hereby clarifies that Rabo Bank, N.A. is not a party to or otherwise
involved in Rabo's loans to the Debtors.

[2] Dkt. 94, which appears to be identical to Dkt. 95, is designated on the docket sheet for Case No.
18-20125 as the Debtor's Amended Disclosure Statement.

[3] As indicated in footnote 1 of Dkt. 266, the Debtors in the jointly administered Chapter 11 cases
are Waggoner Cattle, LLC (Case No. 18-20126) ("**Waggoner Cattle**"), Circle W of Dimmitt,

A.    **INTRODUCTION AND BACKGROUND FOR RABO'S CLAIMS**

1.    Rabo filed the following Proofs of Claim (the "**Rabo Proofs of Claim**") in the

Chapter 11 cases of Michael Quint Waggoner, Waggoner Cattle, LLC, Circle W of Dimmitt,

Inc., Bugtussle Cattle, LLC, and Cliff Hanger Cattle, LLC (collectively the "**Debtors**"):  (a)

Claim No. 5 filed on August 28, 2018 in In re Michael Quint Waggoner (Case No. 18-20125-11-

rlj) in the amount of $13,104,815.50; (b) Claim No. 10 filed on August 28, 2018 in In re Circle

W of Dimmitt, Inc. (Case No. 18-20127-11-rlj) in the amount of $13,104,815.50; (c) Claim No.

5 filed on August 28, 2018 in In re Bugtussle Cattle, LLC (Case No. 18-20128-11-rlj) in the

amount of $13,104,815.50; and (d) Claim No. 2 filed on August 28, 2018 in In re Cliff Hanger

Cattle, LLC (Case No. 18-20129-11-rlj) in the amount of $13,104,815.50.  Each of the Rabo

Proofs of Claim asserts a secured claim of $970,182.23, based upon the value of all of Rabo's

collateral, including non-debtor collateral, and an unsecured claim of $12,134,633.27 after the

deduction of the value of Rabo's collateral.

2.    As outlined in the Rabo Proofs of Claim, Rabo's collateral and the values asserted

by Rabo for such items of collateral are as follows:

---

Inc. (Case No. 18-20127) ("**Circle W**"), Bugtussle Cattle, LLC (Case No. 18-20128)
("**Bugtussle**"), and Cliff Hanger Cattle, LLC (Case No. 18-20129) ("**Cliff Hanger**").

[4] Dkt. 265, which appears to be identical to Dkt. 266, is designated on the docket sheet for the
jointly administered Case No. 18-20126 as the Debtors' Amended Disclosure Statement.

| Name of Debtor | General Collateral Description | Value |
|---|---|---|
| Cliff Hanger | None (no property listed by Debtor) | $0.00[5] |
| Circle W | Inventory and A/R | $0.00[6] |
| Quint Waggoner | Equipment, Cash Surrender Value of Insurance Policies and Eight Bison[7] | $79,452.23 |
| Waggoner Cattle | 8465 head of cattle | $0.00[8] |
| Bug Tussle | Real estate, farm machinery, vehicles and equipment, and medicine/hay/straw | $890,730.00[9] |
| **TOTAL COLLATERAL VALUE:** | | **$970,182.23**[10] |

3. The Plan lists certain real property (the "**Bugtussle Real Property**") owned by

Debtor Bugtussle, which Debtor Bugtussle values at $405,000.00 in connection with the

classification of Rabo's secured claim against Bugtussle as Class 4-A (see Plan at p. 31).  The

Plan also lists certain equipment (the "**Bugtussle Equipment**") owned by Debtor Bugtussle,

which Debtor Bugtussle values at $350,000.00 in connection with the classification of Rabo's

additional secured claim against Bugtussle as Class 3-B (see Plan at p. 31).  Rabo assumes that

---

[5] See Dkt. 23, Case No. 18-20129.
[6] See Dkt. 48, Case No. 18-20127.  Rabo has a second position lien behind Lone Star State Bank of West Texas ("**Lone Star Bank**"), and there likely is no remaining equity.
[7] See Dkt. 23, Case No. 18-20125.  The Plan states that Quint Waggoner will surrender the 8 bison and the cash value of the insurance policies to Rabo "upon the effective date of the Plan." See, Plan at p. 23 (treatment of Rabo's Class 5 claim).
[8] See Dkt. 64, Case No. 18-20126.  Rabo has a second position lien on the cattle behind Lone Star Bank, and there likely is no remaining equity.
[9] See Dkt. 24, Case No. 18-20128.
[10] The collateral values are based upon the Debtors' Chapter 11 Bankruptcy Schedules.

the Bugtussle Equipment includes the farm equipment, vehicles and equipment, and

medicine/hay/straw owned by Bugtussle that are described in the Rabo Proofs of Claim.  The

combined value ($755,000.00) of the Bugtussle collateral listed in the Plan is $135,730 less than

the $890,730.00 value of the Bugtussle collateral listed in the Rabo Proofs of Claim.

4.    The Plan states that Rabo's total claim against the Debtors is $13,104,815.50 for

four of the Debtors (see, Plan at p. 22 [Rabo's Class 5 claim for $13,104,815.50 in the Quint

Waggoner case], Plan at p. 25 [Rabo's Class 3 claim for $13,104,815.50 in the Waggoner Cattle,

LLC case], Plan at p. 27 [Rabo's Class 3 claim for $13,104,815.50 in the Circle W of Dimmitt,

Inc. case], and Plan at p. 30 [Rabo's Class 4 claim for $13,104,815.50 in the Bugtussle case].

However, the Plan (see Plan at p. 32) erroneously states that Rabo's Class 2 claim in the Cliff

Hanger Cattle, LLC case is only $12,784,815.50, even though Cliff Hanger Cattle, LLC is a co-

obligor on the Rabo loans along with all of the other Debtors.

5.    Exhibit "A" to the Plan lists Rabo's unsecured claim in all five Chapter 11 cases

as the amount of $12,349,815.50, which is 55.13% of the total Unsecured Claims in all five

cases.  Rabo votes its Secured and Unsecured Claims against confirmation of the Plan.

Accordingly, the majority in dollar amounts of the claims of the Unsecured Creditors in all five

Chapter 11 cases (Class 6 in the Quint Waggoner case, Class 4 in the Waggoner Cattle, LLC

case, Class 4 in the Circle W of Dimmitt, Inc. case, Class 5 in the Bugtussle case, and Class 3 in

the Cliff Hanger Cattle, LLC case) has voted to reject the Plan.

### B.    CONFIRMATION STANDARDS

Rabo objects to the Plan, and votes all of its Secured Claims and Unsecured Claims

against the Plan. Rabo objects to the Plan because, as shown below, the Plan does not comply

with a number of Section 1129's confirmation requirements, and the Plan violates other

provisions of the Bankruptcy Code. The Plan also is not feasible, and is doomed to failure. As a

result, the Plan cannot be confirmed as drafted, and confirmation of the Plan should therefore be

denied.

Section 1129 of Title 11 of the United States Code (the "**Bankruptcy Code**") generally

sets forth the required elements for plan confirmation. The Debtors, as the proponents of the

Plan, bear the burden of proving that the Plan satisfies each of the elements listed in Section

1129 by a preponderance of the evidence. *See, e.g., Acequia, Inc. v. Clinton (In re Acequia,

Inc.)*, 787 F.2d 1352, 1358 (9th Cir. 1986); *Bishara v. Gulfstar Indus., Inc. (In re Gulfstar Indus.,

Inc.)*, 236 B.R. 75, 77 (M.D. Fla. 1999); *In re Future Energy Corp.*, 83 B.R. 470, 481 (Bankr.

S.D. Ohio 1988); *In re Trail's End Lodge, Inc.*, 54 B.R. 898, 903 (Bankr. D. Vt. 1985); *In re

Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986); *In re Hoosier Hi-Reach, Inc.*,

64 B.R. 34, 37 (Bankr. S.D. Ind. 1986).

Moreover, regardless of the evidence presented at the confirmation hearing, the Court has

an independent duty to determine that the Plan satisfies Section 1129's requirements as a

condition to confirmation. *In re MJ Metal Prods., Inc.*, 292 B.R. 702, 704 (Bankr. D. Wyo.

2003) ("The [bankruptcy] court has an independent duty to determine whether a plan complies

with § 1129."); *In re Digital Impact, Inc.*, 223 B.R. 1, 6 (Bankr. D. Okla. 1998); *In re New

6

*Midland Plaza Assocs.*, 247 B.R. 877, 895 (Bankr. S.D. Fla. 2000); *In re Bolton*, 188 B.R. 913,

915 (Bankr. D. Vt. 1995); *In re Shadow Bay Apartments, Ltd.*, 157 B.R. 363, 365 (Bankr. S.D.

Ohio 1993).

### C.      RABO'S VOTE ON THE PLAN

With respect to both its Secured Claims and its Unsecured Claims against all Debtors and

their respective estates, Rabo votes no on the Debtors' Plan.

### D.      RABO'S SPECIFIC PLAN OBJECTIONS

I.      The Plan Expressly Admits that the Debtors Have Not Complied with the
"Absolute Priority Rule.  As a Result, the Plan Cannot be Confirmed."

Section 1129(a)(1) of the Bankruptcy Code requires, as a condition to confirmation, the

Court to find that the Plan "complies with the applicable provisions of this title."  11 U.S.C. §

1129(a)(1).  The Plan fails to meet this requirement in several ways.

11 U.S.C. § 1129(a)(10) requires that at least one impaired class has accepted the

proposed plan.  The deadline for voting on the Plan does not expire until the same time as

objections to the Plan, so it is unknown at the time that this Objection is filed if the Plan satisfies

Section 1129(a)(10).  However, the Plan clearly does not comply with 11 U.S.C. § 1129(a)(8),

which requires that each class under the Plan must accept the Plan or such class must be

unimpaired.

The Plan acknowledges that the classes of Unsecured Creditors in four of the five cases

"are impaired by virtue of 11 U.S.C. § 1124(1) and are entitled to vote."  See, Plan at pp. 18-

20.[11]  As acknowledged in Section 18.2 of the Plan, "[f]or there to be an acceptance of the Plan

by a Class of Claimants, Claimants who hold at least two-thirds in dollar amount of the Claims

voted and constitute more than one-half in the number of holders of such Claims voting must

vote to accept the Plan." See, Plan at p. 40.  Because Rabo has voted its 55.13% of the

Unsecured Claims in each of the five classes of Unsecured Creditors against confirmation of the

Plan, there is no mathematical way for the Debtors to obtain "at least 2/3 of the total amount of

[Unsecured Claims] debt that is voted."

11 U.S.C. § 1129(b)(1) states that if all of the requirements of Section 1129(a) are

satisfied (which Rabo disputes, as discussed below) other than Subsection 1129(a)(8), "the court,

on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements

of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with

respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

The "fair and equitable" condition to confirmation of the Plan under a "cram down" scenario

includes the codified "absolute priority rule" in Subsection 1129(b)(2)(B)(ii), as follows:

> [T]he condition that a plan be fair and equitable with respect to a class
> includes the following requirements:
>
>     . . .

---

[11] The Plan does not acknowledge that the class of Unsecured Creditors in the Quint Waggoner case, Class 6, is impaired. See, Plan at p. 18.  Rabo assumes that this is an unintended error, since the Unsecured Creditors in the Quint Waggoner case are not being paid the full amount of their claims without alteration of their legal rights; rather, the treatment of the Class of Unsecured Creditors in the Quint Waggoner case is the same as the treatment of the impaired Classes of Unsecured Creditors in the other four cases.

(B)  With respect to a class of unsecured claims [such class must be paid in full its allowed amount, or] –

(ii)  the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

The Plan's failure to comply with the "absolute priority rule" is not only the most glaring confirmation obstacle for the Plan, but this failure is already acknowledged by the express language of the Plan, and such failure is therefore admitted by the Debtors.  The Debtors have made the following admissions in connection with the treatment for Class 5 (the "**Equity Owner**") in the Waggoner Cattle, LLC case (see, Plan at p. 25), the treatment for the Equity Owner classified in Class 5 in the Circle W of Dimmitt, Inc. case (see, Plan at p. 28), the treatment for the Equity Owner classified in Class 6 in the Bugtussle case (see, Plan at pp. 31-32), and the treatment for the Equity Owner classified in Class 4 in the Cliff Hanger Cattle, LLC case (see, Plan at pp. 32-33):

The member of this Class shall retain his respective equity or member interests that they owned when the case was filed.[12]  A reorganization plan in which the owner retains an equity interest is contrary to the absolute priority rule.  There is, however, a recognized exception to the absolute priority rule, that being:  the new value exception.  For the equity holders to take advantage of the new value exception, there must be 1) a contribution that is new capital; 2) the contribution must be necessary for a successful reorganization; 3) the contribution must be in money or money's worth; and 4) the contribution must be reasonably equivalent to the value of the property acquired by the equity holders.

---

[12] Section 9.1 of the Plan states:  "The Debtors will remain in possession of their property and will control the operation and disposition thereof unless otherwise provided in this Plan.  The 100% owner of all the Waggoner Cattle Entities is Michael Quint Waggoner."

> Laurens Schilderink, a member of S & R Cattle, LLC, testified before this
> Court on Monday, February 25, 2019, in a hearing on Motion to Lift Stay filed by
> Lone Star Bank of West Texas, that S & R Cattle, LLC was prepared to financially
> contribute to the Waggoner Cattle entities.  Once, and if, the financial offer is
> proposed by S & R Cattle, LLC, the Debtors will supplement its Disclosure
> Statement and Plan to report the proposal.

See, Plan at p. 25, p. 28, pp. 31-32, and pp. 32-33.  See also, Plan treatment for the Quint

Waggoner case, quoting the same language on p. 23 of the Plan.

As of the date of this Objection, neither S & R Cattle, LLC, nor any other person or

entity, has filed anything even remotely suggesting that such entity or individual will be making

any financial contribution to the Debtors.  Moreover, the Debtors have not filed anything to

supplement the Plan (and its Disclosure Statement provisions) to report that any commitment has

been made to make a financial contribution to the Debtors.[13]  Therefore, by its own terms, the

Plan fails to satisfy the "absolute priority rule," and the Debtors have already admitted that such

failure is an absolute bar to confirmation of the Plan so long as the Plan provides for Quint

Waggoner to retain his equity interests in the other Debtors.

The United States Supreme Court affirmed the continued viability of the absolute priority

rule in bankruptcy reorganization cases in *Northwest Bank Worthington v. Ahlers,* 485 U.S. 197,

108 S.Ct. 963, 99 L.Ed.2d 169 (1988), as part of a reorganizing debtor's obligation to

demonstrate that a reorganization plan is "fair and equitable."  In the *Ahlers* case, the debtors

proposed a reorganization plan that allowed them to retain their ownership interest in their family

farm, asserting that their "yearly contributions of labor, experience and expertise" as their

---

[13] If the Debtors attempt to rescue their Plan by proposing the long promised infusion of "new value" in support of confirmation of the Plan after the deadline for filing this Objection, or even at the confirmation hearing, Rabo hereby objects in advance to any such untimely supplementation of the Plan.  It would be manifestly unfair to Rabo and the other creditors for them to be "ambushed" by any late desperate attempt to comply with a confirmation requirement that the Debtors acknowledged applied to them at the time of the filing of the Plan on April 23, 2019.

claimed "money or money's worth" contribution to the reorganization effort was a permissible

exception to the absolute priority, and therefore they were entitled to retain their equity interests,

notwithstanding the objections of the creditors.  The Supreme Court rejected the debtors'

assertion that their proposed reorganization plan did not violate the absolute priority rule.  As

noted by the Supreme Court, the absolute priority rule provides that a dissenting class of

unsecured creditors must be provided for in full before any junior class, such as an equity class,

can retain any property under a reorganization plan.  *Id.,* 108 S.Ct. at 966.  "Under current law,

no Chapter 11 reorganization plan can be confirmed over the creditors' legitimate objections

(absent certain conditions not relevant here) if it fails to comply with the absolute priority rule.

There is little doubt that a reorganization plan in which respondents retain an equity interest in

the farm is contrary to the absolute priority rule."  *Id.*

The Supreme Court ruled that promises of future services were intangible and likely

unenforceable.  "Unlike 'money or money's worth,' a promise of future services cannot be

exchanged in any market for something of value to the creditors *today.*"  *Id.* at 967.[14]  The

Supreme Court also rejected the debtors' argument that the absolute priority rule did not apply

because the farm property to be retained by the debtor had no value to the senior unsecured

creditors.  "Even where debts far exceed the current value of assets, a debtor who retains his

equity interest in the enterprise retains 'property.'  Whether the value is 'present or prospective

for dividends or only for purposes of control' a retain equity interest is a property interest to

'which the creditors 'are' entitled . . . before the stockholders [can] retain it for any purpose

---

[14] Section 9.2 of the Plan provides:  "The Debtors will devote full time and energy to the
successful completion of the Plan."  However, the Debtors have not contended (undoubtedly
because of the *Ahlers* case) that their "full time and energy" constitutes the required "new value"
to comply with the "absolute priority rule."

whatever.'" *Id.* at 969, *quoting Northern Pacific R. Co. v. Boyd,* 228 U.S. 482, 508, 33 S.Ct.

554, 561, 57 L.Ed. 931 (1913).

As noted by the *Ahlers* Court, the "absolute priority rule" was codified in the Bankruptcy

Code under Section 1129(b)(2)(B)(ii). *Id.* at 966. Section 1129(b)(2)(B)(ii) was amended by

BAPCPA in 2005, and (as outlined above) currently provides in relevant part as follows:

> (ii) The holder of any claim or interest that is junior to the claims of such
> class will not receive or retain under the plan on account of such junior claim or
> interest any property, except that in a case in which the debtor is an individual, the
> debtor may retain property included in the estate under section 1115, subject to the
> requirements of subsection (a)(14) of this section.

11 U.S.C. § 1129(b)(2)(B)(ii). As the Supreme Court later explained, the absolute priority rule

operates as follows:

> As to a dissenting class of impaired unsecured creditors, such a plan may be
> found to be "fair and equitable" only if the allowed value of the claim is to be
> paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if "the holder of any claim or
> interest that is junior to the claims of such [impaired unsecured] class will not
> receive or retain under the plan on account of such junior claim or interest any
> property," § 1129(b)(2)(B)(ii). That latter condition is the core of what is known
> as the "absolute priority rule."

*Bank of America National Trust and Sav. Ass'n v. 203 North LaSalle Street P'ship,* 526

U.S. 434, 441-42, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999).

II.   The Plan's Provisions with Respect to Quint Waggoner's Chapter 11 Case Also
      Do Not Comply with the "Absolute Priority Rule" that Governs Individual
      Chapter 11 Cases.

The Fifth Circuit in *In the Matter of Lively,* 717 F.3d 406 (5th Cir. 2013), confirmed that

the "absolute priority rule" is still in effect in the Fifth Circuit in individual debtor Chapter 11

cases, and rejected the argument that the language referring to individual debtor cases that was

added to Section 1129(b)(2)(B)(ii) in 2005 abrogated the absolute priority rule for individual

debtors such as Quint Waggoner.  In the *Lively* case, the proposed reorganization plan would

have allowed the individual Chapter 11 debtor, Philip Lively, to retain all of his property,

including valuable, non-exempt, pre-petition assets such as the net value of a mortgage and net

lease income from nine railroad tank cars, and proposed to pay unsecured creditors only a small

dividend that exceeded the liquidation value of his assets.  *Id.* at 407-08.

The Fifth Circuit noted that the Chapter 11 debtor "does not dispute that his plan fails to

comply with the absolute priority rule, because it allows him to retain the above-listed valuable,

non-exempt, pre-petition assets."  *Id.* at 408.  The Fifth Circuit did not adopt the "broad"

interpretation of the BAPCPA amendment to Section 1129(b)(2)(B)(ii) (i.e., that the reference to

property being added to the individual debtor's estate impliedly exempted individual debtors

from the absolute priority rule).  Instead, the Fifth Circuit followed the "narrow" interpretation

that "the absolute priority rule was amended so that individual debtors could exclude from its

reach only their post-petition earnings and post-petition acquisitions of property, *i.e.,* only

property that was not already included in the Chapter 11 estate by § 541."  *Id.* at 408-09.

*Accord, Dill Oil Co., LLC v. Stephens (In re Stephens),* 704 F.3d 1279, 1285, 1287 (10th Cir.

2013) (rejecting the argument that Congress impliedly intended to repeal the absolute priority

rule, "a pillar of creditor bankruptcy protection", with respect to Chapter 11 individual debtors,

and following the narrow view that the BAPCPA amendment to Section 1129(b)(2)(B)(ii) only

exempted from the absolute priority rule the post-petition earnings and post-petition acquisitions

of property that were added to the property of the estate of an individual Chapter 11 debtor by 11

U.S.C. § 1115).  Because the absolute priority rule still applies to individual Chapter 11 debtors,

Quint Waggoner's retention of his ownership interests in the other Waggoner debtors without

providing any "new value" is a violation of the absolute priority rule, thereby precluding

confirmation of the Plan.

III.   Quint Waggoner's Retention of his Exempt Property under the Plan is Also a
       Violation of the Absolute Priority Rule.

The Plan does not address the disposition of Quint Waggoner's exempt property.  Rabo

assumes that, under the Plan, Quint Waggoner would keep that property.  In any event, Quint

Waggoner certainly is not proposing to distribute any of this exempt property to his creditors.

And the value of Quint Waggoner's exempt property is not insubstantial.  Pages 13 and 14 of the

Plan identify real property valued at $394,990 (and consensual liens of only $80,273.55 against

such property), and those pages also identify personal property worth almost $570,000 (and

claimed exemptions against such property of $41,750.00).

Case law addressing the absolute priority rule as applied to an individual Chapter 11 case

concludes that an individual Chapter 11 debtor is obligated to contribute all of his or her pre-

petition property, including exempt property, if he or she proposes to comply with the absolute

priority rule.  "[W]here a debtor intends to avail itself of the protection available under Chapter

11 and pay less than 100% to unsecured creditors, if an unsecured creditor objects to such

treatment, the debtor will be required to contribute all of his or her property, exempt or

otherwise, to the extent required under § 1129(b)(2)(B)(ii) to obtain plan confirmation." *MJPB,*

*Inc. v. Fross (In re Fross)*, 233 B.R. 176 (table), 1999 WL 26886 *11 (10th Cir. BAP 1999).

Accord, *In re Gosman*, 282 B.R. 45 (Bankr. S.D. Fla. 2002). Because the Plan does not propose

to contribute Quint Waggoner's exempt property, the Plan is not confirmable as to Quint

Waggoner and his individual Chapter 11 case.

IV.   The Plan's Provisions with Respect to Quint Waggoner's Individual Chapter 11
      Case Do Not Comply with the Requirements of Subsection 1129(a)(15).

Quint Waggoner, as a Chapter 11 Debtor, is also subject to the requirements of

Subsection 1129(a)(15), as follows:

(15) In a case in which the debtor is an individual and in which the holder
of an allowed unsecured claim objects to the confirmation of the plan –

(A) the value, as of the effective date of the plan, of the property
to be distributed under the plan on account of such claim is not less than
the amount of such claim; or

(B) the value of the property to be distributed under the plan is not
less than the projected disposable income of the debtor (as defined in
section 1325(b)(2)) to be received during the 5-year period beginning on
the date that the first payment is due under the plan, or during the period
for which the plan provides payments, whichever is longer.

11 U.S.C. § 1129(a)(15).[15] It is clear that Subsection 1129(a)(15) applies in the Quint Waggoner

case, and yet the Plan does not even refer to Subsection 1129(a)(15)'s requirements with respect

---

[15] 11 U.S.C. § 1325(b)(2) provides: "For purposes of this subsection, the term 'disposable income' means current monthly income received by the debtor . . . less amounts reasonably necessary to be expended – (A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and (ii) for charitable contributions . . . in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business."

to Quint Waggoner's projected disposable income for five years, let alone purport to comply with the requirements of Subsection 1129(a)(15) by dedicating that projected disposable income to Plan payments.  Rabo is the holder of an allowed unsecured claim, and Rabo hereby objects to the confirmation of the Plan as the Chapter 11 reorganization for the bankruptcy estate of Quint Waggoner as an individual.  The secured portion of Rabo's claim in the Quint Waggoner case is classified as Class 5, and the unsecured portion of Rabo's claim against Quint Waggoner is classified as part of Class 6.  See, Plan at p. 23, Case No. 18-20125-11-rlj, Dkt. 95.  The Plan provides that the unsecured creditors "will receive five percent (5.0%) of their respective claims over a 10 year term (accruing interest from the petition date), to be paid on a monthly basis, beginning June 15, 2019 at 3.0% interest. . . .  Claimants will receive their pro-rata share of each payment, based upon the percentages set forth in Exhibit '**A**.'  The Plan calls for 120 monthly payments to all [unsecured creditors] totaling $10,815.77 per month."[16]

Rabo's Unsecured Claim clearly is not being paid in full under the Plan, so the provisions of Subsection 1129(a)(15) clearly apply to the Plan to the extent that the Plan proposes to reorganize the business affairs of Quint Waggoner as an individual Chapter 11 debtor.  "[I]n an individual chapter 11 case, if the debtor's proposed plan does not provide for payment in full of an allowed unsecured claim then, upon the objection of that creditor to confirmation, the debtor's plan must provide for his or her projected disposable income to be a component of plan funding

---

[16] As previously outlined, Exhibit "A" to the Plan lists Rabo's Unsecured Claim as the amount of $12,349,815.50, which is 55.13% of the total unsecured claims, and the Plan's 5% dividend payment on Rabo's Unsecured Claim will result in a $5,962.54 monthly Plan payment to Rabo. See, Exhibit "A" to the Plan, Case No. 18-20125-11-rlj, Dkt. 95-1.

for at least five years." *In re Brown,* 498 B.R. 486, 501-02 (Bankr. E.D. Pa. 2013).  Because the

Plan does not provide for Quint Waggoner's projected disposable income to be devoted to Plan

payments for at least five years, the Plan does not comply with Subsection 1129(a)(15) and

cannot be confirmed.

> V.     The Plan Does Not Comply with the Disclosure Requirements of Subsection
> 1129(a)(5), Which Precludes Confirmation of the Plan.

Under Section 16.1 of the Plan, the Debtors reserve the right to prosecute three

specifically referenced claims, including "[c]laims against Rabo Agrifinance, LLC due to

fraudulent transfers.  Whether or not any valid claims exist and the amount of those claims are

yet to be determined."  Section 16.1 of the Plan then states that "[i]t is the intention of the

Debtors to set up a litigation trust ('Litigation Trust') and to obtain authority from the Court to

appoint special counsel whose job would be to consider and possibly prosecute the above-stated

claims (as well as any Estate avoidance actions . . . .).  Section 16.1 describes the terms of the

Litigation Trust as follows:

> The Litigation Trust would establish a litigation trust agreement (the
> "Litigation Trust Agreement") entered into by and among the Debtors and an
> appointed attorney or law firm, not individually but solely in its representative
> capacity as trustee of the Debtor's Litigation Trust, and **certain individuals who**
> **would serve as members of the Trust Advisory Board (the "Trust Advisory**
> **Board"), approved by the United States Bankruptcy Court** . . . pursuant to the
> First Amended Chapter 11 Plan of Reorganization . . . , if confirmed by the
> Bankruptcy Court, which herein provides for the establishment of the Litigation
> Trust, and entry into a Litigation Trust Agreement.

Case No. 18-20125-11-rlj, Dkt. 95, pp. 38-39; Case No. 18-20126-11-rlj, Dkt. 95, pp. 38-

39 (emphasis added).

On May 23, 2019, in order to comply with Section 16.1 of the Plan, the Debtors filed their *Motion to Approve Litigation Trust Agreement* (the "**Litigation Trust Motion**") (Case No. 18-20126-11-rlj, Dkt. 286).  Exhibit A to the Litigation Trust Motion is the Debtors' Trust Agreement (the "**Litigation Trust Agreement**") (Case No. 18-20126-11-rlj, Dkt. 286-1).  This Court entered its *Order Granting Motion to Approve Litigation Trust Agreement* on May 28, 2019 (Case No. 18-20126-11-rlj, Dkt. 287), prior to receiving any input from Rabo or other creditors.

Notwithstanding this Court's entry of its *Order Granting Motion to Approve Litigation Trust Agreement* (Rabo assumes that the Court merely intended to acknowledge that the Debtors had filed the proposed Litigation Trust Agreement in support of the Plan), Rabo contends that the Litigation Trust Agreement is defective, and is inconsistent with the terms of the Plan, for the following reasons:  (1) The Litigation Trust Agreement does not identify the individuals who would serve as members of the Trust Advisory Board for Court approval.  In fact, the Litigation Trust Agreement does not say anything about the creation of the Trust Advisory Board.  (2) The Trustee for the Litigation Trust is not named.  Instead, the Litigation Trust Agreement states that "[t]he Litigation Trustee shall be designated by the Bankruptcy Court."  (Case No. 18-20126-11-rlj, Dkt. 286, p. 4).  The Court is not in the business of identifying, interviewing, negotiating with, and selecting a Litigation Trustee.

11 U.S.C. § 1129(a)(5), which is one of the mandatory requirements for confirmation of a proposed plan of reorganization, requires the following:

(A)   (i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor . . . or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B)   the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

The Plan and the Litigation Trust Agreement do not comply with the requirements of 11 U.S.C. § 1129(a)(5). The Plan does not disclose the identity or affiliations of the Litigation Trustee or the members of the Trust Advisory Board. It is not clear if the Litigation Trustee or the members of the Trust Advisory Board could be insiders (or Quint Waggoner himself) or any of the attorneys who have represented any of the Debtors, either in bankruptcy or pre-petition. The proposed compensation of the Litigation Trustee and the possible compensation (if any) of the members of the Trust Advisory Board are unclear and ambiguous. These deficiencies in the Plan and the Litigation Trust Agreement preclude confirmation of the Plan.

VI.   <u>The Plan is Not Otherwise "Fair and Equitable" to the Classes of Unsecured Claims in Which Rabo Will be Participating, and is Otherwise Fatally Flawed.</u>

a.   *There is No Fixed Deadline for Objections to Unsecured Claims.*

The Plan repeatedly states in connection with the treatment of the claims of all Unsecured Creditors that "Debtors also reserve the right to object to any claim." <u>See,</u> Plan at pp. 23, 25, 28, 31, 32, Case No. 18-20125-11-rlj, Dkt. 95; Plan at pp. 23, 25, 28, 31, 32, Case No. 18-20126-11-rlj, Dkt. 266. The Debtors propose to transfer these reserved rights to object to any Unsecured

Claim to the Litigation Trustee.  Section 1.16 of the Litigation Trust Agreement states:  "After

the Effective Date, the Litigation Trustee shall have the authority to file objections to General

Unsecured Claims and to settle, compromise, withdraw, or litigate to judgment objections to

General Unsecured Claims."  (Case No. 18-20126-11-rlj, Dkt. 286, p. 9).

There are no deadlines stated in the Plan or the Litigation Trust Agreement for the

Litigation Trustee to object to General Unsecured Claims.  Presumably, the only time limitation

would be the deadline for dissolution of the Litigation Trust.  Section 1.14 of the Litigation Trust

Motion states that the Litigation Trust shall not be dissolved any later than three years after the

creation of the Litigation Trust; provided, that there could be one fixed period extension, not to

exceed three additional years, or in other words, a potential six years for the duration of the

Litigation Trust.  It is not "fair and equitable" for the creditors holding Unsecured Claims, in

particular Rabo, which holds 55.13% of the Unsecured Claims, to be at constant risk of having

their Unsecured Claims challenged by the Litigation Trustee, with no deadline for certainty and

finality as to the allowance of their Unsecured Claims.

These provisions of the Plan and the Litigation Trust Agreement violate Section 502(a) of

the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3007.  Section 502(a)

unambiguously states that claims are "deemed allowed" unless a party in interest objects.

Further, Bankruptcy Rule 3007 requires a written objection with at least 30 days advance notice

of any hearing.  For these reasons, it "ordinarily is procedural error to resolve objections to

claims in plan confirmation proceedings." *Garvida v. Litton Loan Servicing, L.P. (In re*

*Garvida)*, 347 B.R. 697, 703 (9th Cir. BAP 2006).  Moreover, in limited circumstances, a party

may use the plan process to object to a claim, but creditors are still entitled to appropriate

procedural protections. *Id.* at 704 ("Considerations of due process mandate caution when ersatz

procedure is used and require that the creditor receive specific notice and be afforded the same

opportunity to litigate one-on-one, as would occur in a straightforward claim objection under

Rule 3007."); *Universal Am. Mortgage Co. v. Bateman (In re Bateman)*, 331 F.3d 821, 828 (11th

Cir. 2003) (holding that a plan provision did not constitute a "constructive objection" to a proof

of claim).

If it would be unreasonable for the Debtors to delay and not assert their objections to any

Unsecured Claims until the confirmation hearing, it is even more unreasonable for the Debtors to

hold their right to object to Unsecured Claims over the heads of the Unsecured Creditors for up

to six additional years beyond the confirmation of the Plan.  Because the Plan seeks to hold in

abeyance and suspend for up to six years the final resolution and allowance of the claims of the

Unsecured Creditors (of which Rabo holds a majority 55.13% interest), the Plan does not comply

with the provisions of the Bankruptcy Code, the Plan is not "fair and equitable" to the holders of

Unsecured Claims, such as Rabo, and the Plan cannot be confirmed.

      b.    *The Plan Effectively Consolidates All of the Debtors and Eliminates All*
                *Intercompany Debts Without Any Discussion or Justification.*

Although the Plan does not expressly request that the Court substantively consolidate all

of the Chapter 11 cases for the Debtors, the Plan effectively treats all of the Debtors as if they

operate as a single entity (i.e., as the alter ego of Quint Waggoner).  The Plan does not even

address the intercompany debts between the Debtors; instead, the intercompany debts are treated

in the Plan as if they do not exist. Likewise, the Plan treats the Rabo claim as a single claim against all of the Debtors, notwithstanding the fact that Rabo has a separate legal claim against each of the Debtors and separate collateral against some, but not all, of the Debtors.

Because the Plan will effectively substantively consolidate all of the Debtors, the Debtors should be required to provide justification for that. For example, is the consolidation that is apparently going to happen under the Plan simply a judicial recognition of how the Debtors were always operated? Did Quint Waggoner always treat the Corporate Debtors as a consolidated enterprise? If so, then Debtors should affirmatively acknowledge and concede that the Debtors functioned prepetition as a single business enterprise and as alter egos of Quint Waggoner and of each other, which presumably would justify the bankruptcy treatment of the Debtors post-petition as a single consolidated enterprise under the continued ownership and direction of Quint Waggoner. In any event, if the Debtors are all going to be effectively consolidated under the Plan the Plan should actually say so and that, going forward, the Debtors will be considered a single consolidated enterprise.

     *c.*     *The Language of the Plan is Fatally Flawed, and Must Be Corrected.*

The Plan also has an obvious error that must be corrected irrespective of the Court's decisions on the other issues raised herein. The Plan's provisions for the treatment of unsecured creditors repeatedly state that "[t]he Plan calls for 120 monthly payments to **all Debtors** totaling $10,815.77 per month" (emphasis added), when the Plan should state that the payments are to be made to "all **Unsecured Creditors**." See, Plan at pp. 23, 25, 27, 31, 32, Case No. 18-20125-11-rlj, Dkt. 95; Plan at pp. 23, 25, 27, 31, 32, Case No. 18-20126-11-rlj, Dkt. 266.

VII.    <u>The Plan is Not Feasible and Should Not Be Confirmed.</u>

A bankruptcy plan may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." *See* 11 U.S.C. § 1129(a)(11).  This is known as the "feasibility" requirement.  "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.),* 761 F.2d 1374, (9th Cir. 1985) (quotation marks omitted).

For this reason, "[e]very debtor is required to present 'ample evidence to demonstrate that the Plan has a reasonable probability of success.'" *In re Seasons Partners, LLC,* 439 B.R. 505, (Bankr. D. Az. 2010) (quoting *In re Acequia, Inc.*, 787 F.2d 1352, 1364 9th Cir. 1986)).  And a debtor does this by showing to the Court "'concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan.'" *Id.* (quoting 7 Collier on Bankruptcy ¶ 1129.02[11], at 1129-53 (16th ed. 2010)).

For many of the reasons already highlighted to the Court by both Rabo and Lone Star State Bank of West Texas (*see, e.g.,* Case No. 18-20126, Dkts. 258 and 259), Rabo contends that the Debtors will not be able to meet this evidentiary standard at the confirmation hearing. Because the Plan is not feasible, this provides another reason for the Court to deny confirmation of the Plan.

## D.  <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny confirmation of the Plan.  Among the

many confirmation issues associated with the Plan, the Plan violates the absolute priority rule in

several ways, and for that reason alone is patently unconfirmable because the Debtors do not

have the support of the Unsecured Class, and therefore the Plan cannot be crammed-down.

Further, because the Debtors have not proposed a plan that has a reasonable possibility of

being confirmed within a reasonable period of time, and because the Debtors likely cannot

confirm a plan in these cases without the consent of both Rabo and Lone Star State Bank, this

Court should simply dismiss these Cases instead of giving the Debtors another bite at the

confirmation apple.   As the Court is aware and as the Debtors' Plan confirms through a brief

review of Exhibit "A" to the Plan, these Cases are really just a three party dispute involving the

Debtors, Rabo and Lone Star State Bank.

Indeed, Exhibit "A" to the Plan shows that, between them, Rabo and Lone Star State

Bank hold *94.7%* of the allowed Unsecured Claims against the Debtors.  As such, the Court

should dismiss these Chapter 11 Cases for cause under 11 U.S.C. § 1112(b).  *See, e.g., Muskogee

Environmental Conservation Company,* 236 B.R. at 66–67;*City of Sioux City, Iowa v. Midland

Marina, Inc. (In re Midland Marina, Inc.),* 259 B.R. 683, 686 (8th Cir. BAP), *aff'd* 22 Fed.Appx.

680 (8th Cir. 2001) (dismissal of chapter 11 to allow marina owner to prosecute claims against

city, which litigation was its primary asset; chapter 11 case was largely a two-

party dispute between debtor and city); *In re 266 Washington Associates,* 141 B.R. 275, 288

(Bankr. E.D.N.Y. 1992) (single asset real estate chapter 11 case dismissed when stay modified

and debtor could propose no confirmable plan that could be crammed down on secured creditor's

deficiency claim; other creditors were minor creditors caught up on the petition date).

DATED this 7th day of June, 2019.

> RINEY & MAYFIELD
> Thomas C. Riney, SBN: 16935100
> W. Heath Henricks, SBN: 240556451
> 320 South Polk Street, Suite 600
> Amarillo, Texas 79101
> Telephone:  (806) 468-3200
> Facsimile:  (806) 376-4509
> Email: triney@rineymayfield.com
> Email: hhendricks@rineymayfield.com
>
> --and--
>
> RAY QUINNEY & NEBEKER P.C.
> Michael R. Johnson *(Pro Hac Vice)*
> 36 South State, Suite 1400
> Salt Lake City, UT 84111
> Telephone:  (801) 532-1500
> Facsimile:  (801) 532-7543
> Email:  mjohnson@rqn.com
>
>
> */s/ Michael R. Johnson*
> Michael R. Johnson
> *Attorneys for Rabo AgriFinance LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2019, the foregoing document was filed with the Clerk of

the Court using the CM/ECF system, which sent notice of electronic filing to the following

electronic filing users in this case:

- **Jeff W. Actkinson**    jeffactkinson@amaonline.com, aaarlaw@amaonline.com; cherylecsakan@amaonline.com
- **Christopher V. Arisco**    carisco@livepad.com
- **R. Byrn Bass**    bbass@bbasslaw.com
- **Daniel P. Callahan**    dpc@kesslercollins.com, gld@kesslercollins.com
- **Roger S. Cox**    roger.cox@uwlaw.com, carolyn.corbet@uwlaw.com
- **Tyler Scott Hamm**    thamm@cthglawfirm.com; shawnaq@cthglawfirm.com
- **William Heath Hendricks**    hhendricks@rineymayfield.com
- **Steven Lee Hoard**    shoard@mhba.com, lingram@mhba.com;acordova@mhba.com
- **Jody Dewayne Jenkins**    jjenkins@jwylaw.com, mmccarty@jwylaw.com;
  emartinez@jwylaw.com;bboyd@jwylaw.com
- **Michael R. Johnson**    mjohnson@rqn.com, dburton@rqn.com;docket@rqn.com
- **Joe L. Lovell**    joe@lovell-law.net, melissa@lovell-law.net;tracy@lovell-law.net;Barbara@lovell-law.net
- **John H. Lovell**    john@lovell-law.net, paula@lovell-law.net;melissa@lovell-law.net;kaye@lovell-
  law.net;candice@lovell-law.net;barbara@lovell-law.net;sabrina@lovell-law.net
- **John F. Massouh**    bankruptcy.docs3@sprouselaw.com, sherida.stone@sprouselaw.com
- **Matthew S. Merriott**    matthew@lovell-law.net; Melissa@lovell-law.net
- **Laura Jane Monroe**    lmbkr@pbfcm.com, krobertson@ecf.inforuptcy.com
- **Alison H. Moore**    amoore@thompsoncoe.com, smyers@thompsoncoe.com
- **Cody Joseph Moorse**    cmoorse@thompsoncoe.com, jpesek-bohren@thompsoncoe.com
- **Brad W. Odell**    bodell@mhba.com, memert@mhba.com;mreynolds@mhba.com
- **Deborah D. Reeves**    deborah@lovell-law.net, john@lovell-law.net; joe@lovell-law.net; paula@lovell-law.net
- **Thomas C. Riney**    triney@rineymayfield.com; rduke@rineymayfield.com; jschulte@rineymayfield.com;
  colguin@rineymayfield.com; jcherne@rineymayfield.com
- **Galen Jobe Rodgers**    JRodgers@castrotitle.com
- **Howard Carl Rubin**    hrubin@kesslercollins.com, sruvalcaba@kesslercollins.com
- **John Simpson**    attorney@ssplubbocklaw.com
- **Don Dwight Sunderland**    krobertson@mhba.com,
  dsunderl@mhba.com;jhinders@mhba.com;lingram@mhba.com
- **Max Ralph Tarbox**    jessica@tarboxlaw.com, tami@tarboxlaw.com;
  bkecf_tarbox@bkexpress.info;rmr76455@notify.bestcase.com
- **Marc W. Taubenfeld**    mtaubenfeld@mcslaw.com
- **United States Trustee**    ustpregion06.da.ecf@usdoj.gov
- **Robert B. Wagstaff**    rwagstaff@mcmahonlawtx.com; wwatson@mcmahonlaw.com; lvann@mcmahonlawtx.com;
  alivezey@mcmahonlawtx.com
- **Donna K. Webb**    donna.webb@usdoj.gov, brian.stoltz@usdoj.gov; CaseView.ECF@usdoj.gov;
  brooke.lewis@usdoj.gov

I further certify that on June 7, 2019, the foregoing document was served by first class mail, postage prepaid, on the following parties:

**Barbara Bauernfeind**
Lovell, Lovell, Isern & Farabough, LLP
112 SW 8th Ave
Suite 1000
Amarillo, TX 79101

Gary D. Phillips
2210 Topeka Ave
Lubbock TX 79401

Tarbox Law, P.C.
2301 Broadway
Lubbock TX 79401

Julian R. Berry
Hallman & Berry
2310 Line Ave
Amarillo TX 79106

/s/ Michael R. Johnson
Michael R. Johnson